C. Lawrence LEGGETT, Superintendent of the Division of Insurance in the Department of Business and Administration of the State of Missouri, Respondent,

v.

MISSOURI STATE LIFE INSURANCE COMPANY, a corporation (now dissolved), Defendant, General American Life Insurance Company, a corporation, Respondent, Joseph F. McAlister et al., on their own behalf and on behalf of all other stockholders of Missouri State Life Insurance Company (now dissolved) similarly situated, Intervenors-Appellants, James F. Ladd and Samuel E. Mitchell, Intervenors-Appellants, Matthew F. Morse et al., Intervenors-Respondents.

Nos. 46686, 47156A, 47157B.

Supreme Court of Missouri, En Banc.

Nov. 14, 1960.

Motions for Rehearing Denied and Opinion Modified on Court's Own Motion

Feb. 13, 1961.

---

Jacob M. Lashly, St. Louis, Special counsel for C. Lawrence Leggett, Superintendent of Div. of Ins. in Dept. of Business and Administration. Lashly, Lashly & Miller, Paul R. Moody, St. Louis, of counsel.

Robert J. Keefe, Kenneth Teasdale, Paul G. Ochterbeck, Robert F. Schlafly, St. Louis, for respondent General American Life Ins. Co., Frank P. Aschemeyer, St. Louis, of counsel.

James C. Jones, Jr., Lon Hocker, Jr., Frank Y. Gladney, Joseph H. Grand, George Roudebush, Orville Richardson, St. Louis, for intervening Stockholders McAlister and others. Hullverson, Richardson & Hullverson, St. Louis, of counsel.

Charles E. Gray, St. Louis, Bradley & Noble, Kennett, for intervening policyholders James F. Ladd and others.

STOCKARD and HOUSER, Commissioners.

These are three appeals from six orders and judgments of the Circuit Court of the City of St. Louis. After separate argument of the three appeals in this Court they have been consolidated for the purpose of the preparation of one opinion.

The consolidated appeal relates to the following six orders and judgments:

(1) The judgment, order and decree dated August 19, 1957 (a) overruling certain exceptions to the Final Accounting of General American Life Insurance Company (hereafter referred to as "General American" or "New Company") of its administration of the business and assets of the now dissolved Missouri State Life Insurance Company (hereafter referred to as "Missouri State Life" or "Old Company"), which exceptions were filed by intervenors, the former Stockholders of Missouri State Life, and (b) sustaining certain Set-Offs claimed by General American in the Final Accounting.[1]

(2) The order and judgment dated August 13, 1958 allowing $110,000 for services rendered by the attorneys for intervenors, the former Stockholders of Missouri State Life.

(3) The order and judgment dated June 24, 1958 allowing the attorney for the Superintendent of Insurance of the State of Missouri (hereafter referred to as "the Superintendent") $175,000 in attorneys' fees and $909.87 as expenses, for services rendered and expenses incurred in this proceeding from February 10, 1948 to April 26, 1957.

(4) The order and judgment dated June 24, 1958 allowing $70,000 in appraisers' fees and $2,169.58 as expenses, for services rendered and expenses incurred in this proceeding.

(5) The order and judgment dated August 13, 1958 allowing the special actuary employed by the Superintendent $32,000 in actuarial fees and $3,574.58 in expenses, for services rendered and expenses incurred in this proceeding.

(6) The order and judgment dated August 13, 1958 allowing General American $161,908.19 for certain expenditures made by General American in the course of proceedings relating to the closing of the business and disposition of the assets of Missouri State Life.

### General Factual Background

An examination of the liabilities and assets of Missouri State Life revealed a

---

1. This is the main case. The other five orders and judgments relate to post-trial proceedings.

substantial impairment, and the Superintendent, on August 26, 1933, filed a petition against Missouri State Life in the Circuit Court of the City of St. Louis under §§ 5941–5954, RSMo 1929, Sections 375.560–375.600 RSMo 1949, V.A.M.S., alleging the insolvency of the latter and that its condition was such as to render its further proceeding hazardous to the public and to those holding its policies. The Superintendent prayed that Missouri State Life be enjoined from further prosecution of its business; that it be dissolved and that an agent be appointed to take charge of its property and assets. Missouri State Life filed an answer admitting the allegations of the petition. On August 28, 1933, following a hearing, the court entered a decree of insolvency, finding the facts as alleged in the petition, ordering the assets of Missouri State Life vested in the Superintendent and in his successors in office, in fee simple and absolutely, and ordering him to take possession of the assets, dispose of and sell them, settle all claims and settle and wind up the affairs of the Company.

On September 5, 1933, the Superintendent filed a Report of Condition, pursuant to § 5953, RSMo 1929, Section 375.730 RSMo 1949, V.A.M.S., showing that the liabilities of the Company exceeded its admitted assets by $29,000,001.17, and also a petition for instructions and directions as to the sale of assets, alleging that the most valued assets were the agency organization, good will and other intangible assets of that nature; that these were fast deteriorating and becoming of no value; that to preserve and conserve these assets and prevent irreparable injury, loss and damage to the policyholders, creditors and stockholders it was imperative that all of the assets be sold as speedily as possible; that he had a proposal from General American to purchase all of the assets; that the stated consideration would be sufficient to pay all preferred claimants 100% and all unsecured creditors 50%; that a liquidation of the assets in the usual method would not pay claimants, creditors and stockholders as much as each would receive under the terms of the proposal; that the proposal was just, fair and equitable as far as policyholders and other claimants and creditors were concerned and that an immediate sale should be made for the payment of claims for policyholders and creditors, provided such a sale legally could be made.

After a hearing the court found that the assets at the time of the judgment of insolvency were less than 75% of the necessary amount and that the Superintendent could sell the assets at private sale upon terms to be decreed by the court, without complying with § 5953, RSMo 1929, i. e., without a public offering for reinsurance; that an immediate sale of the assets should be made; and that by the purchase of the assets by General American under its proposed Purchase Agreement the policyholders and other creditors would receive more than if such a sale were not effected. The court approved and confirmed the Purchase Agreement, empowered and directed the Superintendent to execute and perform the same; approved "the sale of the assets"; vested title and ownership of the assets in General American; and reserved jurisdiction of the cause for the purpose of carrying out the decree and the Purchase Agreement.

### The Purchase Agreement

Although specific provisions of the Purchase Agreement[2] must be set forth verbatim subsequently, we shall now set forth its provisions generally to present the overall plan for rehabilitation of the insurance business of Missouri State Life.

2. Missouri State Life and General American are referred to in the Purchase Agreement as "Old Company" and "New Company" respectively. The Purchase Agreement is divided into separate parts designated as "Articles" and all future reference to Articles refer to the Purchase Agreement unless specifically stated otherwise.

Article I, "Purchase and Sale of Assets." New Company agreed to purchase from the Superintendent, and the Superintendent agreed to sell to New Company, all of the assets formerly owned by Old Company, for a consideration of $100,000.[3] It agreed to pay all taxes and debts due by Old Company to federal and state governments, death losses and matured policy claims against Old Company matured or due on or before August 28, 1933, wages and salaries due Old Company employees for services rendered prior to that date, all valid claims of secured creditors, 50% of all other valid claims, and all expenses of closing the business and disposing of the assets of Old Company.

Article II, "Policyholders." New Company assumed all of the outstanding insurance and annuity policies theretofore issued, assumed or reinsured by Old Company and in force on August 28, 1933, "so as to carry out in manner and form all of the obligations of Old Company as contained in said policies and contracts, according to the true intent and tenor thereof," subject to the subsequent provisions of the Purchase Agreement. Inasmuch as the then appraised value of the assets was "less than the required reserves," a lien equal to 50% of the terminal reserve on each life and annuity policy "as such reserve has been established in the accounts of Old Company, computed as of September 1, 1933, to the date to which premiums on such policies have been paid," was established and placed against each such policy. Liens were to bear interest at 5% per annum from September 1, 1933 to September 1, 1948, and 4% thereafter, and were to be treated as policy loan indebtedness, and carried as an asset by New Company. The amount of the lien was to be deducted from any payment or settlement under policy provisions, except that liens would be waived upon death claims occurring before September 1, 1948. The cost of such lien waivers was to be

"provided out of the net earnings of the business of the Old Company," but if the net earnings were insufficient to provide such mortality cost, then New Company was obliged to provide therefor "out of its own surplus," but neither in the New or Old Company account was New Company obliged to maintain any reserve to insure the waiving of liens. The lien provision was made inapplicable to policies of group life, group accident and health and commercial accident and health insurance, "inasmuch as no substantial or accumulative reserves are carried against such policies." Policy loans and cash surrenders were deferred for a period of two years.

Article III, "Claimants." It was provided that claims for deaths occurring before August 29, 1933 were to be paid in full. For deaths occurring thereafter claims were to be paid according to the policy terms, except as modified by the lien provisions. Waiver of premium benefits under total and permanent disability provisions were to be granted in full. Installment disability and monthly income benefits for disability occurring prior to August 28, 1933 on claims approved by Old Company before that date, and such benefits becoming due under policies issued on applications dated on and after July 15, 1932, were to be paid in full. All other such benefits were to be reduced by 50%. Payments coming due on or after August 28, 1933 under annuity, life or endowment policies matured prior to that time, and interest or installment payments coming due thereafter under supplemental contracts were to be paid in full. Dividends on deposit were to be subject to the 50% lien. Endowment policies of Old Company maturing prior to August 29, 1933 were to be paid in full, while those maturing after that date were to be subject to the 50% lien.

Article IV, "Creditors." Agency contracts with Old Company were canceled,

---

3. With the approval of the Superintendent this $100,000 was subsequently charged by General American against the Old Company account referred to hereafter, but this charge is not an issue on this appeal.

but commissions due and payable thereunder, were to be paid subject to reduction by 50%. Inasmuch as the service of agents, managers and supervisors "is to the ultimate interest and advantage of policyholders, claimants, creditors and stockholders," the New Company was authorized but not required to pay former agents of Old Company the amount of their commissions which they would otherwise lose by reason of the lien provisions upon their acceptance of a contract of employment with New Company.

Article V, "Operation of Business. Sale of Assets. Accounting." New Company agreed to operate the business, realize on the assets acquired under the Agreement, keep a separate account thereof, and compile an annual statement "in the manner and form" of the "Convention Blank."[4] This accounting was to commence as of September 1, 1933, with the balance sheet filed of record and marked "Exhibit A to Purchase Agreement." The parties agreed to prepare and file a detailed statement showing the value of each of the assets comprising each class of assets, the total value of which appeared on said balance sheet, and for the purpose of future accountings the value of each such asset as shown "shall conclusively be deemed to be the value thereof as of September 1, 1933." Subject to the conditions of the Agreement, New Company, "as owner of the assets purchased hereunder" in the prudent course of business, was to collect and realize upon, sell, exchange, dispose of, and convert the assets so purchased and exercise in relation thereto all the rights of absolute ownership, but the net proceeds of any such sale or conversion was to be placed in the Old Company account. Every payment, expenditure and allowance required, authorized or permitted to be made by the New Company was to be "a charge against said Old Company account, and to be paid therefrom." As of December 31, 1934, 1937, 1940 and 1943, and August 31, 1948, and as of such other dates as might be specified by the Superintendent, special accountings were to be had for the purpose of applying the provisions of Article VII concerning Reduction and Repayment of Liens and Article VIII relating to Stockholders. In the final accounting of August 31, 1948 the asset account was to be finally valued by taking bonds at their market price as of said date and all other assets at their appraised value. It was provided that "Unless the New Company shall, prior to September 1, 1948, have notified the Superintendent, by notice in writing delivered at his office, of its intention to attempt to reinsure the insurance business then in force in the Old Company account and to transfer policy loans and liens and other assets of an aggregate value equal to the reserves appertaining to such insurance, as hereinafter provided, it shall, as of said date, pay into said Old Company account a sum equal to $7.50 per $1,000.00 of Life Insurance (other than Group Life Insurance) in force in the Old Company account on August 31, 1948; * * *." There then was set forth the procedure to be followed if New Company did not elect to retain the Old Company account. The cost of each accounting was to be borne by New Company, but the cost of such special accountings requested by the Superintendent were to be charged to the Old Company account.

4. A "Convention Blank" is a form used by insurance companies in making their annual statements of condition to state regulatory agencies. By reason of the desirability of a uniform system of making such reports the National Convention of Insurance Commissioners (now the National Association of Insurance Commissioners) adopted a form which came to be known as the "Convention Blank," which with minor revisions from time to time, is recommended by the association each year to its members for use during that year. The Convention Blank form was designated by the Superintendent of Insurance of Missouri as the required form for annual statements of life insurance companies during each year of the period 1933–1948. All of the annual statements, the special accountings, and the Final Accounting were made by General American on the Convention Blank.

At the time of each accounting New Company was to credit to the Old Company account "the fair rental value of all real estate, equipment, and fixtures in the Old Company account, since the last preceding accounting, to the extent that such real estate, etc., shall have been used by the New Company for its own purposes."

Article VI, "Expenses." New Company was permitted to collect, receive and retain from the assets, accumulations and earnings of the business and properties "purchased hereunder * * * for its expenses in operating and administrating (sic) such assets and business," the following: (1) First-year and renewal commissions and collection fees, together with any medical and inspection fees required to be paid in the administration or renewal of said business. (2) "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or assets to be acquired by the New Company as herein provided." (3) A fee of 2% of all renewal premium income on life policies, other than group life policies. (4) $1.25 per annum per thousand dollars of mean Life Insurance in force, except group life insurance. (5) .75 cents per annum per thousand dollars of mean group life insurance in force. (6) 10% of group accident and health premiums collected. (7) 20% of all other accident and health premiums collected. (8) All rentals for use of equipment in the operation of the Old Company's business. (9) Certain expenses to be incurred "in connection with the administration of the assets acquired hereunder," such as salaries, wages, attorneys' fees, accounting charges, rent, traveling expenses, expenses of the Home Office Investment Department, management, supervision and servicing fees and similar charges paid by New Company, etc. Expenses incurred partly with respect to assets carried by New Company in its own account were to be prorated between the two accounts. Expenses incurred solely with respect to the assets of the Old Company account were to be charged to the Old Company account.

Article VII, "Reduction and Repayment of Liens." As of the specified accounting dates New Company was to "reconsider the liens" and "apply the net earnings credited to the Old Company account from the date of the last preceding special accounting * * * to the reduction and/or payment of all liens" in force on outstanding policies, ratably in proportion to the amount of each lien as originally applied. However, New Company could withhold as of the date of each such reconsideration (other than the reconsideration as of August 31, 1948) from the "net earnings," a contingency reserve not to exceed (a) 25% of the aggregate amount of all such net earnings up to such date or (b) 10% of the value of all assets held on such date in the Old Company account. "Such contingency reserve may be applied by the New Company to the absorption of losses, if any, in the Old Company account." New Company was required to continue to apply such "net earnings" to the reduction and repayment of liens until the amount applied equalled the amount of the lien with interest, whereupon the lien should be deemed to have been discharged, or until September 1, 1948, whichever should be the earlier. Upon the discharge of said lien, any net earnings which, but for the discharge of such lien, would have been applicable to the reduction of liens was to be paid to stockholders of the Old Company, "as hereinafter provided under Article VIII hereof." If the lien should not have been so discharged after the application of net earnings in the August 31, 1948 accounting, the lien was to remain in force continuously thereafter.

Article VIII, "Stockholders." New Company agreed to make available to stockholders of the Old Company, common stock of the New Company at specified rates. Upon the discharge of all of the liens according to the provisions of Article VII relating to Reduction and Repayment of Liens, " * * * the net earnings available for distribution under the provisions of said Article VII at each periodic accounting

and at the final accounting on August 31, 1948, will be paid pro rata to the then holders of the stock of the Old Company. * * * Upon the completion of such final accounting, and upon payment to the stockholders of the Old Company of such sums, if any, as shall be due to them pursuant to the provisions of the last preceding sentence, all rights of such stockholders and all rights of the Old Company under this Agreement shall forthwith cease."

Article IX authorized New Company to charge certain expenses against the Old Company account under circumstances not material to the issues.

Article X, "Additions to Group Life and Group Accident and Health Insurance. Changes in Existing Insurance." All additions to existing group life and group health and accident coverages, whether new, renewed or reinstated insurance, were to be carried as business belonging to the Old Company account until the termination of accounting as of August 31, 1948. If during the 15-year period insureds exchanged policies for New Company policies, such new policies were to be continued in the Old Company account, which would be charged with all commissions, allowances, taxes, expenses, dividends, etc., relating to such policy.

Article XI, "Assets and Rights Retained by Superintendent." The Superintendent reserved the right to litigate for the recovery of certain moneys or assets of the Old Company. When recovered, any such money or assets was to be transferred to the New Company to be credited by it to the Old Company account. He also reserved the right to inspect the books and records of the Old Company and remove them for use in court, and he retained a lien on the assets of the Old Company as security for the payment by the New Company of all sums provided for in the Purchase Agreement.

Articles XII to XV, inclusive, have no effect on this proceeding.

Article XVI, entitled "General Provisions" provided, inter alia, that "This Agreement, and all rights, duties and obligations hereunder, shall inure to the benefit of and be binding upon the respective parties hereto, their several successors or assigns."

Events after Execution of Purchase Agreement

On September 8, 1933 General American notified by mail all policyholders of Missouri State Life that the former had purchased the latter's assets and business from the Superintendent. It solicited continued relations with them, and informed them that "formal assumption certificates" would be issued as rapidly as possible. A similar notice was sent to the Old Company stockholders. Missouri State Life was dissolved on October 7, 1933.

General American commenced business in 1933 as a private stock company, with $2,000,000 in capital and paid-up surplus. In 1936 it was converted into a mutual company without cost to the Old Company account. By the imposition of liens on policies in the Old Company account the $29,000,001.17 deficiency in assets existing at the time of the decree of insolvency of Missouri State Life was erased. Thus when General American assumed the Old Company account its assets were $3,457,856.83 in excess of liabilities, which included the reserves as calculated on then-existing bases. No gross premium valuation was made.

A large majority of the policyholders in the Old Company account kept their insurance in force, although there was a rapid decrease in the amount of ordinary insurance in force during the first two or three years of operation. On August 31, 1948 (at the end of the 15-year period) a total of 115,468 policies of whole life, endowment and term policies were in force, which represented $210,183,020 of ordinary insurance, plus over $460,000,000 of group insurance under one-year term policies.

During the 15-year period the bond account was rehabilitated with a net profit to

the Old Company account of more than $4,400,000; the mortgage loan portfolio, which contained many substandard loans necessitating foreclosure, was managed with conspicuous success; a large acreage of farmlands in seven states was managed, rehabilitated and liquidated to the profit and advantage of the Old Company account; a considerable amount of city real estate was rented, rehabilitated, held for better markets, and finally liquidated at satisfactory prices.

Policy liens amounted to $32,457,858 when the Purchase Agreement went into effect. From time to time during the 15-year period "net earnings" aggregating the sum of $19,285,862.59 were applied to the reduction of policy liens pursuant to Article VII. Liens in the sum of $3,004,074.57 were waived at death. Lapses, surrenders, maturities, etc., accounted for an additional $10,167,920.84, so that by April 30, 1946 the principal amount of the liens had been fully discharged and, in addition, $1,437,637.90 had been refunded in cash or credited to policyholders on account of payments by them or charged against their policies as interest on the principal amount of the liens. This left a balance of approximately $6,000,000 unrefunded interest computed on the amounts of the liens as reduced from time to time. The original amount of the policy liens thus was reduced and discharged as follows: $19,285,862.59 from "net earnings"; $10,167,920.84 due to terminations other than by death, viz., lapses, surrenders, maturities, etc.; and $3,004,074.57 from waiver of liens.

General American made accountings of the assets, liabilities and transactions relating to the Old Company account on December 31, 1934, 1937, 1940 and 1943, and additional special accountings, ordered by the Superintendent, based on the statements of December 31, 1936 and April 30, 1946, all on the Convention Blank. On December 31 of each year, 1933–1947, inclusive, General American filed with the Superintendent a statement on the Convention Blank, showing the income, disbursements, assets and liabilities of the Old Company account, in addition to its annual statement required by statute showing the condition of General American, without distinction as to the Old Company and New Company accounts.

The net premium reserves on about 85% of the policies (which were nonparticipating) in force in 1933 had been computed upon the basis of two assumptions: a death rate according to the American Experience Table of Mortality (herinafter AET), and an interest rate of 3½%. All but a comparatively few of the remaining policies were participating policies and on them the reserves were computed upon the basis of AET and an interest rate of 3%. Between 1933 and 1948 the net rate of interest earned by General American and by the insurance industry generally declined. In the latter part of 1946 General American's president prepared and at his instance the Superintendent had a bill introduced in the Missouri General Assembly amending the valuation statute, RSMo 1939, § 5831, Sections 376.370, 376.380 RSMo 1949, V.A.M.S., in a manner deemed by General American to authorize the Superintendent to order that the reserves in the Old Company account be increased. This bill was passed in June 1947, and approved. Laws of Missouri 1947, p. 338. Late in 1947 the Superintendent employed Joseph B. Maclean, a recognized authority in the field of life insurance and actuarial matters, for consultation with respect to the problems to be encountered in connection with the Final Accounting. The Superintendent posed three questions to Mr. Maclean: (1) whether General American had the right to increase the reserves of the Old Company account; (2) what bases of mortality, interest, etc., should be used in computing reserves; and (3) his opinion with respect to the establishment of a new reserve for possible losses in elections of settlement options in the future under existing contracts of insurance. Mr. Maclean was of the opinion that the company could increase the reserves; that on ordinary life policies the Commissioners Standard Ordinary (hereinafter CSO) Table of Mortality be used, with an interest rate of 2.9%; that

on annuities and existing supplementary contracts involving life contingencies the 1937 Standard Annuity Table with age set back one year for males and six years for females be used, with an interest rate of 2.9%, and that certain other recommendations be adopted as to expense and termination of rates, and that a new future optional settlement loss reserve be established in the amount of approximately $4,683,000. He recommended a gross premium valuation of the Old Company reserves, which was ordered by the Superintendent. On the basis of the disclosures made, the Superintendent, on August 27, 1948, issued an order to General American to increase the Old Company account reserves (specifying the rates of mortality, interest, etc.), and to create a new future settlement option loss reserve, in the total amount of $10,171,120, in accordance with the recommendations of Mr. Maclean. He did not specify the bases for computing the new reserve, but left it up to General American to set up an "adequate" amount. On August 30, 1948 the Board of Directors of General American voted to increase the existing Old Company reserves, and to set up the new reserve. On that date it also elected to retain the Old Company account as its own after August 31, 1948, and pursuant to Article V to pay into that account $7.50 per $1,000 of life insurance in force in the Old Company account on that date, which amounted to $1,576,372.73.

The Final Accounting, as of August 31, 1948, made on the Convention Blank, lists four principal items: Income, Disbursements, Assets and Liabilities. The Final Accounting commences with the amount of the ledger assets at December 31, 1947 and ends with the amount of surplus at August 31, 1948. The assets, liabilities and surplus, however, reflect the results of all of the transactions relating to the Old Company account during the entire 15-year period. Total admitted assets of $136,403,807.91, and total liabilities of $134,365,126.82 were shown, leaving a surplus, denominated "Net Earnings," of $2,038,681.09, as the amount

to be distributed to the Old Company policyholders under the Purchase Agreement. That amount, augmented by a $24,265 mathematical error in computation later discovered, was distributed to the policyholders. Counted in the Liabilities was an amount for reserves of $10,171,120 more than the amount which would have been stated if the reserves had been calculated on the basis of the same mortality table and interest factor used in calculating rates in 1933, and at every subsequent reporting period to and including December 31, 1947. The latter figure included the new future settlement option loss reserve, stated in the sum of $3,317,632. In other words, if the reserve increases and the new reserve had not been added to the reserves as previously calculated, there would have been available for distribution to the Old Company policyholders and stockholders the sum of $12,234,066.09 instead of $2,062,946.09.

### Pleadings and Trial

On November 15, 1948 the Superintendent filed an application with the Circuit Court in which, among other things, he requested approval of the Final Accounting. The stockholders of the Old Company filed an intervening petition and exceptions to various items of the Final Accounting, twenty-seven in number, most of which related to items in the accounting which they claimed had been mistakenly charged to the Old Company account. The other Exceptions related to the reserves. General American and the Superintendent filed separate answers and responses defending the Final Accounting. General American also claimed a right to four Set-Offs.

James F. Ladd, who held a $2,500 policy, and Samuel E. Mitchell, who held a $1,000 policy, were permitted to intervene for themselves only, but not on behalf of other policyholders. Their intervening petition asserted that the reserves had been overstated in the Final Accounting by more than $10,000,000 and that Laws of Missouri 1947, p. 338, under which it was alleged General American sought to justify the increase,

was unconstitutional. They were the only policyholders objecting to the Final Accounting. Matthew F. Morse and twenty-three other policyholders intervened, claiming that if the stated reserves were reduced in accordance with the pleas of Ladd and Mitchell, General American would be unable to meet its obligations upon policies in the Old Company account and that the position of Ladd and Mitchell was against the interests of all the policyholders in the Old Company account.

The parties who actually participated in the trial of the exceptions were the Superintendent, General American, and Old Company stockholders Joseph F. McAlister, et al. The trial was held before Honorable Edward M. Ruddy as Judge of the Circuit Court of the City of St. Louis. With some intermissions the trial lasted from November 6, 1950 to July 30, 1951. Judge Ruddy took the case as submitted on December 1, 1954, after the filing of briefs by all parties, and on April 26, 1957 filed his Memorandum Opinion, Findings of Fact and Conclusions of Law. On April 30, 1957 the trial court entered an order directing that all applications for fees for services rendered and for reimbursement for expenses incurred, be filed. On June 6, 1957 Jacob M. Lashly filed a petition for the allowance of attorneys' fees for services rendered to the Superintendent and for reimbursement of expenses. On June 18, 1957 Clarence M. Turley, John J. Nangle and the Executors of the Will of William R. Cady, Deceased, filed a petition for the allowance of appraisers' fees and for expenses. On June 21, 1957 the Superintendent filed an application for approval of payment to Joseph B. Maclean of fees for actuarial services and expenses. On June 27, 1957 the intervening Stockholders and their attorneys filed a motion for allowance of attorneys' fees and expenses. On August 16, 1957 General American filed a petition for an order regarding certain expenses relating to the closing of the business and disposition of the assets of the Old Company account. The final

decree in the main case was entered August 19, 1957. Eighteen of stockholders' twenty-seven exceptions were overruled in their entirety. Five were overruled except with respect to comparatively minor items. Three were sustained entirely or in major part. Three Set-Offs in amounts aggregating $665,910.61 were allowed in favor of General American against the total of net surcharges under other rulings. General American was directed to pay 4% interest per annum upon the amount due policyholders under the decree. Instructions were given the Superintendent on the questions submitted by him. The net amount surcharged to General American was $1,480,303.58, less $24,-265, leaving $1,456,038.58 net to be applied as directed by the court. Of that amount $300,000 was ordered held back to satisfy allowances to be ordered upon pending motions and to make up any deficiency in the $300,000 set up in the Final Accounting as a reserve for expenses and court costs, thus leaving a net amount of $1,156,038.58 to be credited and applied as "net earnings" of the Old Company account under the Purchase Agreement.

Motions for new trial were filed by the Stockholders and by Ladd and Mitchell, and were overruled on November 14, 1957, following which those parties appealed to this court. Not all of the rulings on all of the Exceptions are in question on this appeal. Thirteen of the original twenty-seven Exceptions to the Final Accounting, and the action of the court in allowing the three Set-Offs claimed by General American, are involved in this review.

In their brief Intervenors Ladd and Mitchell have adopted the statement of facts and Points XI through XIX, pertaining to reserves, in the brief of intervening stockholders Joseph F. McAlister, et al. Therefore, except where otherwise specifically indicated, all future references in this opinion to "Stockholders," insofar as Points XI through XIX inclusive are concerned will be understood to include James F. Ladd and Samuel E. Mitchell, in

addition to Joseph F. McAlister, and all of the other former stockholders of Missouri State Life.

On June 24, 1958 the court entered separate judgments awarding Jacob M. Lashly $175,000 attorneys' fees and $909.87 expenses, and awarding Clarence M. Turley, et al. $70,000 appraisers' fees and $2,169.58 expenses. On August 13, 1958 the court entered separate judgments authorizing the Superintendent to pay Joseph B. Maclean $32,000 actuarial fees and $3,574.58 expenses; allowing General American $161,-908.19 for closing expenditures; and allowing Stockholders and their attorneys fees in the amount of $110,000. Appeals from these separate judgments were taken.

## Scope of Review

Stockholders on the one side and General American and the Superintendent on the other are in disagreement concerning the scope of review of this court.

■ The trial court was required by § 5945, RSMo 1929, now § 375.610 RSMo 1949, V.A.M.S., to hear and determine the issues in the suit brought by the Superintendent on August 26, 1933, pursuant to which he took possession of Missouri State Life, "without the intervention of a jury." Following the judgment vesting the property, business and assets of Missouri State Life in the Superintendent, the court retained jurisdiction of the cause, and it is to the petition of the Superintendent subsequently filed in that same cause seeking final approval of the closing of the Old Company account that the Stockholders filed their exceptions, and which resulted in the main appeal.

■ Section 510.310 RSMo 1949, V.A. M.S., enacted in 1943, Laws of Missouri 1943, p. 353, § 114, is procedural, as distinguished from substantive, and is applicable to the scope of review on this appeal. It provides that in cases tried before the court without a jury, the appellate court "shall review the case upon both the law and

the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." This court has said that pursuant to Section 510.310 "The rule seems clear that the appellate court should independently consider the evidence and reach its own conclusions, but where the evidence is conflicting and close, and particularly where the decision depends upon conflicting oral testimony and the credibility of witnesses, it should generally defer to the findings of the trial court unless satisfied that the findings should have been otherwise." In re Petersen's Estate, Mo. Sup., 295 S.W.2d 144, 148.

■ The interpretation and construction of the Purchase Agreement are questions of law. Neither the Superintendent nor General American had authority to act contrary to its valid provisions. What General American or the Superintendent did present questions of fact, which on this appeal we determine from the evidence, subject to the above rule pertaining to deference to the trial court. Whether those acts constituted compliance with or a violation of the Purchase Agreement or of a statute is a question of law, a matter we determine for ourselves.

■ The trial court held that "the business judgment rule is applicable to the transactions challenged in the various Exceptions" of Stockholders. That rule should be examined. A corporation is managed by its board of directors, § 351.310 RSMo 1949, V.A.M.S.; Hayes v. St. Louis Union Trust Co., 317 Mo. 1028, 298 S.W. 91, 56 A.L.R. 1276; Vol. II, Thompson, Corporations (3rd ed.), § 1297. The charter of General American expressly provided that the "corporate powers of the company shall be vested in a Board of Directors," and that such powers be exercised by the board and by such officers and agents as they may from time to time appoint and empower. The general rule is

that "Where * * * the management and control of the corporation is vested by statute or the charter, not in the stockholders or members, but in a board of directors and trustees, their action in regard to the affairs of the corporation is controlling and exclusive, and the stockholders or members cannot control the directors or trustees in the exercise of the judgment vested in them by the charter. Their function is to exercise judgment and discretion which the courts cannot do in their stead." Fletcher, Cyclopedia Corporations (Perm. ed.), § 2104; Merrill v. Davis, 359 Mo. 1191, 225 S.W.2d 763, 768; 13 Am.Jur., Corporations § 947; Vol. II, Thompson, Corporations (3rd ed.), § 1297. 19 C.J.S. Corporations § 743. Also, courts will not interfere with or attempt to control the internal management or policy of a corporation except in cases of fraud, bad faith, breach of trust, gross mismanagement, or ultra vires acts on the part of the officers or directors. 19 C.J.S. Corporations § 984; Niedringhaus v. William F. Niedringhaus Investment Company, 329 Mo. 84, 46 S. W.2d 828, 833; Barrows v. J. N. Fauver Co., Inc., 280 Mich. 553, 274 N.W. 325, 328–329; Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 8 N.E.2d 895, 915; Blanchard v. Prudential Insurance Company, 80 N.J.Eq. 209, 83 A. 220, 224. But, the discretionary power of directors does not extend to acts or decisions beyond "the limits of their authority," and where "a by-law limits the power of an officer of the corporation, an act by such officer in excess of his authority may constitute ground for judicial interference, even though the act involves an exercise of the officer's discretion. Where a statute limits the discretionary power of directors, an act by them which goes beyond the limit imposed, while in itself an exercise of their discretionary power, involves a violation of statute, and on this ground the court may interfere." 19 C.J.S. Corporations § 743. The same reasoning applies to a contract. The directors of a corporation may freely exercise a full and complete discretion in determining whether the corporation shall enter into a contract, but once a lawful contract is made the corporation is obligated to perform the contract, and the directors thereafter have no discretion as to whether or to what extent it shall be performed. For the above reasons, the general and all-inclusive statement of the trial judge that "the business judgment rule is applicable to the transactions challenged in the various Exceptions" of the stockholders is too broad. The above rules must be separately applied to the factual situation of each Exception.

Practical Construction of the Purchase Agreement by the Parties

A rule of construction to be considered in analyzing the nonreserve exceptions is that relating to the practical construction of the Purchase Agreement by the parties thereto. If the terms of a contract are clear and unambiguous the contract will be enforced or given effect in accordance with its terms, and without resort to construction to determine the intention of the parties. State ex rel. National Life Insurance Co. v. Allen, 301 Mo. 631, 256 S.W. 737. In such case the construction of the parties, if at variance with the written terms, will not be followed, Campbell v. Webb, 356 Mo. 466, 202 S. W.2d 35, but the contract will be construed as written. J. E. Blank, Inc. v. Lennox Land Co., 351 Mo. 932, 174 S.W.2d 862. "When the language of a contract is plain, there can be no construction because there is nothing to construe." Mickleberry's Food Products Co. v. Haeussermann, Mo. Sup., 247 S.W.2d 731, loc. cit. 738. Construction is necessary, however, where the terms of a contract are ambiguous.

Exceptions C, Y (Part), E and G and General American's Second and Third Set-Offs involve the meaning of paragraph 2, Article VI, by which the New Company was allowed to charge against the Old Company account "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or

assets to be acquired by the New Company as herein provided." Questions are raised whether state premium taxes, social security taxes, expenses for examinations and audits, and valuation expenses are taxes "payable * * * on or in respect to the business" of the Old Company. While the words "all taxes" have a well-defined meaning and as such are unambiguous, Johnson v. Dalrymple, 140 Mo.App. 232, 123 S.W. 1020, the term "all taxes payable * * * on or in respect to the business" (when considered in connection with the four types of taxes and expenses listed) is reasonably and fairly susceptible to different constructions. "Language is ambiguous where it is susceptible of interpretation in opposite ways." J. E. Blank, Inc. v. Lennox Land Co., supra, 174 S.W.2d loc. cit. 868. General American's First Set-Off calls for a construction of the ambiguous language "used by the New Company for its own purposes," occurring in Article V. A question of the construction by the parties of the ambiguous phrase "medical and/or inspection fees required to be paid in the administration * * * of said business" as it appears in paragraph 1, Article VI, is raised in connection with Exception F.

 Where the parties themselves have placed a knowledgeable, uniform, consistent and long-time construction upon the provisions of an ambiguous contract, such a construction is persuasive and ordinarily will be accepted by the courts, unless it is contrary to the obvious intendment of the contract. Wentzel v. Lake Lotawana Development Co., 226 Mo.App. 960, 48 S.W.2d 185, loc. cit. 195. In construing ambiguous contracts the prime objective of the court is to ascertain and render effective the mutual intent and understanding of the parties. In its effort to reach that objective the court may consider the relationship of the parties, the subject matter of the contract, usages of the business, the surrounding facts and circumstances attending the execution of the contract, and the practical construction which the parties

themselves have placed on the contract by their acts and conduct. Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539; Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262. The construction put on a contract by the parties thereto in the course of its performance, as evidenced by their actions, is "an aid to the court" in determining the meaning of a contract which is ambiguous, but is not conclusive, Meissner v. Standard Ry. Equipment Co., 211 Mo. 112, 109 S.W. 730, standing alone, 3 Corbin on Contracts § 558, except where one party construes the contract in a manner against his interest. Lene v. MFA Mutual Insurance Co., Mo.App., 301 S.W.2d 874; Lawton-Byrne-Bruner Insurance Agency Co. v. Stiers Bros. Const. Co., Mo.App., 186 S.W.2d 480, loc. cit. 486. While the construction of the parties has been said to be "always persuasive," First National Bank v. West End Bank of University City, 344 Mo. 834, 129 S.W.2d 879, and "of the greatest weight," State ex inf. McKittrick ex rel. City of Springfield v. Springfield City Water Co., 345 Mo. 6, 131 S.W.2d 525, 532, if not the controlling weight in ascertaining the intent and understanding of the parties, City of St. Louis v. Laclede Gaslight Co., 155 Mo. 1, 55 S.W. 1003; 17 C.J.S. Contracts § 325, and ordinarily will be adopted by the court, Haseltine v. Farmers' Mutual Fire Ins. Co. of Billings, Christian County, Mo.Sup., 263 S.W. 810, affirming, Mo.App., 240 S.W. 815; 17 C.J.S. Contracts § 325; 12 Am.Jur., Contracts § 249, there are circumstances in the instant case which impel us to apply the rule of the practical construction of the parties with great caution. In the first place, the rule is based upon the concept that the interest of each party to a contract leads him to a construction most favorable to himself. Topliff v. Topliff, 122 U.S. 121, 7 S.Ct. 1057, 39 L.Ed. 1110. One of the assumptions upon which the rule is based is that " * * * each party is alert to protect his own interests and to insist on his rights." 12 Am.Jur., Contracts, § 249, p. 789. So the rule is entitled to greater or lesser weight depending upon the pres-

ence or absence of divergence or adversity of interests and the vigor or lack of vigor with which the parties press or assert rights enuring to their own selfish benefit. Conflict of interest, and adversary assertion of selfish rights, are elements notoriously absent in the surrounding circumstances and the relations existing between General American and the Superintendent. On every important particular they were in agreement. No hostility, clash or conflict of interests was apparent. In their relations through the 15-year period there was none of that tug and pull between adversaries which gives definition and meaning to an agreed course of conduct under the provisions of a contract granting benefits to two parties dealing at arms length. Accordingly, the uniform construction of the parties in this case, while a factor deserving of consideration and some weight, is not as persuasive or influential as it would be if the parties had occupied adversary positions. In the second place, the weight to be accorded the practical construction of the Purchase Agreement adopted by the successors in office of the Superintendent who made the contract on behalf of the state is much less than that which would be accorded the Superintendent who actually made the contract. See Page on Contracts, § 2034, p. 3516. In City of Cincinnati v. Cincinnati Gaslight & Coke Co., 53 Ohio St. 278, 41 N.E. 239, loc. cit. 242, the Ohio Supreme Court said:

" * * * The reason of the rule of practical construction has its origin in the presumption that the parties to the contract, at and after the making thereof, knew what they meant by the words used, and that their acts and conduct in the performance thereof are consistent with their knowledge and understanding, and that, therefore, their acts and conduct show the sense in which the words were used and understood by them. In such cases acts sometimes speak louder than words. But the reason of the rule ceases when the acts or conduct are not those of the parties who made the contract, and are not presumed to know in their own minds what was in fact meant by the words used. The acts and conduct of the parties following after the parties who made the contract, must, in the nature of the case, be only their own construction of the words used, and not an acting out of the understanding of the words by the parties who used them. The same is true of public officers. They may put their own construction upon the words used, but in so doing they are not acting out the mental understanding of the sense in which the words were used by those who made the contract or written instrument. In such cases the acts and conduct of the parties in the performance of the contract are only their construction of the meaning of the words used, and their construction of the words used by others should not override the construction to be placed thereon by the courts. So that, while the practical construction of the contract by the parties who made it is entitled to great weight, in case of doubt, the construction placed thereon by those who follow is of much less weight. * * *"

The parties signatory to the Purchase Agreement, who best knew the meaning of the words they themselves employed, were General American and R. Emmett O'Malley, who was Superintendent on September 7, 1933 and thereafter until October 19, 1937, when he was succeeded by George A. S. Robertson. Judge Ray B. Lucas succeeded Mr. Robertson. Edward Schueffler succeeded Judge Lucas. Owen G. Jackson succeeded Mr. Schueffler and was serving at the time of the Final Accounting on October 31, 1948. Therefore, although we will consider and give some weight and value to the construction of the "parties," in cases of ambiguity, particularly

during the period of September 7, 1933 to October 19, 1937, we do so with the foregoing limitations in mind.

Exception A. Home Office Rent Credits
General American's First Set-Off.
Excess Rent Credits.

By their Exception A to the Final Accounting, Stockholders contend that General American failed to give proper credit to the Old Company account for the reasonable rental value of that portion of the home office building used by it. They allege that the credits given "were unreasonably low, grossly inadequate, wholly insufficient and not in such amount as was contemplated and provided by the Decree of [the] Court * * * and the Purchase Agreement," and ask that the court "ascertain and determine the reasonable rental value" and credit the Old Company account with the difference between that amount and what had been credited. Closely related to the issues presented by Exception A is General American's First Set-Off in which it contends that it mistakenly credited to the Old Company account an amount in excess of $450,000 for the use by it of the home office building in the operation of the Old Company insurance business. The trial court overruled the Stockholder's Exception A and sustained General American's First Set-Off.

Article V contains the following provision relating to *credits* to the Old Company account:

"At the time of every accounting and pursuant to the provisions of this Article V, the New Company agrees to credit to the Old Company account a sum equal to the fair rental value of all real estate, equipment and fixtures in the Old Company account, since the last preceding accounting, to the extent that such real estate, equipment and fixtures shall, during such period, have been used by the New Company for its own purposes."

Article VI, relating to *charges* against the Old Company account, provides:

"The New Company shall be allowed * * * to collect * * * from the * * * earnings of the business and properties purchased hereunder * * * for its expenses in operating and administering such assets and business, a sum equal to the aggregate of the following items: * * *

"3. A fee of 2% of all renewal premium income on Life Policies, other than Group Life Insurance Policies.

"4. $1.25 per annum per Thousand Dollars of mean Life Insurance in force, except Group Life Insurance.

"5. 75 cents per annum per Thousand Dollars of mean Group Life Insurance in force.

"6. 10% of Group Accident and Health premiums collected.

"7. 20% of all other Accident and Health premiums collected.

"8. All rentals paid by the New Company for the use of any equipment in the operations of the Old Company's business.

"9. The following expenses to be incurred in connection with the administration of the *assets* acquired hereunder, as well as any proceeds thereof and any assets substituted therefor or added thereto, to-wit:

"(a) All salaries, wages, attorney's fees, accounting charges, *rent,* traveling expenses, and like expenditures; and

"(b) The amount of:

"(1) All expenses of the Home Office Investment Department."

The home office building, a twelve-story structure with full basement, was an asset of the Old Company account. While there were some minor changes during the 15-

year period, as far as here material it can be said that from 1933 to February 28, 1937, General American occupied the upper six floors and part of the basement, and after February 28, 1937, it occupied the seventh to eleventh floors inclusive and part of the basement. During most of the 15-year period the Federal Land Bank leased and occupied the lower six floors and part of the basement.

The operation of a life insurance business involves the management and operation of what is referred to as the "insurance" side and the "asset" side of the business. Generally speaking, the insurance side includes, among other things, the sale, servicing and conservation of insurance policies and contracts. The asset side includes the investment and management of assets such as bonds, mortgages and other securities. The double aspect of the insurance business was clearly recognized in the language of the Purchase Agreement and in the testimony of the witnesses. For the period 1933–1948 General American credited the Old Company account with the sum of $949,653.18 as the "fair rental value" of that part of the building "used by the New Company for its own purposes." This credit was for all space used by it in connection with the operation and management of the insurance and asset sides of both the Old Company and the New Company accounts. Pursuant to Article VI the Old Company account was then charged $167,292.34 for rental of space used by General American in administering Old Company assets. In this manner General American charged itself for the space used by it in administering Old Company *insurance* and New Company assets and insurance. This procedure, followed throughout the entire 15-year period, was approved by General American, the Superintendent, and by five sets of Convention Examiners, and this was the basis upon which the Final Accounting by General American on August 31, 1948, was prepared.

By its First Set-Off General American contends that it mistakenly *credited* the Old Company account with a sum equal to the fair rental value of the space in the office building used in administering the Old Company *insurance* because that space was not "used by the New Company for its own purposes" within the meaning of the last paragraph of Article V of the Purchase Agreement. We shall consider and rule this Set-Off before considering Stockholders' Exception A.

General American's contentions are, in substance, that its acts in crediting the Old Company account for the fair rental value of space in the home office building used in administering the *insurance* side of the Old Company business "were contrary to the language and intent of the Purchase Agreement." It contends that the term "for its own purposes" was intended "to refer to the use of the real estate for the benefit of the New Company account, as distinguished from its uses in conducting the business of the Old Company account," and that the term really meant "for purposes not relating to the Old Company account." The trial court held that the term "for its own purposes" was intended to have some meaning and "when given its ordinary meaning it limits the credit to the fair rental value of the space used by the New Company for the administration of the New Company insurance business and assets." We note here that this interpretation is contrary to what was done by General American, and inferentially approved by the trial court in that it was not disturbed, in connection with crediting the Old Company account with the fair rental value of the space used by the New Company in administering the *asset* side of the Old Company business. We do not agree with either the contention of General American or the ruling of the trial court, for the following reasons. Missouri State Life, called the Old Company, was dissolved in October, 1933, and General American took title to all of the Old Company's assets and business.

General American was organized for the express purpose of engaging in the insurance business, and by contract it agreed to assume and operate, within the terms of the Purchase Agreement, the business of the Old Company. Therefore, the operation and management of the Old Company business was one of the principal purposes and business interests of General American. There was but one company, even though by contract it agreed for a 15-year period to maintain a separate account of the business of the Old Company. When General American is referred to in the Purchase Agreement the term "New Company" is used; when the separate account is referred to the term "Old Company account" is used. The last paragraph of Article V provides that the *New Company* shall credit the *Old Company account* with a sum equal to the fair rental value of all real estate in the *Old Company account* to the extent that such real estate shall have been used by the *New Company* for *its* own purposes; it does not say for the purposes of the *Old Company account*.

General American says that the term "for its own purposes" is meaningless if not given the meaning contended for by it. We do not agree. When the Purchase Agreement was entered into it was known that General American would not need all of the building. The term as used excludes any possible contention that the New Company was to credit the Old Company account for space rented or leased to others. Instead, the rent so received went directly to the Old Company account.

There are other reasons which compel the above conclusion. The procedure followed by General American for fifteen years establishes a logical and workable relation between the provisions of Article V and Article VI. Article V required General American to credit the Old Company account with the fair rental value of "all real estate, equipment, and fixtures in the Old Company account * * * used by the New Company for its own purposes." For the 15-year period General American

credited the Old Company account for the space used by it for all purposes. Article VI authorizes General American to "collect, receive and retain" from the Old Company account "for its expenses in operating and administering such *assets and business*" (emphasis added) certain specifically enumerated sums designated as fees, rentals, and expenses. Paragraph 8 provides that General American may recover, i. e., charge to the Old Company account, "all rentals paid by the New Company for the use of any equipment in the operation of the Old Company's business." This would include the *insurance* side as well as the *asset* side of the business. In paragraph 9 General American is authorized to recover, i. e., charge to the Old Company account, "expenses to be incurred in connection with the administration of the *assets* acquired hereunder * * * to wit: * * * rent * * * and * * * All expenses of the Home Office Investment Department, * * *." Therefore, it clearly appears that it was intended that the New Company was to *credit* the Old Company account for the fair rental value of space used in the operation and management of the asset side of the Old Company business. If not, how can the authority in Article VI to *charge* the Old Company account for rent and certain other expenses in the administration of the assets be justified? General American did credit the Old Company account for space used by it in administering the asset side of the business, and it does not now contend that it should not have done so. This is completely inconsistent with its position that it should not have credited the Old Company account for space used in administering the insurance side of the Old Company business, because if one is "for its own purposes" the other is "for its own purposes." It is true that Article VI permits General American to recover, i. e., charge to the Old Company account, the fair rental value of the space used by it in administering the asset side of the Old Company business, and that Article VI does not authorize the recovery of the fair rental value of the space in the

home office building (it does authorize the recovery of "all rentals * * * for the use of any equipment") used in administering the insurance side of the Old Company account. But Article VI does permit General American to "collect, receive and retain * * * from the assets and from the accumulations and earnings of the business and properties * * * for its *expenses* in operating and administrating (sic) such assets and business, a sum equal to the aggregate" of specifically enumerated items. Paragraphs 3 to 7 inclusive then provide for fees for administering the insurance side of the Old Company business. Rent is generally regarded as an expense of the operation of a business, and, no other provision having been made for charging the Old Company account for rent in the administration of the insurance side (as was specifically done for the administration of the asset side) of the business, the parties unquestionably intended that these fees "for its expenses" should include the expense of rent.

General American's position on this First Set-Off is, in substance, that when it used space in the home office building to administer the insurance side of the Old Company account it was not using that space "for its own purposes." This is diametrically opposed to the position it takes as to Exception C pertaining to state premium taxes. There General American seeks to justify its payment of more than $2,800,000 of state premium taxes on the basis, as it states in its brief, that "the assets and *business* carried in the Old Company account were the assets and *business* of General American" (emphasis added). As later set forth in our discussion of Exception C, we agree with the position of General American there made, but both of these inconsistent positions cannot stand. It is obvious that if the administration of the insurance side of the Old Company account was the "business" of General American, the use of a part of the home office building to administer that business was for its (General American's) purposes.

We conclude from a consideration of the entire Purchase Agreement that it was the intention of the parties that General American should credit the Old Company account with the fair rental value of that portion of the home office building used by it in administering both the asset and insurance side of the Old Company business. For whatever it is worth, we notice that the practical construction of the parties throughout the 15-year period was in accord with this interpretation.

For the above reasons the ruling of the trial court as to General American's First Set-Off is reversed and the issue is remanded for adjustment of the credits due the Old Company account according to the views here expressed.

We turn now to a consideration of Stockholders' Exception A. The method used by General American in arriving at what it considered to be the fair rental value of space used by it in the home office building was based upon the rent provided for in certain leases with The Federal Land Bank. The first lease made by General American with The Federal Land Bank covered the period from December 15, 1933 to December 14, 1936. It provided for an annual rental of $1 per square foot including the space in the basement. In 1936 The Federal Land Bank demanded a reduction in rent, and after considerable negotiation a 5-year lease was entered into which called for an annual rate of 25¢ per square foot for basement space and 90¢ per square foot for all other space. Apparently this reduction came about by not including in the rented space the public corridors and space such as that occupied by elevators. The result was that the annual rate was approximately $1 per square foot for the space actually used or 90¢ per square foot for the over-all or gross area. In 1941 a 10-year lease was entered into with the same terms as those in the previous 5-year lease, except that in addition to the rent The Federal Land Bank was to amortize the cost of air conditioning the leased space. Stockholders make no challenge whatever concerning these leases.

In 1933 the Superintendent and General American orally agreed that since General American and The Federal Land Bank occupied substantially the same amount of space in the building, the rental rate established by the lease with The Federal Land Bank was a fair method of determining the rental value of the space occupied by General American. This understanding was reduced to writing in the form of a letter from General American to the Superintendent and the original was marked "approved" and signed by the Superintendent. This same procedure was followed after the execution of the second and third leases. When the third lease was executed there was a new Superintendent. On September 9, 1941, General American wrote the new Superintendent stating: "It has been our understanding since 1933 that the rentals paid by The Federal Land Bank would determine the rentals to be paid by the General American Life Insurance Company to its 'Old Company' account under the provisions of the Purchase Agreement of September 7, 1933. This understanding is recorded in letters dated December 28, 1936, and May 8, 1937, approved in writing by the then Superintendent of the Insurance Department of Missouri. In order that there may be no misunderstanding about the continuance of such arrangement, we would appreciate your approving this letter as evidence of your understanding as Superintendent of the Insurance Department of Missouri that the Company's [General American's] rate of rental payments from December 15, 1941, to December 15, 1951 (or until such time as Purchase Agreement accounting ends), shall remain the same as the rental payments provided in the lease hereinbefore referred to, it being understood, of course, that in the event that the Company does not air-condition the space occupied by it, then the additional rentals provided in the lease will have no application. It should also be understood that in no event will the Company occupy less than five floors of the Building."

Stockholders have abandoned all their original contentions under their Exception A concerning the inadequacy of the credits to the Old Company account for rent except as follows: "General American and the Superintendent had no right under the Purchase Agreement in 1941 to fix the 'fair rental value' of the Home Office building at 90¢ a square foot for the entire period from 1941 to August 31, 1948," and the "rental credits for the 1946–1948 period were insufficient because General American's witnesses testified that such space used by the General American was worth $1.25 per square foot in 1947 and $1.50 per square foot in 1947 and 1948."

General American's position is that since it could not make a lease or contract with itself and thereby establish a landlord-tenant relationship, it did the next best thing and entered into a written agreement with the Superintendent regarding the rate of rent to be credited by it to the Old Company account during the period of the Purchase Agreement. It argues that it wanted, and that good business judgment dictated, that it acquire a reasonably permanent location for its home office, and that it was important to know what its costs would be for a reasonable period in the future. Therefore in 1941 it entered into what it contends was a valid and binding agreement with the Superintendent to occupy not less than five floors of the building for the remaining term of the Purchase Agreement, and that the fair rental value for the remaining period should be based on the rental rates provided for in the 10-year lease with The Federal Land Bank. The Stockholders admit, for the purposes of this appeal, that if General American and the Superintendent were authorized to fix the rate for rent in 1941 for the entire period remaining and to August 31, 1948, the rate then arrived at was fair and reasonable.

■ The Superintendent had no authority to enter into any agreement of rehabilitation of the insurance business of Missouri State Life without the express

approval of the Circuit Court, Lucas v. Manufacturing Lumbermen's Underwriters, 349 Mo. 835, 163 S.W.2d 750, 757, and in this case by its judgment the Circuit Court authorized and directed the Superintendent "to forthwith execute and proceed to perform the Purchase Agreement * * * in the form presented." The terms of the Purchase Agreement were then set out verbatim in, and became a part of, the judgment. General American and the Superintendent had no authority, by an agreement between themselves, to change the judgment of the Circuit Court. In Couch on Insurance 2d § 22:23, it is said, and we agree, that "When a [rehabilitation] plan has been adopted and approved by the court it is binding thereafter upon the parties and the state insurance commissioner." [5]

■ The essential question is whether the purported agreement or understanding between General American and the Superintendent evidenced by the letter of September 9, 1941 constituted a change, or stated another way—a violation, of the Purchase Agreement. Article V provides for five different "special accountings" on specified dates, one of which was the Final Accounting on August 31, 1948, and for additional accountings on "such other date or dates as may be specified by the Superintendent." The same Article also provides in plain and unequivocal language that at the time of each such accounting General American should credit to the Old Company account a sum equal to the fair rental value of the home office building *since the last preceding accounting* to the extent that the building was used by it for its own purposes *during such period*. We cannot escape the conclusion that regardless of the advantages to General American to be able to enter into a long term lease in order to stabilize or establish certain costs, or for other asserted reasons, the purported agreement

with the Superintendent was neither authorized by nor in accord with the terms of the Purchase Agreement and therefore it was void and of no effect. General American was required to credit the Old Company account on August 31, 1948 with a sum equal to the fair rental value for that part of the office building used by it for its own purposes from and after "the last preceding accounting," which was held on April 30, 1946, whether that sum be the same as, or higher or lower than, the sum arrived at by using the lease with The Federal Land Bank as the method for its determination.

■ We turn now to a consideration of the evidence concerning the fair rental value during this period under question. The only testimony bearing on the issue of what constituted a fair rental value subsequent to April 30, 1946, was presented by General American. Mr. Clarence M. Turley, one of its witnesses, was unquestionably well qualified and expert in the business of handling rental property in the St. Louis area similar to the home office building. The trial court found and declared that his experience "has been extensive and varied and without doubt his qualifications to testify to the condition of the rental market during the 15-year period are equivalent, if not superior, to any other person engaged in a similar business in this area." It was the opinion of Mr. Turley that the credits for rent from 1933 to 1941 made by General American to the Old Company account represented the fair rental value of the portion of the home office building used by General American. He testified that the lease for a period of ten years to The Federal Land Bank was fair and proper, and that "assuming that in 1941 General American * * * made a commitment to occupy the upper floors of that building * * * on the basis we have discussed before and on the rental arrangement similar or identical with that

5. Except that provisions found to be unconstitutional, illegal, or contrary to public policy would not be enforced, and the provisions are subject to change by the parties with the approval of the Circuit Court for good cause shown after proper notice and hearing.

as per $1.00 for usable space and 90¢ per square foot for gross space on those floors and 25¢ for basement storage space, * * for the period 1941 to and including August 31, 1948," then that would have been a reasonable rental arrangement "as of 1941." However, he stated that in 1942 and 1943 the "monthly vacancy survey" was in the neighborhood of 24%; that it decreased some in 1944; it was "around 11%" in 1945, which was "a substantial vacancy;" and that in 1946 it "had reduced to somewhere in the neighborhood of 5 or 6%." His following testimony is of such importance to the pending issue that we set it out verbatim.

"Q. Would that factor of vacancies affect the situation as to rentals? A. That would tend to, let's say, stiffen the rental market or the rental rates being obtained.

"Q. Now, in view of that fact, is that why you said that the rentals you have testified to would be fair and reasonable up to the period to 1945? A. Yes, sir.

"Q. Now, in 1946 what would be a reasonable rental value of floors seven, eight, nine, ten and eleven of that building assuming the service you assumed in previous questions? A. I feel a rental of $1.25 a square foot would be reasonable.

"Q. That was for 1946? A. Yes.

"Q. Would that apply for 1947? A. No, I think in '47 the rate would increase to $1.50.

"Q. And how about the first nine [eight] months of '48? A. I think $1.50 would be a fair rental value at that time."

The only other witness to testify concerning this issue was Henry F. Chadeayne, Secretary of General American. He testified as follows:

"Q. * * * [W]asn't the fair rental value of the space occupied by General American Life Insurance Com-

pany in the home office building $1.25 a square foot, excluding basement space, for the calendar year 1946 in your opinion, sir? A. May I explain my answer?

"Q. Surely. * * * A. I would like to qualify initially my answer by saying this: If the space were available for rent on January 1st, 1946, then it would be my opinion that $1.25 a square foot would have been in the neighborhood of a reasonable rental at that time.

"Q. I would like to use the words a fair rental value, would that be a fair rental value? A. Yes, for vacant space in the building, available for rent at that time.

"Q. All right. Now, for the years 1947 and the first eight months of 1948 in your opinion wasn't the fair rental value of the space in the home office building occupied by General American Life Insurance Company, excluding the basement space, $1.50 a square foot, making again, if you want to qualify it your same qualifications? A. Yes, I think if the space were available for rent the rent in 1947 and 1948 would have been somewhat higher than at January 1st, 1946.

"Q. And would that fair rental value under the qualifications mentioned by you and me both be about $1.50 a square foot?

* * * * * *
"A. * * * It would be my opinion that would be in the neighborhood of a fair rental value for space available in that building."

There is no evidence contrary to the above opinions as to the fair rental value of that part of the home office building used by General American subsequent to 1945. Since we have previously concluded as a matter of law that the purported agreement between the Superintendent and General American concerning the credit for rent subsequent to April 30, 1946 was not

authorized, and that General American on August 31, 1948 was required to credit the fair rental value for that part of the building used by it from "the last preceding accounting," we must and do conclude that for the last seven months of 1946 General American should have credited the Old Company account with a sum, as the fair rental value, determined on the basis of an annual rental of $1.25 per square foot of the space actually used by it (except basement space), and for 1947 and the first eight months of 1948 it should have credited to the Old Company account with a sum based on an annual rental of $1.50 per square foot of the space actually used by it (except basement space). There is no evidence that the fair annual rental value of the basement space was not 25¢ per square foot, and for that reason there is no occasion to disturb the method of computation of the sum credited by General American for the use of that space.

General American charged the Old Company account for rental space used by it in administering Old Company assets, and these charges should be figured on the same basis as the credits even though General American makes no specific contention to this effect. Therefore, the ruling of the trial court as to Exception A is reversed and the issue is remanded to the trial court for the determination of the additional amounts to be credited to and charged against the Old Company account according to the views herein expressed.

### Exception F. Investigation and Settlement of Claims.

By their Exception F Stockholders contend that General American improperly charged the Old Company account with $113,781.60 for certain expenses classified by it as "inspection" and "medical" fees.

The expenses in issue were incurred by General American in connection with the investigation and settlement of claims on matured policies in the Old Company account. The "inspection" fees were amounts paid to such organizations as Retail Credit Company and American Service Bureau for the investigation of matured policy claims. The "medical" fees were expenses of medical investigations in connection with claims on policies and fees of doctors for appearing as witnesses in certain proceedings in which General American resisted claims.

The position of General American, concurred in by the Superintendent, is that the charges against the Old Company account were authorized by Article VI, which in its applicable parts is as follows:

"The New Company shall be allowed and permitted to collect, receive and retain, * * * from the assets and from the accumulations and earnings of the business and properties, purchased hereunder, * * * for its expenses in operating and administrating such assets and business, a sum equal to the aggregate of the following items:

"1. First-year and renewal commissions and collection fees on business assumed or reinstated hereunder, paid according to the terms of Section (a) of Article IV hereof, entitled 'Agents' Commissions,' together with any medical and/or inspection fees required to be paid in the administration or renewal of said business."

Stockholders contend that General American was not authorized to charge against the Old Company account any expense of administering the insurance side of the business unless specifically authorized by the Purchase Agreement and that paragraph 1, Article VI does not authorize expenses of the type in issue to be so charged. In support of this contention Stockholders argue that when the Purchase Agreement was drafted the parties had in mind the terminology used in the Convention Blank. There, in line 19 under Disbursements, is listed "Medical Examiners fees" and "Inspection of Risks." These two items relate *only* to expenses incurred at the time of the original issuance or the later reinstatement

862

of a policy, and it is to these expenses that Stockholders claim the above quoted language refers. In line 13 of the Convention Blank under Disbursements is listed "Expenses of investigation and settlement of policy claims, including $——— for legal expenses." The items of expense in issue were listed in line 13, and Stockholders contend that the language of paragraph 1, Article VI does not refer to these expenses.

It is agreed that all expenses, whether of the type listed in line 13 or in line 19 of the Convention Blank, incurred before September 1, 1933 were properly charged against the Old Company account, not by reason of the provisions of Article VI, but by reason of Articles I and V. In the parts here material Article I provides that the New Company shall pay "All the expenses of closing the business and disposing of the assets of the Old Company, including court costs and attorneys' fees," and Article V provides that "every payment * * * required, authorized or permitted to be made by the New Company under the terms of this Agreement shall be and is a charge against the * * * Old Company account, and to be paid therefrom."

From September 1, 1933 to July 1, 1943, with the approval of the Superintendent and without objection on the part of the Convention Examiners, General American did not charge the expenses here questioned against the Old Company account. In fact, in 1939 the then General Solicitor of General American prepared an office memorandum in which he stated that "the home office and field administrative handling of * * * claims is one of the services intended to be covered by the management fees under the terms of the Purchase Agreement and therefore charged against the new company." However, in February 1942 General American's actuary questioned the previous procedure and the matter was submitted to the Superintendent who in December 1943 "ruled" that all the expenses here challenged were chargeable to the Old Company account as "Medical and In-

spection fees" pursuant to paragraph 1, Article VI. General American then made adjusting entries for the previous ten years.

The trial court overruled Exception F except as to a small item admitted to be a clerical error. It held that the term "said business" as used in paragraph 1, Article VI, meant all business, that is, both the insurance and asset side, and that any medical and inspection fees required to be paid in the administration of said business, which included the investigation and payment of claims, was a proper charge against the Old Company account. It relied primarily on the fact that the Old Company account was "closed" and concluded that "when it is understood that no new policies were to be issued by the Old Company with the exception perhaps of group policies * * * the reference to medical and inspection fees seems to be in contemplation of such fees necessary to be incurred in connection with claims." We note, however, that in considering Exception C, State Premium Taxes, the trial judge found that "new and additional insurance [apparently group] in a very substantial amount was written for the benefit of the Old Company account." We also note that on line 19 of the disbursement sheet of the Convention Examination Report of the Old Company account as of August 31, 1948, containing a composite statement of income and disbursements from September 7, 1933, there appears the following: "Medical examiners' fees $108,-910.34, Inspection of risks $43,910.68," a total of $152,821.02. Therefore, even though it may be said that the Old Company account was "closed" in some respects, a substantial sum of money was expended by General American for that type of medical examiners' fees and inspection of risks which were incurred solely in connection with the original issuance or reinstatement of policies, and to which Stockholders contend the language in paragraph 1, Article VI refers. The amount so expended was greater than the $113,781.61 expended for the "inspection" and "medical"

fees pertaining to claims on matured policies.

In order to evaluate the contentions of Stockholders and General American we should review the general plan of the Purchase Agreement concerning the payment of expenses incurred subsequent to September 1, 1933 in the administration of the Old Company account.

Article V required the New Company "to operate the business and realize on the assets" acquired from the Old Company, to keep a separate account thereof, and to compile a statement as of December 31 of each year on the Convention Blank. The general plan of the Purchase Agreement was to divide the total operations of the Old Company account into two basic groups; the asset side and the insurance side of the business. Article VI authorized the payment to the New Company of "management" fees for the operation of the insurance side of the business, and authorized the reimbursement of the New Company for certain specific expenses by charging them against the Old Company account. Generally speaking, practically every expense in connection with the operation of the asset side of the business was authorized to be charged against the Old Company account, but the New Company was to pay all the expenses of the administration of the insurance side out of the "management" fees allowed to it, except those limited expenses specifically authorized to be charged against the Old Company account.

The issue here to be decided is a legal one and not factual. It involves the interpretation of the applicable terms of the Purchase Agreement. When we consider the terminology used and the general plan of the Purchase Agreement for handling expenses of administering the insurance side of the business, we cannot escape the conclusion that it was the intent of the parties, as recognized by General American, the Superintendent and Convention Examiners for a period of ten years, that the processing and resisting of claims on policies were services to be performed by General American in return for the "management" fees; and that these contested expenses were to be borne by General American. The "management" fees were certainly adequate for that purpose. For example, in a report by General American to the Superintendent it was stated that for the first four years and four months of its administration of the Old Company account the amount of management fees in excess of actual expenses relating thereto was $2,620,777. In the compilation of this figure the expenses at issue then incurred had not been charged against the Old Company account but were figured in the actual expenses of General American. The parties, in drafting the Purchase Agreement, were familiar with Convention Blank accounting and the manner in which expenses were therein classified. When in paragraph 1, Article VI the term "any medical and/or inspection fees" was used, it is obvious that reference was had to "Medical Examiners' fees" and "Inspection of Risks" set forth on line 19 of the Convention Blank, and not to "Expenses of Investigation and settlement of policy claims" set forth on line 13. In insurance terminology the risk of entering into or renewing an insurance agreement is "inspected," and claims pertaining to matured policies are "investigated." The uniform and consistent practice of ten years in accord with the considered judgment of General American's General Solicitor supports our interpretation. That practical construction changed only when General American's actuary discovered language in the Purchase Agreement which he thought permitted the charge against the Old Company account, contrary to the general plan of compensation for administering the assets and business.

General American contends, and the trial court agreed, that when the Purchase Agreement provided for charging the Old Company account with "medical and * * inspection fees * * * in the administration and renewal of said business," the term "said business" included the insurance

side of the total operations, and the term "administration" included processing claims on matured policies. These terms must be considered in context. Paragraph 1, Article VI consists of but one sentence. The first part authorizes General American to charge the Old Company account with "First-year and renewal commissions and collection fees" on the insurance business assumed or reinstated when paid according to the terms of Section (a) of Article IV. That Section authorized General American to pay "the amount of commissions, allowances and benefits" to those former agents of Missouri State Life who agreed to employment with General American which the agents "would otherwise lose" by reason of the termination of their contract of employment with Missouri State Life and the reduction of "any commissions, whether first year or renewal" by "the lien percentage of 50%." The "First-year and renewal commissions and collection fees" of agents of Missouri State Life, as reduced by the lien, when paid by General American were chargeable against the Old Company account pursuant to Articles I and V. The first part of this single sentence comprising paragraph 1, Article VI authorizes General American to charge against the Old Company account under the stated circumstances only that part of "first year and renewal commissions and collection fees" paid by it to former agents of Missouri State Life which they would otherwise have lost by reason of the lien provisions. These expenses pertain only to the origination or renewal of policies. The last part of the sentence refers to "medical and/or inspection fees," required to be paid in the administration or renewal of said business. When the term "medical and/or inspection fees" is held to refer to "Medical Examiners' fees" and expenses of "Inspection of Risks" as used in line 19 of the Disbursement side of the Convention Blank, and as we think it does, then both parts of the same sentence refer to fees and expenses incurred only with the origination or renewal of policies, and not to the expenses of administering matured policies.

This is in accord with the general plan of the Purchase Agreement pertaining to the right to charge expenses and with the obvious intent of the parties.

■ General American contends that "a construction of the parties themselves in the course of performance of their contract is conclusive of the meaning of a provision which may not be clear from its own terms," and that the "ruling" by the Superintendent that the contested expenses could be charged is therefore conclusive. Ellis v. Harrison, 104 Mo. 270, 16 S.W. 198 and United States v. Springfield Fire & Marine Insurance Co., 8 Cir., 207 F.2d 935, are cited. As indicated previously, the construction placed upon an ambiguous contract by the parties is not conclusive. Certainly the construction by the parties is not entitled to much weight in this instance, because it was not consistent. It was construed one way for ten years and the opposite way for five years. "There is no binding construction of a contract by the parties where they construe it different ways at different times." 17 C.J.S. Contracts § 325, c., p. 765. If we were to assign any weight to either period we would prefer the first period, for it was during that period that R. Emmett O'Malley, an original signatory party to the Purchase Agreement, was in office as Superintendent. Furthermore, the ruling of the Superintendent in December 1943 demonstrates its own weakness. In effect he held that General American could charge against the Old Company account as "Medical and Inspection fees" the costs of obtaining reports from credit agencies and investigation services concerning claims on policies, but could not charge the expenses of obtaining copies of birth and death certificates. If the Superintendent was correct as to the first part, what could be more essential to the proper processing of a claim than to determine that the insured had in fact died or that the person who died was in fact the insured?

We conclude that the judgment of the trial court as to Exception F must be re-

versed and the issue remanded for the imposition of a surcharge in the agreed amount of $113,781.60.

Exception C. State Premium Taxes.

 Stockholders except to the charge against the Old Company account of the aggregate sum of $2,806,390.40, representing premium taxes paid to the various states by General American over the 15-year period. The trial court overruled this exception.

The facts are not in dispute. General American exercised the privilege of engaging in the insurance business in a majority of the states. It solicited and sold insurance in the New Company account, collected premiums on New Company policies, and serviced them; it collected premiums on policies in the Old Company account and, as contemplated in the Purchase Agreement, renewed and extended existing Old Company group life, accident and health policies and wrote new insurance for the Old Company account in the group lines. During the 15-year period every state in which General American did business imposed a premium tax for the privilege of engaging in the insurance business therein. Such taxes, generally speaking, are calculated upon the basis of, and are measured by, the amount of premiums collected by the insurance company from policyholders residing in the state in which the taxes are imposed. Each year General American's accounting department tabulated all of the premiums collected from both Old Company and New Company policyholders in each state, without distinction between the two, and paid the premium tax so determined. On its records General American allocated the premium taxes to the New and Old Company accounts on the basis of the amount of premiums collected on policies in the respective accounts. During the 15-year period General American paid a total of $3,853,003.29 in state premium taxes, $2,806,390.40 of which were charged against the Old Company account. These payments and charges

were reported in every annual statement and special accounting during the 15-year period and were checked and approved by the Convention Examiners and by the various Superintendents of Insurance of this state from 1933 to 1948.

Stockholders make two principal contentions. The first is that there was no legal obligation on General American to pay the premium taxes which it charged against the Old Company account, and that it should not have paid them. In this connection Stockholders assert that premium taxes are taxes on the privilege of doing business; that the Purchase Agreement was a mere management contract and not a reinsurance contract and that General American, in collecting premiums on Old Company policies, was acting merely in the capacity of managing agent or trustee, which did not require a permit, and, therefore, General American should not have paid any premium taxes on premiums collected on Old Company policies. The second is that if the premium taxes were properly paid by General American they should not have been charged against the Old Company account.

One basis upon which General American seeks to justify the payment of these taxes is the business judgment rule, but this rule has no application to this exception, which presents only questions of law. Liability or nonliability for the payment of these taxes is to be determined from the applicable principles of law and not by applying some standard of discretion or business judgment.

In support of its position that General American was not liable for and therefore should not have paid the premium taxes which it charged the Old Company account, Stockholders rely primarily on American United Life Insurance Co. v. Fischer, 234 Iowa 460, 461, 11 N.W.2d 573, 576. In that case the Supreme Court of Iowa held that the Iowa premium tax is an "annual tax" assessed for "the privilege of doing business * * * during the year in which the premiums are received"; that the stat-

ute imposing the tax "refers to such companies as are transacting business in Iowa that requires a license or consent from the state"; that the "mere collection of premiums on already existing policies is not 'doing business' in the sense of the statute"; and the fact that "the collection of such premiums is being made by an agency or trusteeship, represented by a foreign insurance company which is also transacting its own business in Iowa in its own right, cannot make it liable for this tax when there is no business of the agency or trusteeship being performed to make anybody liable."

■ A state tax on gross premiums or receipts of a foreign insurance company is generally understood not to be a property tax but to be an excise or privilege tax imposed for doing business within a state. Bankers Life Co. v. Chorn, Mo.Sup., 186 S.W. 681; General American Life Insurance Co. v. Bates, 363 Mo. 143, 249 S.W.2d 458; Couch on Insurance 2d ed. §§ 21:115, 21:119–21:122; 44 C.J.S. Insurance § 380. Also, as a general rule when an insurance company ceases to do business in a state there is no further liability on it for such a tax (but see State v. Continental Assur. Co., 176 Tenn. 1, 137 S.W. 2d 227, 138 S.W.2d 447, appeal dismissed 311 U.S. 5, 61 S.Ct. 1, 85 L.Ed. 5), and the mere continued collection or receipt of insurance premiums on previously written policies does not constitute doing business in a state, within the meaning of that term. American United Life Insurance Co. v. Fischer, supra; State ex rel. Smrha v. General American Life Insurance Co., 132 Neb. 520, 272 N.W. 555; Couch on Insurance 2d § 21:117. In Provident Savings Life Assurance Society v. Commonwealth of Kentucky, 239 U.S. 103, 36 S.Ct. 34, 37, 60 L.Ed. 167, L.R.A.1916C, 572, it was said that "as a privilege tax, that tax rests upon the assumption that what is done depends upon the state's consent. But the continuance of the contracts of insurance already written by the company was not dependent on the consent of the state."

It thus appears, except possibly in Tennessee, that when an insurance company ceases to do business in the various states as a foreign corporation and its policies are placed under the management and control of a mere receiver, trustee or agent (i. e., its policies are not assumed and reinsured by another company) the act of the receiver, trustee or agent in subsequently collecting or receiving premiums on the outstanding policies of the foreign corporation would not result in any liability upon the part of the receiver, trustee or agent for premium taxes on those premiums, notwithstanding the fact that the latter conducted an insurance business of its own, on its own account, in those states. However, the implication of the Iowa case, and the express ruling of Central States Life Insurance Company v. State, 190 Ark. 605, 80 S.W.2d 628, is that· if the assets and business of an insurance company are sold and transferred to another company under an agreement to reinsure and assume the outstanding policies, then when the reinsuring company collects the premiums on such previously issued policies it is not, in respect to those policies, acting as trustee or receiver, but is acting for itself, and if it otherwise does business in a state which requires the payment of a gross premium tax as a prerequisite to the consent of the state to conduct that business it is liable for the tax measured by the gross premiums received on the reinsured policies as well as on policies originally issued by it. While the above statement necessarily must be general because the liability in each state for a premium tax depends upon the precise language of the statute, the above two situations present the opposing views of the Stockholders on the one hand and General American and the Superintendent on the other. The determining factor under the respective positions of the parties is whether the Purchase Agreement provided for a management contract with General American merely acting as the agent or trustee to collect the insurance premiums and manage the business,

as contended by Stockholders,[6] or whether General American was a reinsurer of the policies and acting for itself when collecting the premiums.

■ The parties on both sides cite literally dozens of instances in which isolated words or phrases were used and employed by counsel and by witnesses in court appearances or depositions, in the language of the decree of 1933, in the Purchase Agreement, in pleadings in lawsuits, letters, memoranda, reports, examinations, pamphlets and documents, by the various Superintendents, officers, actuaries and agents of General American, Convention Examiners and other individuals who during the 15-year period had some part in considering, construing or operating under the terms of the Purchase Agreement. Many acts, statements and practices have been singled out and advanced by the parties in support of their respective positions. Some of this material tends to indicate that the Purchase Agreement was nothing but a management contract in which General American occupied the status of a mere agent, steward, trustee or administrator and that there was no real sale of the business and assets and no reinsurance of the Old Company policies, but merely a temporary trusteeship with an option in General American to purchase and to reinsure at the end of the 15-year period. On balance, approximately an equal amount of this material indicates that the Purchase Agreement resulted in a bona fide and genuine sale whereby for many valuable considerations General American purchased the policies, assets and business of the Old Company as its own property, in fee simple absolute, and that the Purchase Agreement was a present contract of reinsurance.

After careful consideration of each of these evidences of intent, together with the persuasive arguments advanced by resourceful and competent counsel, and with the dedicated purpose of ascertaining and giving effect to the over-all objective and purpose of the arrangement entered into between the parties in 1933, we have reached the conclusion that the Purchase Agreement was neither a pure management contract nor a pure reinsurance contract. It had some of the characteristics and attributes of each. Considered in their entirety, the terms and provisions of the Purchase Agreement and of the court decree approving it effected a limited sale of the assets and business of the Old Company to General American and a limited reinsurance of its policies by General American, a sale authorized by statute and confirmed and approved by a judicial decree, for a particular purpose and for a specified period of time. The purpose and objective of the entire arrangement was to have a solvent insurance company assume, administer, manage and operate the business, assets and insurance of an insolvent, dissolved company, not as a mere agent, trustee or receiver acting in a representative capacity, but as the real and responsible owner for a 15-year period with these objectives in view: to conserve the business and maintain the insurance in force, to afford the holders of contracts and policies the protection and benefits for which they had contracted, to rehabilitate the Old Company account, to pay periodically out of "net earnings" amounts to reduce and ultimately to eliminate policy liens, and then to pay out the balance of "net earnings," if any, to the Stockholders of the Old Company at the end of the 15-year period. During

6. Stockholders also cite Lincoln National Life Insurance Co. v. Fischer, 235 Iowa 506, 17 N.W.2d 273; Central Life Assurance Society v. State ex rel. Frittz, 191 Okl. 493, 131 P.2d 110; Morthland v. Lincoln National Life Insurance Co., 216 Ind. 689, 25 N.E.2d 325; Berry v. Kavanaugh, 6 Cir., 137 F.2d 574; the opinions of the Attorney General of Missouri and eight other states; and the opinion of the Chief Counsel of the Missouri Superintendent of Insurance. Each citation has been carefully examined and they support the reasoning of the previously cited cases from Iowa and Arkansas. They are not, however, particularly helpful in determining whether the Purchase Agreement in this case is a mere management contract or one for reinsurance.

the 15-year period the assets and business acquired by the terms of the sale were to be managed and operated according to the terms of the contract and decree, under the continuing supervision of the Superintendent and subject to the orders of the court. The seller retained a lien on the subject matter of the sale to insure the payment of all sums due to be paid by the purchaser. The sale operated to convey the legal title to the assets, business, etc., and invested the purchaser with many, but not all, of the incidents and attributes of ownership. It was not an absolute and unconditional sale in the sense that the purchaser acquired full and unlimited dominion over the subject matter of the sale. Limitations and restrictions were imposed upon the rights of ownership of the purchaser. Within the framework of those limitations and restrictions, however, the purchaser received and enjoyed the rights of ownership and in order to accomplish the over-all purposes of the entire arrangement had the duty to exercise ordinary business prudence in the management and operation of the insurance account, business and assets.

General American took over the assets of the Old Company account and operated and managed the account in the capacity of principal or owner. For the 15-year period General American assumed all of the outstanding insurance and annuity policies of the Old Company in force August 28, 1933 in its own name, for the purpose of carrying out the obligations of the Old Company as contained in said policies and contracts, "according to the true intent and tenor thereof," subject to the provisions respecting liens, cash loans and surrenders. This constituted reinsurance by General American for 15 years, insofar as the unliened amounts of the policies were concerned. Although all payments by General American under the Purchase Agreement were to be paid from and charged to the Old Company account, its assumption of liability to pay the insurance and annuity policies of the Old Company was not limited to pay only to the extent of the assets re-ceived from the Old Company and segregated in the Old Company account, as in American United Life Insurance Co. v. Fischer, supra, but its assumption of liability was general, with the exceptions noted above. All policies started the 15-year period with a 50% lien on them, but if an insured died before September 1, 1948 General American waived the lien in the payment of the death claim, subject to the deduction of any accrued interest on the amount of such lien. The mortality cost of lien waivers was to be provided out of the "net earnings" of the business of the Old Company, but if the "net earnings" of the Old Company account were insufficient to provide that mortality cost, General American agreed to provide therefor, or reinsured the payment, out of its own surplus. If, during the 15-year period, there had been insufficient assets in the Old Company account to pay a claim General American would have been obliged to pay the unliened amount due under the policy out of the New Company account, i. e., out of the funds, assets and resources of General American, but the surplus only of General American would have been liable for the mortality cost of the waiver of the lien. A 15-year reinsurance was provided, i. e., an assumption by General American of the insurance risks of Missouri State Life and the substitution of the former for the latter, as the insurer, with the consent of the policyholder. It was a limited type of reinsurance—what we denominate "term reinsurance," for the lack of a better name. At the end of the 15-year term General American had the option to keep the account and to make permanent the temporary reinsurance. (Temporary, in that the reinsurance was for a 15-year term only; permanent, in that by completing the payment of the total purchase price by paying $7.50 per thousand dollars of life insurance in force on August 31, 1948, the temporary reinsurance would then become reinsurance for the life of the policies.)

There was only one company. The Old Company account was not an entity separate and apart from General American.

Ownership and managership were not divorced, as in the case of a trustee managing assets of an insolvent corporation, with no personal liability for its debts. The liability of General American for state premium taxes based on Old Company business was governed by the general rule announced in Central States Life Insurance Company v. State, supra [190 Ark. 605, 80 S.W.2d 628].

We turn now to the question whether General American was entitled to charge state premium taxes against the Old Company account. First to consider is Stockholders' contention that the sole reason General American paid these taxes was to enable it to secure a license to sell new insurance in the New Company account. They argue that the resulting benefit was to the New Company account only and for that reason it, and not the Old Company account, should be charged with these taxes. Under the general rule previously mentioned, and disregarding the apparently different rule in Tennessee, it appears that if General American had not engaged in the insurance business in those states other than Missouri where Missouri State Life policies were in force it would not have incurred any liability for premium taxes, because the mere collection of premiums on policies previously written does not result in any such tax liability. Provident Savings Life Assurance Society v. Commonwealth of Kentucky, 239 U.S. 103, 36 S.Ct. 34, 60 L.Ed. 167, L.R.A.1916C, 572; State ex rel. Smrha v. General American Life Ins. Co., 132 Neb. 520, 272 N.W. 555. In making this assertion Stockholders necessarily take the position that the act of General American in writing "new and additional [group] life insurance in a very substantial amount * * * for the benefit of the Old Company account" did not constitute doing business in the states where such insurance was written. General American does not rely on a contrary contention.

One of the principal objectives of the Superintendent and General American in executing the Purchase Agreement providing for the disposition of the former assets and insurance business of Missouri State Life was to get those assets and policies as quickly as possible into the hands and under the management of a solvent insurance company which would actively and aggressively engage in the insurance business every place where feasible and profitable to do so. The objective was not to liquidate the business, but that would have been the inevitable result if General American had stayed out of all those states where Old Company policies were in force. The Purchase Agreement clearly contemplated that General American should expand its business in the New Company account in every way possible during the 15-year period. It placed no restriction whatever on General American as to where it should seek to do business, and it would have been completely contrary to the over-all objective to provide that General American should reinsure the Old Company policies, but that in building up its resources to accomplish this it should not operate in those states where Old Company policies existed.

As discussed elsewhere, the over-all plan was that in the operation of the insurance side of the Old Company business General American would pay all the expenses in return for the "management fees," and General American was not to charge any such expenses against the Old Company account unless expressly authorized. Paragraph 2, Article VI provides certain exceptions to the general rule, one of which is that General American could charge against the Old Company account "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or assets to be acquired by the New Company as herein provided." Stockholders, without citing authority, contend that the "taxes referred to or contemplated by this clause are manifestly property taxes assessed against the business * * * and could not apply to or cover premium taxes." We do not agree. Premium taxes unquestionably are included in the term "all taxes," and they unquestionably were incurred "in respect to the busi-

ness," that is, General American's business which included the insurance side of the Old Company business. In addition, we note that the uniform and consistent construction of this provision by the parties supports this result. For fifteen years the parties to the Purchase Agreement construed state premium taxes to be "taxes payable * * * in respect to the business * * * acquired by the New Company." The construction was reasonable, uniform, consistent and knowledgeable, and it was approved throughout the period by all the Convention Examiners.

The judgment of the trial court on Exception C is affirmed.

### Exception Y (Part): State Premium Taxes for 1948

Stockholders except to the charging of the Old Company account with a reserve in the sum of $104,647.65 for state premium taxes accrued from January 1 to August 31, 1948. The issues raised by this exception are governed by our ruling on Exception C. There is no dispute as to the facts. It therefore follows that General American was entitled to establish a reserve for the payment of its legal obligations for state premium taxes for this period and such reserve would be a proper charge against the Old Company account. Accordingly we affirm the judgment of the Circuit Court overruling that part of Exception Y presented for review.

### General American's Second Set-Off: Social Security Taxes

In response to Stockholders' exceptions General American pleaded its Second Set-Off, asking credit in the sum of $132,910.85, under paragraph 2, Article VI for the proportionate amount of social security taxes payable on or in respect to "the business" of the Old Company, paid by General American but at no time charged to the Old Company account. At the trial the Superintendent took no position upon the Set-Off because it was a "matter of accounting not previously brought to the

attention of the Superintendent." The Circuit Court held that social security taxes were the type of taxes referred to in paragraph 2, Article VI, which entitled General American to credit for its expenses in operating and administering the *"assets and business"* including "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or assets to be acquired by the New Company as herein provided."

The taxes involved are the federal and state taxes commonly known as social security taxes: taxes against employers under the Federal Contributions Act, 26 U.S.C.A. §§ 1400–1432, the Federal Unemployment Act, 26 U.S.C.A. §§ 1600–1610 and the Missouri Unemployment Act, Sections 288.010–288.380 RSMo 1949, V.A.M.S. First imposed in 1937, these taxes were never charged to the Old Company account under paragraph 2, Article VI in any accounting, and until after exceptions to the Final Accounting were filed there had never been any contention by General American, the Superintendent, or any examiner that they should have been so charged. From 1937 to 1948 they were treated as expenditures to be divided between New and Old Company accounts under paragraph 9, Article VI, i. e., the Old Company account was charged with those social security taxes paid by General American referable to the administration of the *assets* of the Old Company account, and the New Company account was charged with all other social security taxes paid, i.e., those referable to the insurance side of the Old Company account and those referable to the asset and insurance sides of the New Company account.

Stockholders claim that those taxes were not chargeable to the Old Company account under paragraph 2, Article VI, because they were not taxes payable on or in respect to Old Company "business and/or assets," but were excises on the privilege of employment, properly chargeable under paragraph 9, Article VI, to the Old Company account only to the extent that they were incurred

on payrolls of employees engaged in the administration of the *assets* (and not of the *business*) of the Old Company account. They point to the language of the two federal acts which refer to the tax upon the employer as an "excise tax, with respect to having individuals in his employ," and to the language in the state act making contributions payable by employers "with respect to wages payable for employment." Stockholders say that these taxes do not fall upon "business" as such in general, which they say means "the insurance side of the Old Company account," i.e., insurance policies, annuity contracts, etc., in force, but fall only upon the particular phase of business relating to the privilege of employing persons and paying wages. They say neither Missouri State Life (dissolved in 1933, before the enactment of social security laws) nor the Old Company account exercised the privilege of employing anyone; that the Old Company account was not a legal entity, never had any individuals in its employ, never was an employer so as to be subject to the tax, and that General American and General American alone exercised the privilege of paying wages to employees, so that General American alone is responsible for taxes on that privilege.

General American contends that its failure to charge the Old Company account with its proper share of taxes under paragraph 2, Article VI was an error, a failure to take said paragraph 2 into account; that social security taxes were taxes "payable on or in respect to the business" of the Old Company account; that the insurance business acquired by General American under the Purchase Agreement could not have been operated without employees; and that social security taxes with respect thereto constituted a necessary incident to the operation of such business.

Paragraph 2, Article VI permitted General American to charge against the Old Company account "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or assets * * *." Paragraph 9, Article VI, allows General American to charge against the Old Company account expenses incurred in connection with the administration of the *assets* of said account, including "all *salaries, wages,* * * * and like expenditures; and the amount of *all expenses* of the Home Office Investment Department"; it provides for proration between the New and Old Company accounts whenever an expenditure is partly incurred with respect to the assets of both, and provides for the approval by the Superintendent of every proration of any expenditure for salaries or wages.

■ It is perfectly clear that the parties to the Purchase Agreement, executed in 1933, did not contract with reference to social security taxes as such. The social security legislation was not enacted until, 1937. That the parties contemplated some change in the tax laws, however, may be inferred from their use of the language " * * * taxes * * * which may hereafter become payable * * *." Whether the business side of the Old Company account should be required to bear its proportionate share of the burden of social security taxes paid on account of the employees of the New Company depends upon a proper interpretation of the language used in paragraph 2, Article VI. Are social security taxes payable "on or in respect to the business?" What is meant by "the business" ? The meaning of this term depends upon the context in which it is used. It may mean the total operation of the insurance company's business in general and as a whole, or it may mean the insurance contracts, policies, annuities, etc., of the company outstanding and in force in a particular account. The use of the word "business" in the phrase "business and/or assets" indicates that "business" was used in contradistinction from "assets." Throughout the Purchase Agreement the distinction between "business," referring to the insurance side of the operation, and "assets," referring to the assets side of the operation, is preserved. We conclude that the lan-

guage in paragraph 2, Article VI that General American could charge against the Old Company account "all taxes * * * which may hereafter become payable on or in respect to the business" referred to taxes on or in respect to the policies, annuities, contracts, etc., on the insurance side of the Old Company account. Social security taxes are not payable "on or in respect to the business" as thus used. Social security taxes are excises imposed upon the privilege of employing persons. They are specifically so defined in the federal statutes enacting them. See 26 U.S.C.A. §§ 1410, 3111, 1600 and 3301. The "contributions" (see § 288.-090 RSMo 1949, V.A.M.S.) required by Missouri is an excise. Henry v. Manzella, 356 Mo. 305, 201 S.W.2d 457.

A privilege tax on the relationship of employer and employee is not a tax on or in respect to the business in which the employer is engaged. In United States v. Glenn L. Martin Co., 308 U.S. 62, 60 S.Ct. 32, 84 L.Ed. 82, a contract for the sale of aircraft and aircraft parts, entered into between the United States and a manufacturer, contained a provision that any federal taxes which might thereafter be imposed "and made applicable directly upon production, manufacture, or sale of the supplies called for * * *" should be added to the sale prices stipulated in the contract. Thereafter the Social Security Act was passed, 42 U.S.C.A. § 301 et seq., giving rise to the question whether the contract prices should be increased by the amount of the social security taxes paid by the manufacturer. The Supreme Court of the United States held that the contract concerned federal taxes "on" the goods to be provided under it, whatever the occasion for the taxes, and that a tax "on" the relationship of employer and employee "is not of the type treated by the contract as a tax 'on' the goods or articles sold," 308 U.S. loc. cit. 65, 60 S.Ct. 32, 34; that the manufacturer was not entitled to extra compensation under the contract. General American concedes " * * * that the Social Security Tax is not a direct tax *on* in-

surance business or a direct tax *on* assets" but maintains that it is a tax payable *in respect to* the business or assets. The distinction which General American seeks to draw is not valid. "On" and "in respect to" as used in the Purchase Agreement mean the same thing. This point has been decided twice by the Massachusetts Supreme Court. In Codman v. American Piano Co., 229 Mass. 285, 118 N.E. 344, 345, there was a covenant in a lease to pay "all taxes and assessments whatsoever * * * for or in respect of the * * * leased premises * * *." The court held that "a tax 'on' or 'for' or 'in respect of' leased premises means the same thing, and that no sound distinction exists between them"; that the "legal signification" of taxes " 'for' or 'in respect of' leased premises" is that "the taxes are those which relate directly to the premises themselves." In United Shoe Machinery Corp. v. Gale Shoe Mfg. Co., 314 Mass. 142, 49 N.E.2d 913, 916, there was a covenant in a lease by which the lessee promised to "pay all taxes and assessments which shall be assessed upon or in respect to the leased machinery * * *." The taxing statute imposed an excise tax upon the lessor with respect to the carrying on or doing of business by it within the commonwealth. Again the court held that the covenant did not include the excise tax as a tax "in respect to" the property described in the lease. We endorse this view. The social security taxes in question were neither taxes on nor in respect to the business of the Old Company account. The fact that the persons upon whose wages the taxes were calculated assisted in and were essential to the operation of the insurance company or of its business does not change the nature of the tax.

The practical construction by the parties of paragraph 2, Article VI, supports and confirms our view on the merits. From the fact that the Old Company account was charged with the social security taxes paid by General American referable to the administration of the assets side of the account, but not charged with taxes referable

to the business side, it may be inferred that General American and the superintendent in office when these taxes were first imposed, consciously considered the question of the construction of paragraph 2, Article VI. At no time following the enactment of the Social Security Act did either party charge the Old Company account with social security taxes, or contend that such taxes should be charged, in the manner now proposed by General American. No such contention was made until after the Final Accounting and not then until after the Stockholders had filed their exceptions. Then for the first time the contention was advanced as a Set-Off. There is every indication that it was both an innovation and an afterthought.

On the merits, and because of the eleven-year uniform, consistent and knowledgeable construction placed on the Purchase Agreement by General American and the superintendents as not including social security taxes upon the business, i.e., the insurance side of the Old Company account, the judgment of the Circuit Court on General American's Second Set-Off is reversed and the issues thereon are remanded for further proceedings consistent with the views herein expressed.

### Exception E. Convention Examinations and Audits

### General American's Third Set-Off

■ Stockholders except to charges against the Old Company account of a portion of the expense of conducting three of the five Convention Examinations of General American between 1933 and 1948. General American contends the charges were proper, and for its Third Set-Off asserts that it was entitled to charge the Old Company account with more of the expenses of the other two Convention Examinations than it did. The trial court overruled Exception E and sustained the Third Set-Off.

There is no dispute as to the facts. The legal question, broadly speaking, is whether under a proper construction of the Purchase Agreement the expenses of these Convention Examinations allocated to the examination of the Old Company account were "taxes" within the meaning of paragraph 2, Article VI, or "expenses" within the meaning of paragraph 9(a), Article VI. If the former, they all were properly charged to the Old Company account. If the latter, only such portions of these expenses as relate to Old Company assets should have been charged to the Old Company account. These Convention Examinations, for purposes of clarification, should be distinguished from other accountings or statements. General American was required to keep a separate account of the business and assets of the Old Company and "to compile a statement thereon" each year on the Convention Blank. It was also to have five "special accountings" at stated times for particular purposes, the cost of which was to be "borne by the New Company," and "additional special * * * accountings" when requested by the Superintendent, the cost of which was to "be charged to the Old Company account." None of these statements or accountings is to be confused with the five Convention Examinations under consideration.

A Convention Examination is an examination of the financial condition of a life insurance company conducted by the insurance department of the state of its domicile, assisted by examiners from other states in which the company does business. It is "a much broader proceeding" than auditing annual statements. It calls for the examiners to go to the office of the company, examine the records, and do everything necessary to determine the financial condition of the company. Under Missouri law such an examination must be made periodically (§ 5684 RSMo 1929; § 5794 RSMo 1939; § 374.190 RSMo 1949, V.A.M.S.), and the expenses therefor "shall be assessed by the superintendent upon the company" which shall be "in the first instance paid by such company, on the order of the superintendent directly to the person or persons rendering the service" (§ 5685 RSMo 1929;

§ 5795 RSMo 1939; § 374.220 RSMo 1949, V.A.M.S.): The examination expenses, according to General American's witnesses, consist of a "per diem fee and a per diem expense allowance" for the examiners. The rates are fixed by the supervisory authorities of the states represented by the examiners, and the bills are submitted and paid directly to the examiners from time to time during the course of the examination.

. The general plan of the Purchase Agreement, as explained in detail elsewhere, was that General American should "operate the [insurance side of the] business" and in return therefor receive certain "management fees." It could charge against the Old Company account only those items of expense in connection therewith specifically authorized. Paragraph 2, Article VI specifically authorized General American to charge against the Old Company account "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or assets to be acquired by the New Company * * *." General American and the Superintendent contend that the expenses incurred and paid directly to the Convention Examiners in connection with the five Convention Examinations constitute "taxes" within the meaning of paragraph 2, Article VI. Stockholders, on the other hand, contend that these expenses are not "taxes," and that there is no authority to charge against the Old Company account that part of said expenses applicable to the insurance side of the account. They admit, however, that the portion of the total expenses for Convention Examinations applicable to the asset side was properly charged against the Old Company account pursuant to paragraph 9, Article VI which authorizes a charge of "Expenses to be incurred in connection with the administration of Old Company assets, to wit: (a) All * * * accounting charges, * * * and like expenditures * * *."

The expenses of the five Convention Examinations were not treated uniformly by the parties. General American tentatively divided the 1935 examination expenses between the Old Company and New Company account on the basis of total business in each account. The Convention Examiners recommended to the Superintendent that the expenses be allocated to the New and Old Company accounts on the basis of the time spent in examining each account, and that only that part be charged against the Old Company account applicable to the examination of the asset side, and not the insurance side, of the business. This was in accord with Stockholder's present position. General American followed this recommendation in allocating and charging the expense, but did not agree with it. The same procedure was used for the expenses of the 1939 Convention Examination. Following the 1939 Convention Examination General American made a protest to the Superintendent concerning the position taken by the Convention Examiners as to certain matters including the allocation expenses for the valuation of policies. This will be discussed in detail in connection with the consideration of Exception G. In December 1940 the Superintendent "ruled" that expenses of valuations of policies were "in the nature of a tax" and properly chargeable against the Old Company account. General American and the Superintendent placed considerable reliance on the ruling of a board of arbitration in 1930 that the phrase "all taxes payable on or in respect to said business or assets" contained in a reinsurance contract between International Life and Missouri State Life included expenses of valuation of policies and Convention Examinations. At the time of the 1942 Convention Examination the Missouri examiner took the position that expenses of the Convention Examination were also "in the nature of a tax and each account should bear the expense for the work done * * *." With the approval of the Superintendent the expenses of examining the Old Company account, both insurance and assets, were charged to it, and this procedure was followed in the 1945 and 1948 examinations. This was in accord with General American's present position.

The basic question is: which procedure was correct? The proper procedure will apply to the allocation of expenses for all Convention Examinations. It is agreed that if the expenses of the Convention Examinations are "taxes" within the meaning of paragraph 2, Article VI, General American is entitled to its Set-Off in the amount $79,973.82, but if these expenses are not "taxes," as therein defined, Stockholders are entitled to a surcharge under their Exception E in the amount of $35,204.46.

The trial court held that it was not necessary to rule on whether or not the expenses of Convention Examinations was "a tax under the statutes" because it was a "tax" within the meaning of the term "all taxes" as used in paragraph 2, Article VI.

 In support of its argument that these fees and expenses are taxes General American points out that the two terms are frequently used interchangeably in the General and Business Corporation Law and in the Motor Vehicle Code; that they are statutory exactions "assessed" against insurance companies as a requisite to their doing business (language appropriate to the field of taxation); that by failure to pay them a first lien is impressed upon the company's assets, and that since 1945 they have been allowed as deductions in computing the state premium tax. These facts, however, do not bring these expenses and fees within the technical definition of the word "taxes." Taxes are "proportional contributions imposed by the state upon individuals for the support of government and for all public needs." Taylor v. Gehner, 329 Mo. 511, 45 S.W.2d 59, 60, 82 A.L.R. 986; Lucas v. Murphy, 348 Mo. 1078, 156 S.W.2d 686; 1 Cooley, Taxation, § 1, p. 61. Taxes are not payments for a special privilege or a special service rendered. City of St. Louis v. Grafeman Dairy Co., 190 Mo. 492, 89 S.W. 617, 1 L.R.A.,N.S., 936; Gunby v. Yates, 214 Ga. 17, 102 S.E.2d 548; United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477; Morgan's Louisiana & T. R. & S. S. Co. v. Board of Health, 118 U.S. 455, 6 S.Ct. 1114,

30 L.Ed. 237; Central Savings Bank in City of New York v. City of New York, 279 N.Y. 266, 18 N.E.2d 151, 121 A.L.R. 607; People ex rel. Curren v. Schommer, 392 Ill. 17, 63 N.E.2d 744, 167 A.L.R. 1347; Pittsburgh Milk Co. v. City of Pittsburgh, 360 Pa. 360, 62 A.2d 49; Memphis Natural Gas Co. v. McCanless, 183 Tenn. 635, 194 S.W.2d 476. Fees or charges prescribed by law to be paid by certain individuals to public officers for services rendered in connection with a specific purpose ordinarily are not taxes, 84 C.J.S. Taxation § 1, p. 34; Gunby v. Yates, supra; Dickson v. Jefferson County Board of Education, 311 Ky. 781, 225 S.W.2d 672; State v. Montevallo Coal Mining Co., 29 Ala.App. 318, 197 So. 82, unless the object of the requirement is to raise revenue to be paid into the general fund of the government to defray customary governmental expenditures, People v. Brooklyn Garden Apts., 283 N.Y. 373, 28 N.E.2d 877, rather than compensation of public officers for particular services rendered. Cooley, Taxation, Vol. 1, § 33. The fees, per diem and expenses in question were not levied upon General American for the general support of the government, they were not paid into the public treasury and were not subject to disbursement for the general public need. They were assessed against General American for the specific purpose of compensating certain public officers (some of them officials of other states) for services performed in connection with the examination of the operations of this particular company. They were paid directly to these officers, and not into the state treasury or into the insurance department (now division) fund. They did not "inure to the benefit of the state." See Meyers v. Matthews, 270 Wis. 453, 71 N.W.2d 368, 54 A.L.R.2d 868, loc. cit. 876. Section 374.220(1) directs that the expenses of examinations shall be paid " * * * directly to the person or persons rendering the service." Such fees are imposed to defray the expenses of the enforcement of the insurance laws, cf. Barker v. Leggett, Mo.Sup., 295 S.W.2d 836, citing State ex rel. Lucas v.

Blair, 346 Mo. 1017, 144 S.W.2d 106, loc. cit. 107, and State ex rel. Carwood Realty Co. v. Dinwiddie, 343 Mo. 592, 122 S.W.2d 912, loc. cit. 914, and are not "taxes" in the usual and generally accepted sense of the word. Section 374.190, RSMo 1949, formerly § 5794, RSMo 1939 and § 5684, RS Mo 1929, is an inspection statute, imposed not as an exercise of the taxing power, but as a regulatory provision enacted in the exercise of the police power of the state for the determination of the financial condition of insurance companies for the protection of policyholders and of the general public. The fees and expenses incurred in the making of such inspections, imposed upon insurance companies by § 374.220, RSMo 1949, are inspection fees, assessed "as a mode of making business contribute to the expense of its proper police regulation." 51 Am.Jur.Taxation, § 70. It is generally held that an inspection fee does not constitute a tax, St. Louis v. Grafeman Dairy Co., supra; 29 Am.Jur.Inspection Laws, § 10, p. 376, but is designed as a compensation for a service rendered. Cooley, Taxation, Vol. 1, § 33.

Reason and common understanding teach us that fees and expenses of examinations of insurance companies conducted by auditors and special examiners are *accounting charges*. While "fees and expenses of examinations" were not in terms provided for in the Purchase Agreement, the parties did specifically provide for "accounting charges, * * * and like expenditures," in paragraph 9, Article VI. Fees and expenses of examinations clearly fall in that category. The intention of the parties with respect to this item, therefore, was clearly expressed in unmistakable language which necessarily governs this situation. The fees and expenses of examinations, as a matter of law, should have been treated as "accounting charges" under paragraph 9, Article VI, and only those portions of the expenses relating to Old Company assets should have been charged to the Old Company account.

The above conclusion is made more evident when the language of paragraphs 2 and 9 of Article VI are considered together. Paragraph 2 applies the term "taxes" not only to taxes payable on or in respect to the *business* but also to taxes payable on or in respect to the *assets*. If the term "taxes" as used in paragraph 2 had been intended to include accounting charges, such as expenses for examinations, as General American contends, there would have been no occasion for the Purchase Agreement to list and repeat "all * * * accounting charges * * * and like expenditures; * * *" in paragraph 9 as one of the several categories of charges specifically authorized to be made against the Old Company account in the administration of the asset side of the business. Thus the Purchase Agreement affirmatively shows that the parties intended to distinguish and differentiate between taxes in the generally understood and accepted usage, and accounting charges such as fees for examinations.

 Notwithstanding these expenses are accounting charges and not taxes, should this Court approve an accounting in which they are charged as taxes, upon the basis of a construction from 1940 to 1948 by the then Superintendent and General American by which they were regarded as taxes? We should not because such a construction is in direct conflict with, contradicts and runs counter to the plain, unambiguous provisions of paragraph 9, Article VI, contrary to the considered decision of the superintendent who signed the Purchase Agreement, and contrary to the considered decision of the Convention Examiners (the trained and recognized experts in the specialized field of insurance management) in the 1935 and 1939 Convention Examinations, and until overruled by the Superintendent in 1940. There is no occasion to construe the general term "taxes" or speculate upon its applicability to accounting expenses or charges, where the parties have employed the specific term "accounting charges," and have agreed as to how the cost of accounting charges on the asset side shall be borne. Where a contract is unambiguous the courts are not permitted

to consider the construction given the contract by the parties "in order to change or modify the meaning apparent on the face of the written instrument." Illinois Fuel Co. v. Mobile & Ohio R. Co., 319 Mo. 899, 8 S.W.2d 834, loc. cit. 842. "Acts done by the parties to a contract after its making, tending to show an interpretation by them, or by one of them, at variance with the plain terms written in the contract, will not control; but the contract is to be construed as written." Holland Land & Loan Co. v. Holland, 317 Mo. 951, 298 S.W. 39, 45. Courts will not overthrow the plain and unambiguous terms of a written agreement because of an erroneous practical construction which the parties have adopted. 17 C.J.S. Contracts § 325.

The judgment of the Circuit Court on Exception E and the Third Set-Off is reversed and the issues are remanded to the Circuit Court for further proceedings consistent with the views herein expressed.

### Additional 1948 Convention Examination Expenses

Pursuant to the trial court's order of April 30, 1957 directing the filing of applications for expenses incurred in connection with closing the business and disposing of the assets of the Old Company, General American filed a petition for authority to charge against reserves previously set up for the payment of court costs and expenses, inter alia, an item of $16,975.68 for additional expenses in connection with the 1948 Convention Examination. The trial court rendered judgment on this issue in favor of General American. Stockholders contend on this appeal that $4,797.75 of the above amount was reasonably allocable to the insurance side of the business and therefore not chargeable against the Old Company account and that the only amount properly chargeable against that account was $12,177.93 (which was the amount agreed to be reasonably allocable to the asset side of the business). These expenses were not included in Exception E or General American's Third Set-Off. They were

incurred at various dates from September 3, 1948 to February 1, 1949. They represent amounts paid to various public officials for work done between September 1, 1948 and November 15, 1948 on a Convention Examination covering a period ending August 31, 1948. The question raised on this appeal is whether such expenses were "taxes" within the meaning of paragraph 2, Article VI. General American and Stockholders agree that the question here presented is the same as that raised by Exception E of the main appeal, and that the issues here presented are governed by our ruling on Exception E. For the reasons previously stated, we rule that the expenses in question were not taxes within the meaning of paragraph 2, Article VI, but were expenses within the meaning of paragraph 9(a), Article VI, and that the Circuit Court erred in failing to limit the charge to the Old Company account to the sum of $12,177.93. Accordingly, that part of the order and judgment of the Circuit Court dated August 13, 1958 authorizing General American to charge $16,975.68 against the reserves for additional expenses in connection with the 1948 Convention Examination is reversed, and the cause is remanded with directions to reduce the amount so authorized from $16,975.68 to $12,177.93.

### Exception G. Valuation Fees

Stockholders except to charges against the Old Company account in the amount of $77,234.20 paid by General American as expenses for the valuation of policies. The trial court overruled Exception G.

Annual valuations of policies of every life insurance company doing business in this state were required to be made by the Superintendent during the period 1933–1948. See § 5720 RSMo 1929; § 5831 RSMo 1939; now § 376.370 RSMo 1949, V.A.M.S. Section 5685 RSMo 1929 and § 5795 RSMo 1939 provided that "The expenses of * * * valuations of policies of insurance companies * * * shall be assessed by the superintendent of

the insurance department upon the company * * * whose policies have been valued, and shall be in the first instance paid by such company, on the order of the superintendent, directly to the person or persons making such * * * valuation, * * *." In the same sections it is also provided that "when any * * * valuation is made by the superintendent in person, the cost of making the same, excepting his traveling or other necessary personal expenses, shall be paid by him, when collected, into the department fund; * *." In 1945 § 5795 RSMo 1939 was amended, but the first part relating to the payment of expenses "in the first instance" was not changed. The latter part was changed to provide that when the Superintendent makes the valuation in person then "the cost of making the same * * * shall be certified to the Director of Revenue for collection." Laws of Missouri 1945, p. 1018. Section 5795 was repealed and re-enacted by the 1949 revision act, H.B. No. 2115, and the section was rearranged and broken down into what is now §§ 374.-220 and 374.230.

Pursuant to § 5685 RSMo 1929 and § 5795 RSMo 1939 the Superintendent annually made or caused, to be made separate valuations of registered and non-registered policies from data in his department and from an investigation of company policy records. His practice was to send the insurance company two bills covering valuation fees assessed, as fixed by statute. The company would then pay the bills. The bills from the Superintendent to General American for expenses or fees of valuations did not differentiate between policies in the New and Old Company account. On its books each year General American allocated the charges between the two accounts on the basis of the amount of insurance in force in each account and the Old Company account was charged with the amount attributable to Old Company policies. From 1933 to 1938 the disbursements for expenses of valuation of policies were carried on the books

of General American in an account designated "Taxes." From 1938 and afterward they were carried in an account designated "Valuation Fees." They were included in the annual statement on the Convention Blank on the line entitled "Other State Taxes" or "Insurance Department Taxes, Licenses and Fees." (Some years the line was entitled one way; some years the other.) Each year General American charged the Old Company account, apparently with the approval of the Superintendent, with these "fees" or "expenses" of valuations of policies in the Old Company account on the theory that they constituted "taxes" within the meaning of paragraph 2, Article VI, which has been previously quoted. The charges appeared in each annual statement of the Old Company account and on each accounting under the Purchase Agreement.

The propriety of the charge was first questioned in 1939 by the Convention Examiners. They stated in the Convention Examination report for that year that they were "unable to find any sound justification" for the interpretation of the Purchase Agreement by General American that expenses or fees for valuations of policies could be charged against the Old Company account, and they recommended disallowance. General American protested this ruling to the Superintendent. General American relied then, as it does now, upon a decision in 1930 of a board of arbitration consisting of the superintendents of insurance of Missouri, Oklahoma and Iowa, construing a similar provision in a contract between Missouri State Life and International Life Insurance Company. That decision is not in the record, but it appears that the board held, in substance, that the phrase "all taxes payable on or in respect to said business or assets" included "departmental licenses and fees and cost of departmental examinations and audits when fixed by statute or supervising insurance departments pursuant to law." The Superintendent reviewed the scope of paragraph 2, Article VI; con-

cluded that the interpretation applied by the arbitrators was correct; "ruled" that valuation fees were "in the nature of a tax" and were properly charged against the Old Company account as a tax under paragraph 2, Article VI, and approved the charges to the Old Company account made by General American from 1933 to 1939 for the portion of the valuation fees paid by General American attributable to the policies of insurance in that account. Following the 1940 "ruling" of the Superintendent the expenses of valuation of policies in the Old Company account were charged to that account in each subsequent annual statement and accounting, without further question.

The trial court held that the result reached by it as to Exception E governed the issues presented by Exception G. We see no material legal distinction between expenses of Convention Examinations and the expenses of valuations of policies. A factual distinction is that while the Superintendent could have employed some person to make the valuations, and the expenses therefor would have been paid directly to such person by General American, apparently he elected to make the valuations in person, and in that event the established fees therefor were collected from General American by him or the Collector of Revenue and paid into the insurance fund. Section 5786, Laws of Missouri 1945; § 5789 RSMo 1939; Laws of Missouri 1945, p. 1018; § 374.160 RSMo 1949, V.A.M.S. See also Barker v. Leggett, Mo.Sup., 295 S.W.2d 836, concerning the establishment, use and purpose of the insurance department (now division) fund, and § 374.160 RSMo 1949, V.A.M.S., wherein it is provided that as to the expenses to be paid from said fund the state shall not be responsible "in any manner for the payment of any such expenses, or of any expenses of this [insurance] division, or of any charges connected therewith."

General American claims that the contracting parties reasonably could use the term "taxes" in a very broad sense to include statutory assessments and fees imposed by governmental authority; that the distinctions between fees and taxes have been disregarded, both in the decisions and the statutes, State ex rel. Bloebaum v. Broeker, 222 Mo.App. 831, 11 S.W.2d 81; and that regulatory fees have been regarded as taxes, in a broad sense, in various connections. 53 C.J.S. Licenses § 3, p. 451. They argue that valuation fees are "assessed," and if not paid become a first lien upon the assets and property of the insurance company, and may be recovered by the collector of revenue in any court of competent jurisdiction (the typical remedy for the collection of delinquent taxes). RSMo 1949, § 374.220. They show that RSMo 1949, § 148.400, V.A. M.S., allows the deduction from premium taxes of amounts paid for valuation assessments, the same as deductions are made for other taxes paid.

Stockholders take the position that these charges were not authorized or permitted by the Purchase Agreement, by court order or by other authority; that valuation fees are not taxes chargeable under said paragraph 2; that there is no other provision in the Purchase Agreement warranting this charge, and that valuation fees were an expense to be included in the $16,752,710.19 charged by General American to the Old Company account as management fees.

The question thus presented is whether valuation expenses or fees paid by General American under the circumstances may reasonably be said to come within the phrase "All taxes payable and/or which may hereafter become payable on or in respect to the business and/or assets" of the Old Company account. If they do, General American was authorized to charge such expenditures against the Old Company account; if not, they were expenses of administering the insurance side of the business for which General American was recompensed by more than 16 million dollars of "management fees."

Expenses or fees for the valuation of policies are not "taxes" in the legal or the usual and generally accepted sense of the term, for the same reasons that expenses of Convention Examinations are not "taxes." Expenses of valuation fees, therefore, cannot be charged against the Old Company account under the provisions of paragraph 2, Article VI. Expenses or fees for the valuation of policies, realistically and in fact and in law, are "accounting charges * * * and like expenditures." This particular type of accounting expense, however, cannot be charged to the Old Company account as an accounting charge under paragraph 9, Article VI (as in the case of examination fees and expenses, Exception E) for the reason that said paragraph 9 applies only to accounting expenses incurred in connection with the administration of *assets*. Valuation fees are not charged for work done in connection with the asset side of the business, as are examination fees. In conducting an examination of an insurance company the examiners investigate both sides of the account—the assets side and the insurance side—whereas in conducting a valuation the examiners confine their work to the valuation of policies on the insurance side of the account only, and are not concerned with the assets side of the account. Having specifically provided that accounting charges and like expenditures on the *assets side* be charged against the Old Company account (paragraph 9, Article VI), and having failed to provide that accounting charges and like expenditures on the *insurance side* be so charged, the parties intended that charges for valuation expenses on the insurance side be compensated for out of the prescribed fees based on insurance in force and on a stated percentage of premiums collected, and not as a separate charge against the Old Company account.

General American argues that in 1945 the Legislature recognized these expenses and fees to constitute taxes because it authorized insurance companies to deduct "valuation fees" and "examination fees" from premium taxes. Section 148.400 RS Mo 1949, V.A.M.S. There is no merit to this. It would be the same as saying that since the state permits individuals to deduct contributions to churches from income for tax purposes a gift to a church is a tax.

Although the expense or fees for valuation of policies are not taxes in the legal or generally accepted meaning of that term, the parties to the Purchase Agreement, with full knowledge of the facts, uniformly and consistently treated and regarded them as taxes and construed the word "taxes" in paragraph 2, Article VI to encompass and include them. (This was done with full knowledge of the position taken by the Convention Examiners in 1939. We note that the chief examiner for Missouri in charge of the 1939 Convention Examination, who apparently joined in the statement of the Convention Examiners that they were unable to find any "sound justification" for charging these expenses against the Old Company account, subsequently became the Superintendent of Insurance of Missouri and, while Superintendent, apparently approved the charge of these expenses and fees for valuations of policies against the Old Company account. He was the Superintendent at the time of the Final Accounting.) Could the parties to the Purchase Agreement reasonably have construed the expenses and fees of valuation of policies to constitute "taxes"? After carefully weighing the respective contentions of the parties and taking into consideration the relationship between General American and the Superintendent as discussed earlier in connection with the rule pertaining to practical construction, we conclude that this construction of the parties is so contrary to the legal definition and meaning and the usual and generally accepted sense of the term "taxes," and so inconsistent with and contrary to the language of said paragraph 2, Article VI and to the general plan for compensating General American for its expenses in adminis-

tering the insurance side of the Old Company account, that we should not adopt and enforce it. To do so would do violence to the clear intent and purpose of the Purchase Agreement.

The judgment of the Circuit Court on Exception G is reversed, and the issues on this exception are remanded with directions to direct a surcharge in the agreed amount of $77,234.20.

### Fees and Expenses of Attorney for Superintendent, Appraisers and Actuaries

██ By its post-trial separate judgments the trial court awarded Jacob M. Lashly $175,000 as fees for his services as attorney for the Superintendent and $909.87 as expenses; awarded three appraisers $70,000 for services and $2,169.58 for expenses; and allowed Joseph B. Maclean, an actuary, $32,000 in fees and $3,574.58 for expenses. The trial court directed that all such allowances be charged against the Old Company account. Stockholders do not challenge the amounts awarded or the right of the recipients thereto. Their only contention on this appeal is that certain portions of the amounts awarded should not have been charged against the Old Company account. We shall first consider the challenged fees and expenses of the appraisers.

The Purchase Agreement required General American to keep a separate account of the business and assets of the Old Company. The accounting was to commence as of September 1, 1933 with a balance sheet showing the value of each of the assets comprising each class. In all future accountings (except the Final Accounting) the value of each asset was to be deemed to be that stated as of September 1, 1933. It was provided that "In the final accounting as of August 31, 1948 the asset account shall be finally valued for this purpose by taking bonds at their market price as of said date and all other assets * * * at their appraised value as of said date, such appraised value to be fixed and determined by a board of appraisers, * * *." The

appraisers were appointed and the parties agree their services were worth $45,000 and that expenses of $2,169.58 were properly incurred. The remainder of the fee allowed to them was for other purposes and is not in issue here.

Paragraph I, Article I provided that General American should pay all "the expenses of closing the business and disposing of the assets of the Old Company," and Article V provided that "every payment, expenditure and allowance required, authorized or permitted to be made by the New Company under the terms of this Agreement shall be and is a charge against the said Old Company account, and to be paid therefrom." In Article V it was also provided that the cost of the Final Accounting "shall be borne by the New Company," or, in other words, that this expense of General American should not be charged against the Old Company account notwithstanding the previous general language. General American contends that the $47,169.58 fees and expenses of the appraisers were expenses of closing the business properly payable by it and chargeable against the Old Company account pursuant to the above general provision in Article V. Its contention, to which the trial court agreed, is that the term "accounting" as used in the Purchase Agreement refers only to "the process of (1) preparing and submitting a detailed statement of the items relating to the matter in question, (2) demonstrating the correctness of that statement to the extent required, and (3) making distribution or payment of the amount found to be due," and that "the costs of the accounting do not include the costs of something that 'relates to' or 'is connected' with or is 'a prerequisite to' the accounting." Stockholders contend that the sum of $47,169.58 was a part of the cost of the Final Accounting to be borne by General American.

The Purchase Agreement expressly provided that the appraisal of assets should be a part of the Final Accounting. After providing that the value of the assets be

fixed for the 15-year period for accounting purposes, the Purchase Agreement then stated that *"in* the final accounting," that is, as a part thereof, "the asset account shall be finally valued *for this purpose* by taking * * * all other assets [except bonds] at their appraised value as of said date, such appraised value to be fixed and determined by a board of appraisers." (Emphasis added.) In addition, the Final Accounting was to be "based on the Convention Blank statement," subject to certain modifications, and the Convention Blank provides for a valuation of the assets. Note the following comment by Maclean, Life Insurance, 6th ed. at p. 311. "The ledger assets detailed in the first section on page 4 represent cash or the *book values* of investments actually owned at the date of the statement. The book values * * * are not necessarily the actual values which will be admitted by the state insurance authorities. Consequently, adjusting entries are provided under *non-ledger assets* and *assets not admitted,* in which is entered the value between the book values and the admitted values." As stated in General American's brief, the modifications provided for in the Convention Blank "relate to the 'values' at which bonds and other assets are to be stated in the special [including the final] accountings." Therefore, it is clear that the Purchase Agreement expressly stated that the valuation of assets was to be a part of the Final Accounting, and as a modification of the Convention Blank statement it expressly set out the manner in which the valuation should be made.

We do not agree with General American's contention, the substance of which is that the term "Final Accounting" as used in the Purchase Agreement means only the tabulation of the figures called for on the Convention Blank. The terms "account" and "accounting" have many meanings depending on how used, see 1 C.J.S. Account pp. 571–577, and have no precise technical meaning. Kneisley Lumber Co. v. Edward B Stoddard Co., 113 Mo.App. 306, 88 S.W. 774. To determine the scope and meaning

of the term "Final Accounting" as used in this case we must consider its purpose and its use in relation to the other provisions of the Purchase Agreement. It was contemplated that at the end of the 15-year period there should be a determination of the net worth of the Old Company account so that what was denominated "net earnings" (less what had previously been distributed or credited) could be distributed to the policyholders up to a certain amount and the remainder to the stockholders. To do this it was necessary to determine the value or worth of the assets and the amount of the liabilities as of that time. This determination was referred to in the Purchase Agreement as the "Final Accounting," and it included all things reasonably necessary and proper to obtain the information that was incorporated into the written statement in the form of the Convention Blank as modified. The Final Accounting is not limited to the tabulation of figures, as General American contends. The tabulation is only the end result of the Final Accounting. It is immaterial that the valuation was to be made by an impartial board. That was the result of prudent precaution to obtain a fair valuation. If the Purchase Agreement had provided that the entire Final Accounting be made by some national accounting firm, there would be no question that the fee paid by General American to it would constitute the cost of the Final Accounting, including the fees and expenses paid by the accounting firm for appraisers to value the assets. The contention of General American is contrary to the express terms of the Purchase Agreement, and contrary to the meaning of the term "Final Accounting" when considered in context and in connection with its purpose.

We turn now to the contested fees and expenses paid to Mr. Lashly in the amount of $4,600 and to Mr. Maclean in the amount of $3,030.30. Both were employed by the Superintendent pursuant to § 375.740 RSMo 1949, V.A.M.S. (§ 6065 RSMo 1939) which authorized the employment of "necessary legal counsel * *

and actuarial force" in proceedings "to enjoin, rehabilitate, dissolve, wind up or otherwise settle the affairs and dispose of the assets of insurance companies." This statute expressly provides that where there is reinsurance (which General American and the Superintendent both assert existed in this case, and which we have held to exist in a limited form for a term) "the expenses of such employment * * * shall be * * * paid * * * by the reinsuring company * * * to the persons doing the work and rendering the service."

The $4,600 represents the value of the legal services of Mr. Lashly from the date of his employment to the date he first appeared in court in connection with the closing of the Old Company account. The $3,030.30 represents the value of the services of Mr. Maclean, and his expenses, from the time of his employment to the date of the Final Accounting. Stockholders admit that the services after August 31, 1948 pertained to the closing of the business of the Old Company account and that the expenses therefor were chargeable against the Old Company account, but they contend that any fees for services rendered prior to August 31, 1948 should have been charged against and paid by General American out of its own funds, and that this portion of the fee was not connected with the "closing of the business and disposing of the assets" of the Old Company.

Prior to the Final Accounting the services of Mr. Lashly and of Mr. Maclean consisted primarily of advising the Superintendent concerning his authority to order an increase in the reserves, and the need or advisability to do so. While Stockholders admit that a solution to this problem may have been necessary before the Old Company account could be closed, they contend that even so "such preliminary advisory services rendered to the Superintendent [did not constitute] an expense of closing the business and disposing of the assets of the Old Company."

We have held that the appraisal of assets, i. e., a valuation of assets, was a part of the Final Accounting. We subsequently rule, in our discussion of Point XII, that a valuation of policy reserve liabilities was contemplated and required by the Purchase Agreement as a part of the Final Accounting. The services for which the disputed costs were paid pertained to whether the policy reserves could be revalued in the Final Accounting, and if so, the proper manner, method and amount. As previously noted, the Final Accounting was to be based on the Convention Blank statement, and as that statement calls for a valuation of assets, it also calls for a valuation of reserve liabilities. The contested fees and expenses were required by statute to be paid by General American. They could not be charged by it against the Old Company account if they constituted a part of the cost of the Final Accounting, but the services admittedly pertained to the valuation of liabilities, and that valuation was a necessary and essential part of the procedure whereby General American determined the amount of total liabilities and total assets, and then by subtracting liabilities from assets obtained the amount of "net earnings." That determination constituted the Final Accounting, and therefore the contested fees and expenses were improperly charged against the Old Company account.

That part of the post-trial separate judgments authorizing the sum of $47,169.58 as fees and expenses of the appraisers, the sum of $4,600 as a fee to Mr. Lashly, and the sum of $3,030.33 for services and expenses to Mr. Maclean to be charged against the Old Company account is reversed, and in all other respects those separate judgments are affirmed.

The foregoing disposes of all of the accounting or nonreserve issues in the main appeal and the appeals from orders entered in four after-trial proceedings, namely, orders numbered (3), (4), (5) and (6) as itemized in the second paragraph of this opinion. The following deals with the

issues arising out of Stockholders' exceptions to the insurance reserves set up by General American in the Final Accounting, the interest rate on surcharges and the appeals of General American and the Superintendent from a post-trial order relating to Stockholders' attorneys fees, e. g., number (2) in said second paragraph.

### The Reserve Issues

Before elaborating upon the preliminary statement of facts relevant to the reserve issues a brief discussion of the nature and purpose of policy reserves is appropriate. The term "reserves" as used in the life insurance business is somewhat of a misnomer. It is a word of art with its own peculiar meaning, and our purpose now is to determine and define that meaning.

In the so-called level-premium plan of life insurance the annual cost of insurance to the policyholders is equalized so that a fixed premium of a uniform amount is paid each year. The amount of the "net premium" is calculated upon the basis of certain assumptions as to the future mortality rate and the future rate of net yield upon investments. Theoretically the net premium is sufficient to pay the benefits provided for in the policy but not the expense of administering the business. The "gross premium" is the total premium paid, made up of the net premium plus a "loading" for expenses, contingencies and profits. During the early years of a policy, at lower ages of the insured, the cost of life insurance is less than the amount of the premium. The cost increases with the increasing probability of death, until at higher ages it is more than the annual premium paid. The total amount received from premiums in any one year from a given block of insurance in excess of the expenses and policy claims during that year cannot properly be considered to constitute profits. A portion of the premiums is received for the purpose of being held and invested in order to pay claims on policies in the future when the uniform annual premium will be less than the rising annual cost. The sum of the accumulation of the gross premiums

paid while the policies are in force, plus the earnings from the investment of the excess of premiums over costs in the years which yield such an excess, should enable the insurer to pay the policy benefits at maturity. The total sum held at any given time on any given block of insurance is "technically" called the reserve, Maclean, Life Insurance, 6th ed., chap. VI, p. 109 et seq., but as will be seen subsequently this needs further limitation and explanation.

The term "reserve" as used in the life insurance business represents that accumulated amount of money at any given time which, with future premiums and future net investment yield, will be sufficient to enable the insurer to pay the policy obligations as they mature in the future and in the meantime to meet the expenses of carrying on the business. While the reserve is sometime spoken of as a fund, there is in fact no separate fund set aside or assets segregated for that purpose. The reserve is not an asset but is a liability, and it is so regarded on a balance sheet for all insurance accounting purposes. In Convention Blank annual accounting this liability is itemized as the "Net present value of all outstanding policies in force on December 31 of current year, as computed on the following tables of mortality and rates of interest, viz. * * *" The "net present value" is determined by comparing the present value of the benefits provided for in the policies with the present value of the future net premiums on the policies, and the amount so determined is the reserve liability on the policies. If the assets on hand do not at least equal the amount of the liabilities, including the reserve liability, the insurance company is insolvent. Rose v. Franklin Life Insurance Company, 153 Mo.App. 90, 132 S.W. 613.

Because insurance companies generally adopt a conservative view of the future in the calculation of premium rates, and also because of the experience of favorable mortality trends and other reasons, the amounts constituting the gross premiums, together with the investment increment, are

not infrequently more than are required to pay the expenses of operation and policy claims and to set aside a sufficient sum to meet future policy requirements, and it is only this excess sum when received and held which constitutes surplus. As subsequently noted in connection with the discussion of provisions for future wars and epidemics an insurance company may and frequently does set up on its books out of surplus what it calls a "contingency" or "special reserve" to meet unusual or unpredictable claims or losses. Contingency or special "reserves" in life insurance accounting do not constitute actual liabilities and must not be confused with "policy reserves." Unless otherwise indicated, when the terms "reserves" or "policy reserves" are subsequently used, reference is had to those reserves constituting a present liability.

There are two generally accepted methods by which the amount of the policy reserve liability may be determined for ordinary life insurance. One is called a net premium valuation, which is the method used in Convention Blank statements. In the net premium valuation only the net premium is considered, that is, the net premium required to mature the policies without any "loading" for expenses, contingencies and profits. The only assumptions employed are the mortality rate and rate of interest. No account is taken of the expense of carrying on the business. However, the mortality rate assumed ordinarily includes some margins, and a net premium valuation does not produce an exact result. While it is generally a satisfactory method for use by a going company, it is not the method ordinarily employed where there is a question as to the sufficiency of the reserves being carried at a given time.

The other method by which the amount of the policy reserve liability may be determined is called the gross premium valuation. In such valuation the gross premiums upon the policies involved are taken into account, and the liability is computed upon

basic assumptions, as realistic as possible, as to the mortality rate, the net yield rate, the rate of expense, and the rate of voluntary terminations to be expected in the future. The policy reserve liability so determined is the difference between the present value of future benefits under the policies and the expenses, and the present value of future premiums and the investment increment thereon. In other words, the sum of the policy reserve liability so determined and the present value of the future income from all sources of the particular block of policies being valued should equal the present value of future benefits under the policies and expenses. A gross premium valuation is used when a company, having no doubt as to the sufficiency of its reserve, desires to determine the margins contained therein, and also when it is necessary to determine whether the policy reserves as stated are equal to the true amount of liability under the policies. The amount determined by a gross premium valuation represents the actual policy reserve liability, and it is translated into the net premium valuation required to be stated in the Convention Blank by selecting a mortality table and an interest rate which, when applied to the policies in question, will produce an amount equal to or at least not less than that determined by the gross premium valuation.

### Events Leading up to Changes in Reserves.

█ The facts here related are the substance of the testimony of General American and the Superintendent on this phase of the case. In addition to the steady decline in interest rates, other factors caused General American to question the adequacy of the policy reserves in the Old Company account prior to the time of the Final Accounting. In 1940 test computations, made on the basis of a new annuity table published in 1939 which showed a marked improvement in the mortality among annuitants, revealed a $600,000 understatement of liabilities in the annuity reserves. A

collateral factor was that by 1945 a substantial volume of the business in the Old Company account had become paid up, a process that would continue. This shrinkage in the volume of premium income was drying up the margins in the premiums. The decline in interest rates, of which General American was fully cognizant, became pronounced by 1945. As a result of test computations begun in 1945 and completed about the middle of 1946 General American's actuary, Mr. Burian, advised the management that policy reserves for the Old Company account would have to be increased. The first action taken was to include in the Convention Blank statement of December 31, 1946 a liability item called "Policy Revaluation Reserve," in the amount of $1,250,000. This represented about 20% of the total increase then estimated to be necessary. This was done to put the supervisory authorities on notice that some change in policy reserves was in contemplation. Throughout 1947 Mr. Burian discussed with Mr. Alex Good, actuary in the office of the Superintendent, the necessity of increasing policy reserves and attendant problems. Mr. Good recommended to Superintendent Jackson the employment of Mr. Maclean, referred to as "the dean of the actuaries of the United States," and in December, 1947 Mr. Maclean was employed to conduct an investigation and make recommendations with respect to the adequacy or inadequacy of the policy reserves in the Old Company account, and the bases upon which they should be computed. Mr. Maclean and Mr. Burian both concluded that a gross premium valuation was necessary and it was subsequently made. In the Convention Blank statement of December 31, 1947 General American designated "what otherwise would have been designated as a mere contingent reserve, or net earnings or surplus," as "Contingency Reserve under the Purchase Agreement Including Reserve for Revaluation of Reinsured Policies" in the amount of $7,544,625.80. This amount was "a balancing item," the difference between the amount of assets (the values of which were frozen at the 1933 level) and the liabilities in the Old Company account when the reserve liabilities were determined on the previously used basic assumptions. The officers knew that this was not "a true statement of the net earnings or contingency reserve, or surplus," and knew from preliminary computations in 1946 that the amount which they considered would be needed for adequate reserves would be approximately $10,000,000. The reason given by General American for not making a revaluation of the liabilities at or near the time when the question first arose, and for waiting until the Final Accounting before increasing the liabilities to reflect what it considered to be their true amount, was that the Purchase Agreement required that in the annual statements the assets of the Old Company account be carried at 1933 values. The stated value of the assets in 1948 was substantially less than their actual value, which had materially increased by the middle 1940's. The accountings, therefore, did not present a true picture, and a statement reflecting a revaluation of reserve liabilities on a true basis, thereby increasing total liabilities, without making a corresponding upward revaluation of the assets, which was not permitted by the Purchase Agreement until the Final Accounting, would have resulted in a greater distortion of the financial statement.

The first two of the three questions [7] directed to Mr. Maclean by the Superintendent were submitted by letter dated January 16, 1948. They related to General American's right to increase policy reserves, and the proper bases for computation. Studies were made and in February, 1948 Mr. Maclean answered the first question, giving his opinion that General American had the right and the duty to set up policy reserves in the Final Accounting on whatever basis it deemed necessary to carry out all of its obligations under the policies. His opinion was based upon the provisions

7. See preliminary statement of facts.

of the Insurance Code, the principles of sound management of a life insurance company, and the terms, purpose and intention of the Purchase Agreement. On the basis of § 5831, RSMo 1939, as amended in 1943 and 1947, it was Mr. Maclean's opinion that General American, "at its own option, and without the necessity of obtaining the consent of the Superintendent, [might] establish reserves * * * on *any* basis producing higher aggregate reserves than those [produced] by the minimum legal standard or by the basis .stated in the policies and contracts;" and that if General American did not do so the Superintendent might *"require* that higher reserves be established and [might] *designate* the basis of such higher reserves." In pointing out the importance of sufficient reserves Mr. Maclean stated that policy reserves cannot precisely be determined, *"once for all,* on a fixed and unchangeable basis;" that when policies are issued it is necessary to make assumptions as to future rates of mortality and interest, but when conditions change so that on the basis of the assumptions used the reserves are or become insufficient to meet policy obligations "then the assumptions *must* be revised and the reserves increased." The third question (whether a new reserve for losses as a result of the future election of settlement options should be established) was submitted to Mr. Maclean by the Superintendent in July 1948. On August 17, 1948 he answered the second and third questions, recommending as to ordinary life policies the use of The Commissioners' Standard Ordinary (CSO) Mortality Table with interest at 2.9%, and certain bases (immaterial here) for other lines of insurance, and that a new reserve be established for losses resulting from future election of settlement options.

Mr. Maclean was of the opinion that a general strengthening of the reserves held for the ordinary life insurance policies and for the annuity and supplementary contracts was required for these reasons: (1) the drastic fall in the general level of interest rates, and the probability of a continuance in the future of relatively low interest earnings; (2) the increase in many categories of expense, and (3) the increased longevity of annuitants and payees under supplementary contracts involving life contingencies as well as other factors such as the increasing tendency of beneficiaries to take greater advantage of optional settlement guarantees which, because of changing conditions, were becoming more valuable and attractive from their point of view. He recommended that the Superintendent require an adequate special reserve for future losses which might arise out of the optional settlement guarantee contained in the policies. He saw in these guarantees "a very serious and substantial additional contingent liability over and above the policy reserves." He stated the seven "realistic assumptions" upon which the amount of this reserve ($4,683,000) should be based.

The Superintendent's order of August 27, 1948, and the resolution of the Board of Directors of General American of August 30, 1948, followed. Before issuing his order adopting the standards of valuation recommended by Mr. Maclean, the Superintendent considered the advice of his actuaries and legal counsel who prepared it. The Board of Directors of General American increased the policy reserves and established the new reserve as recommended by Mr. Maclean, in accordance with its own independent findings and determination, as a matter of sound business judgment, as well as in conformity to the Superintendent's order. All of the policy reserves, except the one for losses from elections in settlement options, were computed and stated in the Final Accounting according to the standards fixed by the Superintendent's order of August 27, 1948. The order of the Superintendent required the reserve for the settlement options to be stated in an "adequate" amount, without specifying the basis for computation. It was computed upon the basis recommended by Mr. Maclean, but the amount as stated

in the Final Accounting was reduced from $4,778,267 to $3,317,632 so that the total of the policy reserves stated in the Final Accounting equaled exactly the total of the amounts determined by the gross premium valuation.

The reserves stated in the Final Accounting, those computed on the gross premium valuation, and those which would have been obtained on the assumptions previously used, are shown by General American's Exhibit No. 101 as follows:

Comparison of Reserves Stated in Final Accounting as of August 31, 1948, with Reserves Computed on Other Bases as of Same Date

| (1) Item No. on Page 5 of Convention Blank | (2) Description | (3) Reserves Stated in Final Accounting | (4) Reserves Computed on Gross Premium Basis | (5) Reserves Computed on Bases in use at 12-31-47 | (6) Excess of (3) over (4) | (7) Excess of (3) over (5) |
|---|---|---|---|---|---|---|
| 4 (Excluding Group) | Life Ins. Reserves | 110,641,317.25 | 109,321,797.25 | 104,933,315.25 | 1,319,520.00 | 5,708,002.00 |
| 5 | Annuity Reserves | 2,274,213.00 | 2,302,662.00 | 1,470,588.00 | (-) 28,449.00 | 803,625.00 |
| Total | | 112,915,530.25 | 111,624,459.25 | 106,403,903.25 | 1,291,071.00 | 6,511,627.00 |
| 6 | Reinsurance Deduction | 125,804.00 | 125,804.00 | 122,363.00 | 0 | 3,441.00 |
| 7 | Net Reserves | 112,789,726.25 | 111,498,655.25 | 106,281,540.25 | 1,291,071.00 | 6,508,186.00 |
| 8 | Double Indemnity Benefit | 103,035.00 | 22,555.00 | 103,035.00 | 80,480.00 | 0 |
| 9 | Disability Benefits | 2,300,395.00 | 2,192,605.00 | 2,241,047.00 | 107,790.00 | 59,348.00 |
| 10 | Supplementary Contracts Not Involving Life Cont. | 5,922,375.00 | 5,941,081.00 | 5,663,934.00 | (-) 18,706.00 | 288,441.00 |
| 20 | Dividends on Deposit | 1,470,561.76 | 1,470,561.76 | 1,443,048.76 | 0 | 27,513.00 |
| 36 | Losses from Future Supp. Contract Election | 3,817,632.00 | 4,778,207.00 | 0 | (-)1,460,635.00 | 3,317,682.00 |
| Total of Items 7 and Below | | 125,903,725.01 | 125,903,725.01 | 115,732,605.01 | None | 10,171,120.00 |

Mr. Maclean's recommendations ' for changes in the basic assumptions had no relation to changes in insurance policy *premiums,* which, fixed by contract, were not subject to change, no matter what assumptions originally were used in arriving at a premium rate. Mr. Maclean's recommendations related to the disposition of the funds of the account remaining at the end of the 15-year period after payment of operational expenses, death claims and claims under other contracts.

### Questions of Law

Stockholders rely on numerous points (1) challenging the power and authority of General American and the Superintendent, under the Purchase Agreement and the statutes, to increase the reserves, and to set up a new and additional reserve, upon the basis of a gross premium valuation, contending that no gross premium valuation was contemplated or permissible under the Purchase Agreement; that the gross premium valuation made by General American and the Superintendent adopted a *method* which was improper as a matter of law because it took no account of future profits from group insurance, and that as a matter of law the *basic assumptions* used in the gross premium valuation contained margins in the nature of surplus for future unforeseeable contingencies and future possible losses in violation of the Purchase Agreement [(a) a surplus for wars and epidemics in the mortality assumption; (b) a surplus for increasing rates of election in future optional settlement losses, and including in the interest rates a surplus for (c) new mortgage loan expenses and (d) asset losses]; (2) challenging the refusal of General American to take into account future profits on group insurance, and (3) objecting to the 4% rate of interest allowed by the Circuit Court on sums surcharged against General American.

### Mixed Questions of Law and Fact

Stockholders rely on numerous points challenging the *need* for an increase of the reserves and for the establishment of a new and additional reserve, contending that the greater weight of the evidence demonstrated that existing reserves without the $10,171,120 increases were more than adequate; disputing on a factual basis, and asking the Court to weigh the evidence relating to, the following assumptions upon which the gross premium valuation was based: (1) the mortality rates of insured lives; (2) the rate of election of future optional settlements, (3) the interest rate used in calculating mortgage loan expenses, and (4) the interest rate employed in calculating asset losses.

Specifically, Stockholders charge error in overruling their Exceptions P, Q, R, S, T, U, and V; in dismissing their Amended Intervening Petition; in approving the Final Accounting, insofar as it reflected increases of existing reserves and the creation of a new Future Optional Settlement Reserve, all totalling $10,171,120, as ordered by the Superintendent on August 27, 1948, voted by General American on August 30, 1948, and approved by the Superintendent on November 15, 1948; and error in allowing interest at too low a rate on the $1,480,-308.58 surcharged against General American, for all of the reasons set forth under Points XI to XX, which relate to the following subjects:

| | |
|---|---|
| Point XI. | Net Earnings and the Contingency Reserve |
| Point XII. | Basic Assumptions for Reserves |
| Point XIII. | New $4,778,267 Future Optional Settlement Loss Reserve |
| Point XIV. | Burden of Proof and Judicial Review |
| Point XV. | Mortality Rates |
| Point XVI. | Future Optional Settlement Election Rates |
| Point XVII. | Interest Rate: Mortgage Loan Expenses |

Point XVIII. Interest Rate: Asset Losses

Point XIX. Group Insurance Profits

Point XX. Interest Rate on Surcharges

———◆———

Point XI. Net Earnings and the Contingency Reserve

Stockholders charge error in overruling Exception P by which they excepted to the failure of General American to show in the Final Accounting as net earnings available for reduction of policyholders' liens and payment to Stockholders a sum of $10,171,120. In that exception, briefly summarized, they charged that regardless of need to strengthen reserves General American had no right to withhold this amount of net earnings and contingency reserve; that under Articles VII and VIII net earnings and the contingency reserve, which had been accumulated from net earnings, were to be paid to the policyholders to extinguish their liens, and after that to Stockholders, and that the Purchase Agreement does not permit such funds to be used for any other purpose except the payment of losses; that retention of such net earnings whether to increase reserves or create margins for unforeseen contingencies or to "protect" holders of General American's own policies, decreased the net amount of its risk as reinsurer and retroactively increased the gross and net policy premiums heretofore paid by Old Company policyholders, in violation of the Purchase Agreement, the court decree and the policy and contract rights of the interested parties; that the 1947 amendment to § 5831, RSMo 1949, V.A.M.S. (Laws of Missouri, 1947, pp. 335–340) and the Superintendent's orders of August 27 and September 15, 1948 are inapplicable to this Final Accounting, and that if applicable they are unconstitutional.

Specifically, in Point XI Stockholders charge error in treating the term "net earnings" as used in the Purchase Agreement as the equivalent of "net worth" to be determined by deducting liabilities from assets on a balance sheet; and error in not ruling that "net earnings" were the periodic accumulations from April 30, 1946 to August 31, 1948, consisting of normal net gains from insurance and normal net profits from investments, supplemented by (1) the contingency reserve as of August 31, 1948, (2) the increase in the value of the assets as reflected by the 1948 appraisal, and (3) the option price of $7.50 per thousand, paid by General American to retain the account, all as required by the terms of the Purchase Agreement. Stockholders also charge error in holding that accumulated net earnings and the contingency reserve were available for the payment of future possible "losses" which General American as reinsurer might sustain after August 31, 1948. Stockholders say that the only "losses" to be absorbed by Old Company account net earnings or contingency reserve were losses actually sustained during the 15-year period, and that any losses sustained thereafter were to be borne by General American out of its own surplus and not out of 1933–1948 net earnings and contingency reserve.

Point XII. Basic Assumptions for Reserves

In this point, which will be considered with Point XI, Stockholders charge error in overruling Exception P and numerous other related exceptions for the reasons given under Point XI, and also for the following reasons: that the Purchase Agreement and the subsequent conduct of the parties indicate that it was the intention of the parties in 1933 that in the calculation of the reserves in the Final Accounting in 1948 the accounting party should use the same basic assumptions as to mortality, interest, etc. as had been used in calculating the reserves in 1933, viz. AET 3½% as to 85% of the policies and AET 3% as to all but a few of the remaining policies; and that no statute, including the 1947 amendment to the valuation statute, § 5831, RSMo 1939, gave either General American or the Superintendent any power to increase reserves or to create the new future optional settle-

ment reserve for the purpose of the Final Accounting under the Purchase Agreement.

The initial question (presented primarily by Point XII) is whether either General American or the Superintendent, or both of them (the contracting parties), had the power and authority as of August 31, 1948 (a) to change the basic assumptions in the calculation of policy reserves for the purposes of the Final Accounting, and (b) to create the new future optional settlement reserve, thereby increasing the amount of the policy reserves over what they would have been if calculated on the basic assumptions used in 1933 and thereafter through December 31, 1947. Are those powers to be found either in the provisions of the Purchase Agreement or in the Insurance Code? We are not now concerned with the factual question of the *necessity* of increasing the policy reserves, a matter for subsequent determination, but only with the legal question of power and authority.

The substance of the contentions of Stockholders is that it was the intention of the contracting parties, "contemplated and provided" in the Purchase Agreement and decree of the Circuit Court, that the policy reserves in the Final Accounting be computed upon the same basic assumptions as those used in 1933, and that no authority for (a) and (b) supra is to be found in the Code.

In determining whether the parties had these powers we look first to the Purchase Agreement under which they were operating. It is at once apparent that the Purchase Agreement does not specifically set forth the bases upon which policy reserves should be calculated in the Final Accounting. Neither does it expressly and in specific terms confer the power and authority upon the contracting parties to change the basic assumptions used in 1933, nor does it expressly prohibit the change of those basic assumptions. However, for the reasons subsequently set forth we have concluded, upon a consideration of the Purchase Agreement as a whole, giving due regard to its plan and purpose and to several specific provisions which highlight its objectives, that the Purchase Agreement grants to General American the power and authority to change the basic assumptions for the calculation of policy reserves in the Final Accounting if necessary to state those liabilities at their true and actual amount, and grants to General American the power and authority to establish whatever new policy reserves may be necessary to reflect actual, existing policy liabilities.

Article V provided that "Each such special accounting to be made on December 31, 1934, 1937, 1940, 1943 and August 31, 1948, and on such other dates as might be specified by the Superintendent shall be based upon the Convention Blank statement made as of said date." Article V also provided that in such special accountings *other than the Final Accounting,* the value of the *assets* side of the account be stated, with minor exceptions, at the amount of their value as of September 1, 1933. The purpose of such special accountings was to provide the procedure whereby General American could "apply the net earnings credited to the Old Company account from the date of the last preceding special accounting * * * to the reduction and/or repayment of all liens." Nothing was said concerning the statement of policy reserve liabilities. While the assets were to be stated in the special interim accountings at a fixed, arbitrary, pre-determined value (which necessarily resulted in a distorted, untrue and incorrect reflection of the financial condition of the Old Company account in each of the special interim accountings) the Purchase Agreement provided that for the purposes of the Final Accounting as of August 31, 1948 "the asset account shall be finally valued * * * by taking bonds at their market value as of said date and all other assets * * * at their appraised value as of said date," thus calling for a true, accurate and correct final accounting of the assets side of the account. But what was the purpose of the Final Ac-

counting? It was to determine and compute the available net earnings, from which any liens remaining unpaid were to be reduced or discharged. The remainder of net earnings, if any, was to be paid to Stockholders. Any portion of the liens not discharged was to become permanent. All rights of policyholders and stockholders under the Purchase Agreement were to be finally determined and fixed as of that time. Net earnings could not be ascertained without a true, correct and accurate accounting (as distinguished from the previous special interim accountings for a limited purpose, based on arbitrary values which did not present a true statement of financial condition) of *both* sides of the account, liabilities as well as assets. Liabilities, including policy reserves, had to be stated at their then true value. The assumptions upon which the amount of the true policy reserve liability is determined as of any given time must be realistic, valid, sound and capable of being held and maintained at the time they are made. To use basic assumptions, which were not at the time realistic and tenable, in calculating policy reserves would present an inaccurate, false and untrue accounting which would be contrary to the obvious purpose and objective of the Final Accounting provided for in the Purchase Agreement, and inconsistent with the principle of insurance accounting practice that policy reserve liabilities must be stated on the basis of assumptions currently realistic and tenable. There was, however, no necessity of including in the Purchase Agreement a provision pertaining to the revaluation of the liabilities, comparable to that pertaining to assets, in order to provide for the revaluation of the policy reserves so as to state their true, accurate and correct amount for the purposes of the Final Accounting. The specific provision that the Final Accounting be based upon the Convention Blank statement, with no modification in this respect, constituted and contained within itself such a requirement. This is true because in Convention Blank accounting policy reserves must be stated as a liability in an amount *not less*

*than the actual liability as of the date of the statement.* They cannot properly be stated in a lower amount or in an amount not then correct but which may have been correct at some previous time. To do either would violate all principles of Convention Blank accounting, the purpose of which is to reveal the true, accurate and realistic financial condition as of the time of the accounting. Knowledge of the well-known and established requirements of Convention Blank accounting practices are to be imputed to General American, which was engaged in the insurance business, and to the Superintendent, whose knowledge of the requirements of Convention Blank accounting is presumed. Parties who contract with reference to a subject matter concerning which known usages prevail incorporate said usages into their agreements if nothing is said to the contrary. 12 Am.Jur., Contracts § 237; 55 Am.Jur., Usages and Customs § 35; Jacobs v. Danciger, 328 Mo. 458, 41 S.W.2d 389, 77 A.L.R. 1237.

While most of Stockholders' contentions under Point XII are necessarily disposed of by the above conclusion, further consideration should be given to their argument that the provisions of the Purchase Agreement giving General American the option to pay $7.50 per $1,000 of life insurance in force and permanently retain the account is a most important and controlling indication that the parties in 1933 assumed, intended and predetermined that the policy reserves in the Final Accounting in 1948 were to be calculated and stated on the same bases and assumptions on which the reserves were calculated in 1933. Stockholders argue that at the time of the execution of the Purchase Agreement General American agreed to pay a price for the Old Company account which would, subsequent to 1948, yield to it a profit; that the price to be paid represented "the then present value of future net earnings to be realized from an excess of premiums and reserves calculated on a *known* basis;" and that therefore the fixing of a set option price in 1933 necessarily involved an assumption

at that time of the actuarial bases upon which reserves would be calculated in 1948 and continued thereafter. They finally argue that if the option price was fixed, "why not the size and content of the article for sale?"

This argument is unsound and not persuasive for several reasons. First, the option price of $7.50 per $1,000 of insurance in force (other than group insurance) was not the entire purchase price. Reference to our statement concerning the provisions of the Purchase Agreement reveals many other considerations. Second, there is nothing in the record to show that the parties contracted on the basis here contended by Stockholders, and we apprehend that if that had been their intention they would have so provided. There is nothing in the Purchase Agreement tying the option price to the policy reserve liability or to the assumptions to be employed in calculating policy reserve liabilities in 1948. Third, and we consider this to be most important, the "size and content of the article" purchased was not increased (Stockholders say in excess of ten million dollars) with the purchase price remaining the same. To say that it was calls for the assumption that the reserve increases were not necessary or were improperly calculated; factual matters for later determination. The Purchase Agreement, when considered as a whole, clearly reveals the intent and purpose that in return for the considerations to be paid by General American, including the payment of the fixed option price, the Old Company account was to be transferred to General American as of August 31, 1948 with the assets, insofar as sufficient, exactly equal to the liabilities. In other words, for the fixed total purchase price General American was to receive a solvent account with no surplus or accumulation of net earnings over and above the sums necessary to render the account solvent. Therefore, if as of August 31, 1948 because of changed conditions the policy reserve liability, when computed on realistic assumptions tenable as of that time, required the withholding of an additional amount from assets in order to have the total assets remaining in the account equal to the total true liabilities of the account, that is what was contemplated by the parties and provided for in the Purchase Agreement. Assuming the increase in policy reserves to be proper, which question we shall subsequently rule, the size and content of the article purchased was not increased; it was maintained at the level contracted for at the fixed price, i. e. assets and liabilities exactly equal with no surplus. While Stockholders argue that the fact the option price was fixed necessarily involved an assumption at that time that the actuarial bases upon which reserves were calculated would remain the same because General American fixed the price with the anticipation of a profit, we think a more reasonable conclusion, albeit both arguments are speculative, is that it involved an assumption that policy reserves would be changed if necessary to state the true liability. On the basis that it was to obtain for the total fixed purchase price to be paid an account in which the assets and liabilities were equal, General American was willing to and agreed to pay the stated fixed price. But if the size and content of the article purchased was to be variable depending on changing conditions, it seems more reasonable that the amount of the final payment, the option price, would have been subject to adjustment by some applicable formula rather than in a fixed amount.

Stockholders, by way of argument, also point to Paragraph C, Article V wherein it is provided that in the event General American elected not to keep the account at the end of the 15-year period, upon reinsurance with another company General American should transfer to such other company "policy loans and liens and other assets of an aggregate value equal to the reserves appertaining to such insurance." Stockholders ask numerous questions and thereby imply that this provision is indefinite and uncertain unless construed as requiring the policy reserves to be calculated upon the same bases in use at the time of

the execution of the Purchase Agreement. Since General American did not elect to place the Old Company account for sale, these provisions are immaterial to any pending issue. However, we find no difficulty in determining the meaning of this language, which clearly refers to the then-existing policy reserves in the amount calculated for the purpose of the Final Accounting, and for the reasons previously stated the policy reserves should be stated at their actual value and not at some inaccurate and fictitious amount determined by use of unrealistic basic assumptions not at the time tenable.

It thus clearly appears from the Purchase Agreement, considered as a whole, that it was the intention of the parties, and that they so provided, that at the time of the Final Accounting the previously employed fiction as to the financial condition of the Old Company account should be discarded and abandoned, and that instead there should be an accounting which would disclose an accurate, true and realistic picture of the true and actual liabilities (including policy reserves) as well as of the true and actual assets so that the real amount of net earnings could be ascertained for the final and conclusive closing out of the rights of policyholders and stockholders under the terms of the Purchase Agreement. In order to do this it was necessary to determine the actual policy reserve liability upon realistic basic assumptions by use of a gross premium valuation. If the previously employed basic assumptions were not at the time tenable and realistic, new and proper basic assumptions were to be adopted and employed, and if it was necessary to establish a new policy reserve in order to reflect actual, existing policy liabilities, that was to be done. In contrast, the construction of the Purchase Agreement proposed by Stockholders would permit and require the making by the accounting party, and the approval by the Superintendent (a public officer charged with the protection of the public interest) of a deceptive final accounting of the financial status of the Old Company account,

an anomalous situation in which assets would be truly stated at their actual value but liabilities would be falsely stated at fictitious and unrealistic values. A false, untrue and inaccurate Final Accounting would be foreordained. We cannot attribute to the signatories of the Purchase Agreement, and to the Circuit Court in approving that agreement, an intention to provide for a totally unrealistic Final Accounting. Stockholders' construction, if adopted, would sanction this eventuality: if reserves, calculated on the original assumptions under changed conditions, would result in a gross understatement of actual liabilities, there would be no alternative but to pay out earnings in satisfaction of liens of policyholders and demands of Stockholders, and proceed inevitably to insolvency. Under their interpretation reserves could not be raised above 1933 levels so as to prevent insolvency, but the 1933 bases would have to be applied inflexibly, rigidly, and arbitrarily without regard to intervening changes in mortality rates, interest rates, or other factors. Stockholders argue that if this resulted in an insufficiency of assets to meet the future obligations under the policies, General American could not revalue the policy reserves of the Old Company account on a basis sufficient to meet all future policy obligations because the parties agreed upon some other basis. They say that while in "ordinary" cases of going companies reserves should be stated in an amount equal to reserve liabilities, a contract to distribute earnings to certain beneficiaries must be enforced even though this results in the insurer's inability to meet its policy obligations as they mature. In their original brief Stockholders say: "If this was the agreement solemnized when executed in the Circuit Court's presence and under its order, then the contract should be so performed." In their reply brief Stockholders say: "Let it be supposed that the reserves so computed [i. e., on the basis of true assumptions] would exceed assets after paying out $12,000,000 or so in 'net earnings.' Do we contend that that should be

done? Yes—beyond question—yes." They deny that all accountings must be based upon true amounts on present assumptions. In their reply brief they give an illustration in which, conceding that it is proper and necessary that a method of computing and valuing assets and liabilities be agreed upon in order to make an accounting, they conclude that if parties agree upon some method which when adopted renders one party insolvent, "the contract must still be enforced." Such a construction of the Purchase Agreement will not be countenanced. An understatement of the policy reserve liabilities serious enough to lead to insolvency would defeat the broad purpose and plan of the Purchase Agreement, which was the *rehabilitation,* not the debilitation, of the Old Company account, and would run contrary to the public policy of this State as revealed in the Insurance Code, the paramount objective of which is to maintain the integrity of insurance policies.

Having determined that the Purchase Agreement provides General American with a sufficient source of power and authority to increase the policy reserves and establish a new reserve, we turn our attention to the Insurance Code. No statute in effect in 1948 prohibited the action taken by General American. Stockholders expressly disavow any contention that any statute expressly prohibited the reserve increases, but they do contend that no statute authorized either General American or the Superintendent to effect such increases. They do challenge the constitutionality of the 1947 amendment which purports to empower the Superintendent to increase reserves in defined cases of reinsurance, and they also challenge the validity of the Superintendent's order of August 27, 1948 on several constitutional grounds. General American takes the position that the requirement that policy reserves be stated at not less than the actual reserve liability, and the authority of the Superintendent to enforce that requirement, are established by the statutes as they existed prior to the 1947 amendment, and

that the 1947 amendment is not unconstitutional.

Since ample power is found in the Purchase Agreement for the action taken by General American, and since that power is not prohibited by any statute, it is not necessary to consider whether another and additional source of power is to be found, either expressly or by implication, in some statute or statutes, and it is not necessary to pass upon the constitutionality of the 1947 amendment or of the order of the Superintendent. It is nevertheless appropriate to refer to two sections of the statutes which were in effect in 1948 and which are supplementary and confirmatory of the contractual requirement of the Purchase Agreement that General American had the authority and duty in the Final Accounting to state the amount of policy reserves as the actual reserve liabilities. Each life insurance company doing business in this state must file with the Superintendent each year a comprehensive statement of its financial condition in which, among other things, it must report "the whole number of policies in force, * * * the amount of liabilities or risks thereon, and of all other liabilities, * * * the amount of assets other than capital * * *." § 376.350 RSMo 1949, V.A.M.S. This statement is required to be made on the Convention Blank. What is now § 376.470 RSMo 1949, V.A.M.S. prescribes the minimum standards for computing policy reserves in a valuation by the Superintendent. By an amendment in 1943, Laws of Missouri 1943, p. 597, it was expressly provided that "Reserves for all such policies and contracts may be calculated, at the option of the company, according to any standards which produce greater aggregate reserves for all such policies and contracts than the minimum reserves required by this subsection." The statutory requirement that in making financial reports all liabilities be stated necessarily implies the statement of such liabilities at not less than their true and

actual amount, the same as the requirement of the Purchase Agreement. The statutory authority granted General American by the latter statute, to calculate reserves according to any standards producing greater reserves than minimum requirements, is consistent with the same authority granted General American by the Purchase Agreement. Both of these statutes apply as well to the Old Company account as to any other block of policies, whether in a closed account or in a going company.

We conclude that the Purchase Agreement authorized and required General American to state policy reserves for the purposes of the Final Accounting in their true and actual amount; that no statute prohibited this procedure, but on the contrary the statutes expressly authorize statements of policy reserves in excess of minimum standards if necessary to state their true and actual value, and for these reasons Stockholders' contentions that General American had no authority or power by reason of the Purchase Agreement or the statutes to change the basic assumptions for the computation of policy reserves in the Final Accounting, and no power to establish a new reserve, are disapproved.

■■■ Stockholders contend (by their Point XI) that the "net earnings" to which they and policyholders are entitled pursuant to the Purchase Agreement consist of the accumulation of normal net gains from insurance and normal net profits from investments between the last preceding special accounting on April 30, 1946 and the Final Accounting supplemented by (1) the increase in asset values through the 1948 appraisal, (2) the amount of the "contingency reserve" as of August 31, 1948, and (3) the option price paid by General American to retain the account ($1,576,-372.73); that they are entitled to the above amounts without reduction by reason of increases in policy reserves, even if such increases are otherwise necessary.

Article V provided that the net earnings of the assets "will be placed in the Old Company account." Article V(C) provided that the amount to be paid into the Old Company account by General American under subparagraph C (the $7.50 per $1,000 of life insurance in force on August 31, 1948) "shall for all purposes of this Agreement be deemed to be net earnings of the Old Company account." Article VII provided that as of stated times including August 31, 1948, the date of the Final Accounting, the New Company (General American) "will reconsider the liens hereinbefore provided for and will apply the net earnings credited to the Old Company account from the date of the last preceding special accounting * * * to the reduction and/or repayment of all liens * * *." It was further provided that the "earnings so to be applied shall in each instance be adjusted by giving effect to any enhancement, accumulation, losses and depreciation, as provided in Article V," which required the revaluation of the assets for the purpose of the Final Accounting. In each special Accounting, other than the Final Accounting, General American was authorized to "withhold * * * from the net earnings so to be applied [to reduction of liens], as a contingency reserve, a sum [specifying the method of determining the amount] * * * [which] may be applied by the New Company to the absorption of losses, if any, in the Old Company account." It was then provided that "there shall be added to the net earnings to be so applied as of August 31, 1948, [the Final Accounting] the amount of such contingency reserve then in effect." Upon the discharge of the liens upon the policies "any net earnings which, but for the discharge of such lien, would have been applicable to the reduction and/or elimination of liens as hereinbefore set forth, shall be paid over to stockholders of the Old Company."

The Final Accounting was to be "based upon the Convention Blank statement."

On page 2 such a statement brings forward from the last accounting date the balance of ledger assets, and adds thereto the income from all sources during the period. On page 3 the disbursements for all purposes during the period are listed, and the sum thereof is subtracted from the amount brought forward from page 2. This is the new balance of ledger assets. On page 4 is stated the total of ledger assets. Nonledger assets are added thereto to arrive at the total of gross assets, from which the nonadmitted assets are subtracted, leaving the total of admitted assets. On page 5, entitled "Liabilities, Surplus and Other Funds," the first item is "Net present value of all the outstanding policies in force" (policy reserves) with a statement of what tables of mortality and rates of interest were used in the computation. All other liabilities are stated. The total amount of all liabilities is subtracted from the total admitted assets (the final figure on page 4) and the difference may be listed on line 41 under the caption "Special surplus funds" or on line 44, designated as "Unassigned funds" (surplus). That amount, when added to the total of all liabilities, balances the account with total admitted assets.

There is no printed line specifically denominated "net earnings" on any page of a Convention Blank statement. In the Final Accounting General American listed as income the $1,576,372.73 payment by it to retain the account. The result of the increase in asset values and the amount of the contingency reserve were reflected in the total admitted assets. The increase in reserves by reason of the revaluation of liabilities was reflected· in liabilities. The amount of "net earnings" was arrived at by deducting the total amount of liabilities from the total amount of assets, and the words "net earnings" were written in ink on line 41 of page 5 in the amount of $2,-038,681.09. In other words, "net earnings" was arrived at in the same manner and considered to be the same as net worth or surplus in the account. Pages 8 and 9 of the Convention Blank contain an "Insurance Exhibit," showing net gains from insurance, and an "Investment Profit and Loss Exhibit" showing net profits from investments. Increases in reserves are reported in the former. The summary is in a form to reveal increases or decreases in surplus during the year.

Stockholders' position is that the term "net earnings" as used in the Purchase Agreement does not mean "net worth" determinable by subtracting liabilities from assets on a balance sheet, and that it does not mean "surplus." They point out that the terms "surplus" and "net worth" are not used in the Purchase Agreement in relation to the Old Company account; that under the Convention Blank form, net gains from insurance and net gains from investment constitute net earnings or annual earned profits; that earnings were not to reach surplus, except insofar as earnings were to be accumulated in the contingency reserve for the absorption of losses; that the amount paid by the reinsurer in 1948 was to be paid into the Old Company account and treated as net earnings, thus indicating that it was not to pass into the balance sheet; that net earnings were the accumulated, annually stated, net gains from insurance and investments and that they never lost their identity as such; and that "net earnings" implies that there shall be "gross earnings" and "expenses." Stockholders refer to the dictionary definition of net earnings: "Excess of earnings over expenses, sometimes including interest charges, during a given period," without deducting deficits for prior years or periods and without considering future "gains" or "losses" either of income or capital. They cite People ex rel. Third Ave. R. Co. v. State Board of Tax Commissioners, 212 N.Y. 472, 106 N.E. 325; State ex rel. St. Charles St. R. Co. v. Board of Assessors, 48 La.Ann. 1156, 20 So. 670; People v. San Francisco Savings Union, 72 Cal. 199, 13 P. 498; Clark v. Vandalia R. Co., 172 Ind. 409, 86 N.E. 851; Kansas City So. Ry. Co. v. U. S., 231 U.S.

423, 34 S.Ct. 125, 58 L.Ed. 296; U. S. v. Riely, 4 Cir., 169 F.2d 542; Grand Traverse Hotel Co. v. U. S., D.C., Mich., 79 F. Supp. 860; Mobile & O. R. Co. v. State of Tennessee, 153 U.S. 486, 14 S.Ct. 968, 38 L.Ed. 793, for the proposition that net earnings mean "gross receipts after deducting expenses of producing them." They say that net earnings ordinarily refer to the earnings for a limited time; earnings "of a particular period, such as a single year, rather than to an accumulation or balance dating from the original capitalization;" Cotting v. New York and N. E. R. Co., 54 Conn. 156, 5 A. 851, loc. cit. 853; that each year is to stand by itself, Grand Traverse Hotel Co. v. U. S., supra; that excess of assets over capital has no relation to net earnings, U. S. v. Riely, supra; and since earnings cannot be employed to make good actual past deficits or capital impairments, net earnings cannot be used to provide against future contingent deficits or capital impairments which may never happen.

The position of General American is that the "net earnings" to be credited to the Old Company account on special accounting dates, and the "net earnings" to be applied to the reduction or repayment of liens under the Purchase Agreement, means the entire or full amount of surplus in the Old Company account to be so credited or applied at any given time; that net earnings means "net worth," and that net earnings were to be arrived at by deducting the amount of the liabilities from the amount of assets in the Old Company account. General American says that a consideration of the nature and purpose of the Final Accounting, and a consideration of the form of the Convention Blank, leads to the conclusion that "net earnings" means "surplus or net worth"; that Article VII provides that the earnings to be credited to the Old Company account shall be adjusted by giving effect to any enhancement, accumulation, losses and depreciation of assets; that the amount of net earnings to be applied to the reduction of liens

was treated in the Final Accounting as the full amount of the surplus, by deducting liabilities from assets; that the form of the Convention Blank confirms the conclusion that net earnings equal surplus or net worth; that there is no other way, consistent with the requirements of the Convention Blank, to determine net earnings other than by deducting total liabilities from total admitted assets. General American takes the further position that the term "net earnings" has no fixed or intrinsic meaning; that its significance depends upon its context, the nature and purpose of the contract in which it appears, and other circumstances, including the construction placed upon the term by the parties; that General American expressed its understanding of the term by the way it computed net earnings and that the Superintendent showed his understanding of it by his approval of the accounting. General American cites Bank of Morgan v. Reid, 27 Ga.App. 123, 107 S.E. 555, 556; Mangham v. State, 11 Ga.App. 440, 75 S.E. 508, 55 A.L.R. 23, for the proposition that net earnings, under the rule that dividends to stockholders of a corporation can be declared and paid only out of net earnings, means " * * * the difference between the present value of all corporate assets and the amount of all losses, expenses, other charges and liabilities, * * *" i. e., surplus

In determining the meaning of "net earnings" we distinguish between earnings arising out of the operations of the Old Company account, and proceeds not coming from operations but from some other source. The former is derived from net profits from the accumulation of normal net gains from insurance, from normal net profits from investments, from the increase in the value of assets as a result of the 1948 appraisal, and from the amount of the contingency reserve as of August 31, 1948. The only "net earnings" coming from some source other than operations was the $1,576,372.73 paid by General American when it exercised its option to

pay $7.50 per $1,000 of insurance in force. This sum, which in reality was not "earnings" in any sense of the word, was derived not from the operations of the insurance account, but arose out of contract. The parties made a contract in which they chose to denominate this sum as "net earnings." This sum is different from the aforesaid sums derived from the operations of the account, which sums (as we subsequently rule) are subject to appropriation to satisfy the demands of adequacy in the amount of the policy reserves. No considerations of public policy require the appropriation of monies not arising out of operations in order to increase policy reserves. Policyholders (and contingently Stockholders) were entitled to this sum of $1,576,372.73, without qualification, as "net earnings available for distribution." However, since net earnings in excess of $1,576,372.73 were found to be due policyholders in the Final Accounting, the foregoing analysis does not in and of itself require a reversal of the judgment.

In determining the meaning of the other category of "net earnings" (net earnings arising out of the operations of the Old Company account) the purpose of the Purchase Agreement must be considered. That purpose was to preserve and enhance the assets of, and to rehabilitate, the Old Company account, with the objective of serving the interests of all of its creditors, policyholders and stockholders. From the Old Company account income during the 15-year period (1) policy claims were to be paid, (2) reserves in sufficient amount were to be laid aside which with future premiums and investment increment would enable the insurer to meet the policy obligations as they matured, both during the 15-year period and in the years to come after 1948, (3) expenses of operation were to be paid including the fees to General American, (4) a contingency reserve was to be set aside for the absorption of losses during the 15-year period, (5) policy liens, interest, etc. were to be reduced or repaid periodically and at the end of the 15-year period on Final Accounting, and

(6) the balance, if any, was to be paid to the stockholders. Net earnings as used in the Purchase Agreement must be equated with net profits. General American was not to participate in net earnings or net profits during the 15-year period. Its compensation was to be in the form of prescribed commissions, fees and expenses. Stockholders' rights under the Purchase Agreement were contingent upon the existence, at the end of the period, of net profits after all of the foregoing requirements were satisfied.

Policy reserves are the life blood of any legal reserve life insurance company or insurance account. They must be calculated and set aside before any determination can be made of net earnings, i. e., before net earnings or net profits come into existence or can be calculated. Net earnings or net profits under the circumstances here mean surplus, which is wholly separate and apart from policy reserves. Surplus is made up of items of savings upon the assumed rate of interest, from the loading for expenses and the gains from lapsed and surrendered policies. Surplus arises from the receipts of the Old Company account in excess of the cost of doing business and over and above the adequate policy reserves which must be maintained to pay future claims on account of deaths or the maturing of policies. "Surplus is the excess of assets each year over the legal reserve and other liabilities, which consist principally of losses and expenses of operation." Lubin v. Equitable Life Assur. Soc., 326 Ill.App. 358, 61 N.E.2d 753, loc.cit. 755. "The surplus or profits of a mutual life insurance company is the sum remaining out of its gross income after deducting the reserve, dividends, and the losses and expenses; it arises from savings on the assumed rate of mortality, from the excess of interest received over the assumed rate, from the loading for expenses, and the gains from lapsed and surrendered policies; all such items go to make up the surplus, or the so-called net profits of the business, and it is from this source that all so-called dividends and returns to the policyholders, in excess of the face of the policy,

are made. *, * * [T]he surplus does not constitute any part of the reserve, and hence it may be distributed without in any way affecting the ability of the company to meet its obligations on its policies as they mature." 44 C.J.S. Insurance § 114, b. (1), p. 673.

The rights of the stockholders to "net earnings" of the Old Company account under the Purchase Agreement may be compared with the rights of policyholders in a mutual company to their proportionate share of the "net profits" or "divisible surplus" derived from the operation of the business. Reserves are laid aside before any such net profits or divisible surplus is determined. § 376.360, RSMo 1949, V.A.M.S. In White v. Provident Life & Trust Co., 237 Pa. 375, 85 A. 463, 464, the Supreme Court of Pennsylvania considered the meaning of the term "net profits" as used in a statute requiring that "the net profits to be derived from the business of life insurance, after deducting the expenses of the company," be divided pro rata among the policyholders. That court held that the term net profits meant "such funds as might arise from the receipts of the company in excess of the cost of doing business, and of the maintenance of a reserve fund, which will provide for the payment of claims on account of deaths, or the maturing of policies. The surplus is a fund entirely apart from the reserve. The solvency of the company depends upon maintaining the integrity of the reserve fund, but the surplus may be distributed without in any way affecting the ability of the company to meet its obligations upon its policies as they mature. When, therefore, the law requires all the net profits to be divided pro rata among the policy holders, it obviously refers to items of surplus. These items arise from savings upon the assumed rate of mortality, from the excess of interest received over the assumed rate, from the loading for expenses, and the gains from lapsed and surrendered policies. All such items, we understand, go to make up the surplus or the so-called net profits of the business, and it is from this

source that all so-called dividends and returns to the policy holders, in excess of the face of the policy, are made." This quotation is applicable to the term "net earnings" as used in the Purchase Agreement. *The new and additional reserves of $10,171,120 were not taken out of net earnings,* as Stockholders contend, *but out of profits or surplus.* Net earnings were those amounts of profits or surplus remaining *after* the new and additional reserves were set aside. Stockholders' contentions to the contrary are based upon an inverted conception of the nature of their rights.

■ Stockholders maintain that they are entitled to the sum constituting the Contingency Reserve; that under the Purchase Agreement this reserve could not be retained by the reinsurer when it assumed the Old Company account in 1948 but was to be paid out to the policyholders and, contingently to Stockholders, and that the trial court erred in holding that the word "losses" as used in the provision of Article VII for a Contingency Reserve for the absorption of losses was "broad enough to cover anything * * * that causes an increase in the amount of liabilities, * * *," such as an increase in the amount of reserves. Stockholders rely on the provision in Article VII authorizing the withholding during the 15-year period of a sum as a contingency reserve for "the absorption of losses, if any, in the Old Company account," and the further provision that in the Final Accounting "there shall be added to the net earnings to be so applied [to retirement of liens and payment to stockholders] as of August 1948, the amount of such contingency reserve then in effect." Stockholders claim that "losses" means losses realized, sustained, incurred, accrued and payable during the 15-year period, and not losses which might occur in the future, i. e., unrealized but possible losses to be sustained in the future from wars, epidemics, asset losses and other unforeseeable and unpredictable causes. General American claims, and the Circuit Court held, that the word "losses" includes not only any decrease in the amount

or value of assets but also any increase in the amount of liabilities; that the amount of any increase in the reserves constitutes a "loss" within the meaning of the term as used in insurance accounting and in the Purchase Agreement.

A strict construction of these provisions of Article VII, when considered alone, supports Stockholders' contentions, but this ignores the fact that any general contingency reserve constitutes surplus. Consideration must be given to the nature and characteristics of reserves and surplus. In insurance accounting general contingency reserves are surplus, i. e., undistributed assets reserved or withheld from distribution as dividends for the purpose of meeting losses which may occur in the future from extraordinary, unforeseeable and unpredictable causes. A contingency reserve is set aside and maintained for the purpose of providing an extra margin of safety and is held as a second line of defense against insolvency. The contingency reserve provided for by Article VII was created for the purpose of absorbing those kinds of losses which it is the function of surplus to absorb and which might occur during the 15-year period. It was not a permanent regular policy reserve. If, as Stockholders contend, the Purchase Agreement provided that the contingency reserve was to be disbursed without regard to the demands of necessary policy reserves, such a provision cannot be enforced. It would be beyond the power of the contracting parties in 1933 to insulate the surplus funds in the contingency reserve from the requirements of adequate policy reserves in 1948. Surplus funds in a contingency reserve must be available at all times from which necessary regular policy reserves may be set aside when needed. Contract provisions which, but for this necessity, direct a different disposition of amounts thus set aside, must yield to the requirements of adequacy in policy reserves. It is an implied provision of every insurance rehabilitation contract, to which all other provisions must be subordinated, that the integrity of the reserve-requiring policies is the paramount and overriding consideration. Insofar as, and to the extent that, the Purchase Agreement provided, or might be construed to provide, for the disbursement (to policyholders and, contingently, to Stockholders) of the contingency reserve arbitrarily, mandatorily and without regard to the adequacy of the regular policy reserves, such a provision would be unenforceable, as in violation of the public policy and statutes of this state. We do not so construe the Purchase Agreement. We rule that the primal requirement of adequacy of policy reserves is to be implied as one of its basic and underlying provisions. Accordingly, it was proper accounting practice and the duty of General American, in all of the accountings under the Purchase Agreement, including the Final Accounting, to transfer from the contingency reserve to the regular policy reserves any amount necessary to establish and maintain the policy reserves of the Old Company account at adequate levels.

We carefully distinguish between strengthening regular policy reserves set aside to meet the actual and present liabilities, and infusing into regular policy reserves improper safety margins for mere future contingencies. We are referring to Stockholders' contention that it was the intention of the parties that the reinsurer after August 31, 1948 be obligated to use its own surplus (not any of the net earnings or surplus of the Old Company account) to meet unforeseeable contingencies, such as wars, epidemics, asset losses, etc., which might occur in the future; that since the reinsurer alone would get the profit, the reinsurer should stand the losses, if any, out of its own surplus; that Old Company policyholders and Stockholders would have no right to future profits and should not now be required to bear future possible losses. To the extent that actual provision was made in the regular policy reserves for future, possible, unforeseeable, unpredictable contingencies of wars, epidemics and other unknowns, Stockholders' contention must be sustained. This is developed in the dis-

cussion of Point XV. There the reasons for disapproving a mortality table including a margin for these unknowns are fully stated. Otherwise and in all other respects, Points XI and XII are overruled.

### Point XIII. Future Optional Settlement Reserve

By this point Stockholders contend the trial court erred in overruling their Exception U to the Final Accounting on the basis that General American wrongfully set up a new reserve in the amount of $3,-317,632 for ordinary policy proceeds which under the terms of the policies may be left with the company under optional modes of settlement guaranteeing mainly 3½%, when the value of such options is taken on basis of 2.9% interest and, for life contingencies, 1937 Standard Annuity Table set back one year.

The purpose of this reserve was to cover losses which General American anticipated upon supplementary contracts by reason of elections of optional settlements in the future on policies in existence August 31, 1948. By reason of provisions written into the Old Company policies the Company promised at maturity as a death claim to pay the face amount of the policies, or, in lieu of payment of policy proceeds in one lump sum, to make settlement under either of three options which the insured or the beneficiary might elect: (1) payment of monthly installments in a certain sum for a definite number of years; (2) payment of monthly installments in a certain sum for a definite number of years, and thereafter so long as payee might live, or (3) holding the proceeds or a part thereof on deposit, and payment of a guaranteed interest income thereon at the rate of 3% or 3½% per annum. The benefits guaranteed in those settlements were calculated at an assumed net yield rate of 3½% on some policies and 3% on others and insofar as the annuity benefits were concerned, upon AET mortality rates.

General American's justification for this reserve was that losses would occur in the future on future elections of optional settlements provided for in policies in existence in 1948 because of the fixed obligation to pay the guaranteed interest rate of 3 or 3½%, the substantial reduction in interest earnings and future net yield, and a mortality element which would result in losses under these contracts, and therefore such a reserve for future losses constituted a true liability.

The reserve was computed on the gross premium valuation basis at $4,778,267 but was stated in the Final Accounting at the lower figure of $3,317,632. The reduction was made in order to state the total reserve in the Final Accounting in an amount exactly equal to the total of the reserve liability computed on the gross premium valuation basis. General American wanted to eliminate the contention that there were margins in the stated reserves.

Eleven basic assumptions were necessary to be adopted in order to compute this reserve. All eleven assumptions were questioned in Exception U, but only four of them were challenged at the trial. Only three are in issue on this appeal: the mortality rate, the interest rate, and the rate of election of settlement options. The first two relate also to ordinary insurance reserves, and are treated in the discussion of Points XV, XVII and XVIII. The reserve in question was computed upon the basis recommended by Mr. Maclean in his letter to the Superintendent dated August 17, 1948.

Stockholders describe the reserve as "the present value of future possible losses under future possible supplementary contracts elected 'for ordinary policy proceeds which under the terms of the policies may be left with the company' under the three optional settlements." Stockholders object to this reserve on numerous grounds. They say that there is no legal basis, either in the Purchase Agreement or in the statutes, for this new reserve; that the reserves set up

and approved in 1948 should have been the same type as those established and approved in 1933, and computed on the 1933 basis; that this reserve was improperly created out of net earnings, and that the contingency reserve was unlawfully appropriated in order to establish this reserve.

Neither the Purchase Agreement nor the statutes prohibit the establishment of new kinds and types of reserves. We have previously held under Point XII that the Purchase Agreement contemplated that reserves constituting liabilities be stated in their actual amount. We have also noted that the applicable statutes supplement the provisions of the Purchase Agreement to the effect that an accounting made on a Convention Blank statement should include all reserves which in fact constitute liabilities.

Other contentions inherent in Point XIII will be considered later in this opinion, i. e., that the mortality rates employed in the gross premium valuation were excessive; that Stockholders' gross premium valuation was improperly rejected; that profits made from group insurance should be taken into consideration in determining the amounts of ordinary reserves required to be set aside, and that there were sufficient margins in the reserves to make any new reserve unnecessary.

We now state and consider, where necessary, the following contentions of Stockholders: that the reserve in question (1) represents no liability; (2) is not a "policy obligation"; (3) was not ordered by the Superintendent in the exercise of any authority conferred by the 1947 amendment, which is inapplicable to this reserve, and (4) is an unconstitutional delegation of the right to set up a reserve without providing sufficient guides or standards as to method or assumptions to be employed in the computation.

(1) Does this reserve represent a "liability"? Stockholders say no, not even a contingent liability, because the liability is to the beneficiary, not to the insured, and until the policy matures the company is not obligated or indebted to the beneficiary; that upon maturity of the policy by death the beneficiary may take the proceeds in a lump sum, so that there may never be any liability to a beneficiary for an optional settlement loss, because the beneficiary may never exercise any option. Stockholders say that it is not a liability but only the present value of a future possible "loss," or failure to make a profit; that no reserve should be set up until the option is exercised, and if one is set up then it should be taken out of surplus; that even then no such reserve need be set up; that as an alternative any existing deficiency could be met out of current earnings, or regular policy reserves could be strengthened with this need in mind. Stockholders assert that it is inequitable to throw the burden and strain of all of the possible future loss upon Old Company policyholders and Stockholders all at one time; that any such deficiencies should be met as they occur in the future by General American, the reinsurer, which has promised to assume all future losses of this type and which will enjoy all future net earnings and gains.

We are of the opinion that the future optional settlement reserve constitutes a liability. The experts so testified. The witnesses for General American made it clear that a reserve for future losses under optional settlements pursuant to existing policies where the guaranteed benefits are excessive when measured by net yield rates of interest and rates of mortality reasonably to be expected constitutes a true liability, which can be estimated with fair precision. Stockholders' actuary testified that policy provisions for optional settlements must be taken into consideration in making a gross premium valuation, and that if future net yield is assumed to be less than that guaranteed in such provisions, a reserve must be set up for the resulting loss, or else a margin must be provided for otherwise, out of which it may be met. In his own calculations Stockholders' actuary had treated reserves for future optional settle-

ments as liabilities, and he regarded sound practice in Convention Blank accounting to require the showing on the liability page of an amount not less than that determined by the gross premium valuation. Stockholders' argument that this reserve is not a present liability because it is subject to a future contingency (election or nonelection of an option) bears upon the *extent* or amount of the liability and not upon the *fact* of liability. Stockholders' argument that this reserve is for "future" losses is not convincing. All liabilities in the field of insurance are in futuro and contingent, in a sense. All reserves are established for future payments of future losses. While the amount of the losses and deficiencies arising from the fact that the benefits promised in the optional provisions are excessive when measured by the expectable interest and mortality rates will depend upon numerous factors, they constitute a liability regardless of amount.

■■■■■ (2) Is the reserve in question a "policy obligation"? Stockholders say no; that the italicized words of the statute requiring the Superintendent annually to value " * * *· the reserve liabilities * * for all outstanding life insurance policies, annuity and pure endowment contracts and *all other policy obligations * * *"* refer not to liabilities such as this, but to the disability and accidental benefits of a policy; and that when an insured dies, what was previously a *policy obligation* to the insured ceases to be a policy obligation and becomes a debt or indebtedness of the company to the beneficiary; that statutory reserves are "policy reserves" for "policy obligations"—for present contingencies— but that this reserve is not a policy reserve for a policy obligation to provide for a future liability on account of an insurance risk, but is a *solvency* reserve to provide for a future liability on account of an investment risk. They say that matured claims require solvency reserves but that unmatured claims upon future possible supplementary contracts are neither policy obligations nor matured claims, and require

no solvency reserves. Stockholders cite Penn Mut. Life Ins. Co. v. Commissioner of Internal Revenue, 3 Cir., 92 F.2d 962; Commissioner of Internal Revenue v. Monarch Life Ins. Co., 1 Cir., 114 F.2d 314; Helvering v. Illinois Life Ins. Co., 299 U.S. 88, 57 S.Ct. 63, 81 L.Ed. 56; Commissioner of Internal Revenue v. Pan-American Life Ins. Co., 5 Cir., 111 F.2d 366; New England Mut. Life Ins. Co. v. Welch, 1 Cir., 153 F.2d 260. These cases relate to the question whether for purposes of calculating income taxes solvency reserves or business reserves (reserves not directly pertaining to life insurance) constitute "reserve funds required by law," deductible as such from the gross income of a life insurance company under Section 203(a) (2) of the Revenue Act of 1934, 48 Stat. 732, 26 U.S.C.A. Int.Rev.Acts, p. 730. In the Penn Mut. Life Ins. Co. case, supra, the distinction is drawn between the obligation of the insurance company to the insured during his lifetime (a policy obligation) and the obligation of the insurance company to the beneficiary upon the death of the insured (an obligation of debt), but none of these cases deals with the question whether a life insurance company would be justified in establishing such reserves or whether such reserves are policy obligations under statutes authorizing or requiring the establishment of reserves for the purpose of meeting policy obligations. The latter question must be answered in the affirmative, without giving weight in this type of case to the refinements and distinctions drawn in the tax cases. The policies provide that in lieu of the payment of the proceeds in one sum at maturity as a death claim the company will make settlement in accordance with any one of the three optional methods of settlement. Although no life contingencies are involved in the reserves set up on supplementary contracts, they are promises to pay; they are obligations created by the policy; they are expected eventually to mature and to require the payment of sums of money in the future. To the extent that they involve the payment of monies in excess of the amount of the principal and

the interest to be earned on the principal sum retained they are liabilities. As policy promises to pay they are policy obligations. To the extent that these obligations constitute present liabilities, they require that reserves be established in order to satisfy them at maturity.

(3) Is the 1947 amendment applicable to this reserve? Stockholders argue that the amendment does not permit the increase of reserves or the creation of reserves for future supplementary contracts (nor even for existing supplementary contracts) but permits the Superintendent to increase only those reserves required by the valuation statute or the terms of policies or contracts reinsured or assumed in bulk. This argument becomes irrelevant in the wake of our previous holding that General American had the right to institute an increase of the reserves, and to establish this new reserve, independently of and prior to the enactment of the 1947 amendment, if necessary to express in the Final Accounting the total amount of the actual liabilities.

(4) Was the Superintendent's order of August 27, 1948 unconstitutional? Since we have ruled that General American had the power and authority to establish this reserve in the Final Accounting independently of any order of the Superintendent, and that it did do so, there is no occasion to rule this question. Accordingly, Point XIII is overruled.

Law questions of power and authority, and of the construction of the Purchase Agreement settled, we now consider questions of law and fact raised by Stockholders' objections to the basic assumptions used in computing the reserves (rate of mortality, rate of net yield, and rate of election in computing reserves for losses on future optional settlements) and the fact question whether it was necessary to increase policy reserves and establish a new reserve in order to state the reserves in the amount of actual liabilities.

### Point XIV. Burden of Proof and Judicial Review

Stockholders say that although the Circuit Court correctly ruled that General American and the Superintendent had the burden to establish the correctness of the items contained in the accounting, it erred (1) in failing to find that it had not been sustained by clear and convincing evidence and with reasonable certainty, and without resort to guess and speculation; and (2) in failing to weigh the evidence but instead holding that it was bound by any fair exercise of General American's "business judgment" and the Superintendent's "discretion" in relation to the size and type of reserves reported in the Final Accounting.

We have previously set forth at length the rules pertaining to the scope of review on this appeal. Our final statement was that the rules there announced "must be separately applied to the factual situation of each Exception." This we shall do, and this point calls for no express and separate ruling.

### Point XV. Mortality Rates

Stockholders contend that if General American had the authority to make some increase in the existing reserves and to add a new reserve, the Circuit Court erred in overruling their Exceptions Q and U to the Final Accounting, and in failing to surcharge General American with a sum estimated by them to be greater than $2,000,000, because of the use by General American of mortality rates in calculating reserves which (a) improperly contained provisions or margins for future wars, epidemics and unknown causes, and (b) made no provision for future mortality improvement.

The rates of mortality upon which the reserves for policies of ordinary life insurance in the Old Company account had been computed during the 15-year period, and prior thereto, were the rates in the American Experience Table of Mortality (AET), originally published about 1868.

That table overstated the mortality rate as of 1948, particularly in the lower age brackets, and was generally "recognized as being out of date and not representative of current experience." The table in common use in 1948 was the Commissioners' 1941 Standard Ordinary Table (CSO), published in 1941 under the auspices of the National Association of Insurance Commissioners, which expressed a mortality experience of a major part of the insurance industry from 1930 to 1940. Mr. Maclean said that the CSO Table was "the only practical and equitable table available as a modern reserve standard," but that it "somewhat overstates the probable mortality rates." In making a gross premium valuation the basic assumptions should be as "realistic" as possible, and the best procedure with which to *begin* the construction of a mortality rate for that purpose is to take the past experience of the group of policies involved. This is the procedure Messrs. Maclean, Burian and Good elected to follow when they decided that a gross premium valuation of the policies in the Old Company account should be made.

The five-year period prior to December 31, 1947 was first selected to obtain the actual mortality experience, but because of the number of war claims in 1943–1944 and the limitation of time to prepare the experience data, the three-year period of 1945 through 1947 was finally selected and all war claims, although "quite small," occurring during that period were excluded. Mr. Maclean was of the opinion that the experience for ages 50 to 79, which constituted about 88.5% of the total experience, was "fairly substantial" but not sufficient to furnish "conclusive mortality rates." He was also of the opinion that the experience below age 50 and above age 79 was too slight to be of value and it was disregarded. He used the experience for ages 50 to 79 "as the foundation and the basis for the [mortality] table which was finally adopted" and used in the gross premium valuation. This is referred to as the "Maclean Table." The actual experience, when expressed in percentages of the CSO Table, disclosed some irregularities which Mr. Maclean considered to be "merely an accidental fluctuation." For example, current mortality expressed as a percentage of the CSO Table normally showed an increasing percentage, i. e., that in the older ages the actual mortality is closer to that expressed in the CSO Table. But the actual experience for ages 50 to 79 was the reverse. In addition, for reasons subsequently stated, Mr. Maclean thought the actual experience for the three-year period was too favorable. Therefore, his "first step" was to substitute for those percentages in the 50 to 79 age group based on actual experience, percentages "which would result in a slightly higher amount of claims than the experience showed," and to eliminate the accidental fluctuations by a "smoothing out" process. The rates for ages below 50 were the result of Mr. Maclean's "judgment based on the statistics of the Mortality Committee for these lower ages." The "slight increase" over the actual experience added by Mr. Maclean resulted in "an increase in the substituted percentages as computed with the experience percentages of about 5%" for the age group of 50 to 79 years where over 88% of the claims were experienced, and when the "very young and very old ages" were included the over-all increase was approximately 9 or 10%. The reasons given by Mr. Maclean for this increase were as follows: First. The experience used was for "a very short period and therefore not too reliable and for that reason alone we could not have safely assumed that the experience of that particular three-year period would be duplicated forever afterwards." Second. The three-year period upon which the experience had been based had been a favorable one, from the rate of mortality standpoint, in the Old Company account and in the industry generally. There had been no abnormal mortality due to epidemics or other causes, and the few war claims had been eliminated in the determination of the actual experience. Third. There should be "some allowance for the certainty * * * that there will [in] over 70 years be some

abnormal mortality experience." The Maclean Table, so formulated and established, expressed in five-year intervals as a percentage of the CSO Table, was as follows:

| Age | Ratio of Maclean Table to CSO Table | Age | Ratio of Maclean Table to CSO Table |
|---|---|---|---|
| 15 | 47.5% | 50 | 75.0% |
| 20 | 50.0% | 55 | 85.0% |
| 25 | 52.5% | 60 | 95.0% |
| 30 | 55.0% | 65 | 95.0% |
| 35 | 60.0% | 70 | 95.0% |
| 40 | 65.0% | 75 | 95.0% |
| 45 | 70.0% | 80 | 95.0% [8] |

It thus appears that the mortality rates in the table used in the gross premium valuation were higher than those reflected by the actual experience during the three-year period, but were lower than those expressed in the CSO Table. The expectations during the test period under the Maclean Table and the CSO Table in comparison to the claims actually experienced are revealed by tables showing the following:

| Age Group | Net for Reserves; Gross for Reinsurance | Expected Claims | |
|---|---|---|---|
| | | According to CSO Table | According to Maclean Table |
| 10–19 | $ 3,886 | $ 15,449 | $ 7,339 |
| 20–29 | 16,429 | 34,761 | 18,250 |
| 30–39 | 98,238 | 196,891 | 118,135 |
| 40–49 | 445,937 | 896,570 | 627,599 |
| 50–59 | 2,028,899 | 2,204,417 | 1,873,754 |
| 60–69 | 2,337,335 | 2,716,158 | 2,580,350 |
| 70–79 | 1,306,571 | 1,601,123 | 1,521,067 |
| 80–89 | 171,360 | 293,044 | 278,392 |
| 90– | 3,084 | 3,618 | 3,437 |
| Total | $ 6,411,739 | $ 7,962,031 | $ 7,028,323 |

| Age Group | Ratio of Actual Claims to Expected Claims by | |
|---|---|---|
| | CSO Table | Maclean Table |
| 10–19 | 25.15% | 52.95% |
| 20–29 | 47.26% | 90.02% |
| 30–39 | 49.89% | 83.15% |
| 40–49 | 40.74% | 71.06% |
| 50–59 | 92.04% | 108.28% |
| 60–69 | 86.05% | 90.58% |
| 70–79 | 81.60% | 85.90% |
| 80–89 | 58.48% | 61.56% |
| 90– | 85.26% | 89.73% |
| Total | 80.53% | 91.23% |

The amount of the actual claims for ages 50 to 79, inclusive, was approximately $5,673,000. The total would have been $5,975,000 if the experience at those ages had been exactly as contemplated by the Maclean Table. The difference of approximately $300,000, or $100,000 per year, is just a little more than 5% of the actual claims, and represents the increase added by Mr. Maclean in formulating the Maclean Table.

We shall consider first Stockholders' contention that the Maclean Table erroneously failed to provide for future improvement in mortality. Stockholders assert that by

8. The fact that the ratio from ages 60 to 80 remains constant does not mean that the mortality rate remains constant. In the CSO Table the mortality rate increases each year up to age 99 years where it is 100%. The rates in the Maclean Table increase accordingly, being 95% of the rates in the CSO Table for the corresponding years.

failing to make provision for future improvement in mortality the rates were unrealistic and thereby improperly resulted in the inclusion in policy reserves of assets of the Old Company account which in fact constituted surplus. It is conceded by all parties that no surplus or "net earnings," as that term was used in the Purchase Agreement, was to be transferred at the end of the 15-year period to the purchaser of the Old Company account. General American contends, and its experts supported the conclusion, that an assumption for future improvement in mortality in the Old Company account over that actually experienced during the three-year test period would not have been justified. Instead of a detailed summary of the voluminous evidence presented by both sides on this issue, we shall state the essential features of the evidence and draw our conclusions based on an analysis and consideration of the evidence in its entirety.

The Old Company account, with minor exceptions, had been closed for 15 years and there had not been the addition of new and younger risks. Because of this, in 1948 the majority of the policyholders were over age 50, and the "cost age" (the weighted average age in relation to the amount at risk) was approximately age 60. While in the past there had been substantial improvement generally in mortality, most of that improvement was in the younger ages. The first report of the Guertin Committee [9] showed that from 1915 to 1934 there had been a general downward trend in mortality rates for the higher age groups during the first part of that period, but during the latter part the trend had been generally upward. That report contained this statement:

"Heart diseases at the older ages have not declined as causes of death, but real progress has been made in

reducing the deaths among children from heart disease. Cancer death rates among women have remained at about the same level, but among men have gradually increased. There has been a reduction, however, in death rates from skin cancer.

"Diabetes mortality at the younger ages has fallen, following the introduction of insulin in 1923, but at the older ages has shown no decrease. Possibly insulin merely defers, rather than prevents, death from diabetes.

"Death rates from diseases of the coronary arteries and angina pectoris at the higher ages have increased and have offset improvements from other causes at those ages."

The fact that there had been little change or improvement in mortality rates in the older age groups was recognized in the Whelpton Monograph (referred to and identified hereafter) wherein it was stated that the improvement in the "middle years of life has been less marked" when compared to the early age groups, and that "Death rates of white males 60 and older have remained relatively unchanged, being somewhat higher in 1929–1931 than in 1900–1902, but somewhat lower in 1940–44 than in 1929–1931." Mr. Maclean testified that information available to him indicated that in the higher age brackets since 1915 the rate of mortality "had gone down and come up again and gone down again," and that he could see no justification for assuming that in the future they would go down any more than that they would go up.

During the three-year test period the mortality rate in the Old Company account had been less favorable than in the industry generally. In 15 companies, including the 13 largest companies in the United States and Canada, during 1945–1948 the actual mortality experience for attained ages of

9. This was a committee, named after its chairman, of the National Association of Insurance Commissioners appointed to

study trends in mortality rates, and which developed the CSO Table.

50 or over was 85.76% of the experience expected under the CSO Table. During the same time for the same age group the actual experience in the Old Company account was 96.2%. The actual claims for the years 1945–47 "was approximately 109.-5%" of the expected claims according to "the most recent experience published in the 1947 Transactions covering deaths after the 15th policy year in the years 1945 and 1946." This adverse experience in relation to the industry generally may have been brought about because the Old Company account included "a substantial volume" of risks which had been insured without medical examination. Some of the insurance had been originally sold without medical examination and some had been issued pursuant to conversion privileges in term policies of ordinary insurance or in certificates under group insurance policies. Another factor tending to result in adverse mortality experience, difficult of valuation or at least more difficult than the other factors, was what is known in the insurance industry as "anti-selection." Persons of impaired health, who are more prevalent among nonmedically examined risks, are apt to "select against the company," that is, retain their insurance under circumstances in which a healthy insurable person would decide to terminate it. Another type of anti-selection occurs when a person who has term insurance or is covered by a group insurance policy would ordinarily drop his insurance but "selects against the company" and converts to an ordinary policy without medical examination. Persons of impaired health exercise the option more frequently than persons in sound health. Anti-selection also results from incidents which impair the confidence of policyholders in their insurer. General American experienced some such incidents which, whether justified or not, tended to cause healthy persons to terminate their insurance, thus leaving the Old Company account, particularly since it was a "closed account," with a disproportionate ratio of those persons who had "selected against the company."

While it is true that the existence of these factors was reflected in the Maclean Table, their presence in the Old Company account was entitled to some consideration in determining whether it was reasonable to assume that an account with such substandard risks would have an additional future improvement in mortality rates.

Stockholders' actuary and expert witness, Mr. Thomas, developed a mortality table (referred to as Mo. State 1945–47 Table) from the three-year (1945–47) experience, but after "smoothing out" the figures to eliminate accidental fluctuations he added no additional amount as did Mr. Maclean. In effect he assumed that all future experience would duplicate the experience of the 1945–47 period. However, we note that for the age groups 50 through 79 (which comprised 88.5% of the claims) the actual experience was 104.24% of the claims expected pursuant to the Mo. State 1945–47 Table. According to General American this resulted in the predicted claims being approximately one-quarter of a million dollars less than the actual claims during the three-year period. Apparently Mr. Thomas failed to give adequate consideration to a "hump" in the experience for ages 50–59 (92% of the CSO Table) for which no satisfactory explanation could be found. It was Mr. Burian's opinion that "the block of business at attained ages 50–59 will probably continue to carry some abnormal mortality with it as it advances into higher attained age groups." Mr. Thomas considered it to be a temporary fluctuation that would not be repeated, and his resulting deviation from the actual experience is almost as far below the actual experience as Mr. Maclean's Table is above the actual experience by reason of the 5% addition.

Mr. Thomas also made what was referred to as the "Thomas Table of Projected Mortality Rates" in which he projected rates on the so-called geometric progression basis to the assumed rates for the year 2000. This table was based on a forecast by Mr. P. K. Whelpton, a demographer

(expert on population trends) contained in what was referred to as the Whelpton Monograph. This monograph contained what was expressed as the "low assumption," the "medium assumption" and the "high assumption." Mr. Whelpton testified that while it was "not expected that the actual course of mortality in the future will follow exactly any of the assumed trends, it is believed that it will be between the high and the low and nearest to the medium series." As to the low assumption, Mr. Thomas said that to achieve such longevity there must be "outstanding progress in medicine and public health." The degree of progress required is emphasized by the following comparison. After pointing out that there had been a substantial decline in the death rates "at most ages under 35," Mr. Whelpton stated that "improvement in the middle years of life has been much less marked. At ages 50–54, for example, the decline from 1900–1902 to 1929–31 was less than 7 percent, and from 1929–31 to 1940–44, about 8 percent. Death rates of white males 60 and older have remained relatively unchanged, being somewhat higher in 1929–31 than in 1900–02 but somewhat lower in 1940–44 than in 1929–31." Yet, according to Mr. Maclean, the Thomas Projected Table called for "such improvements as 56% at age 54, 63% at age 64, * * * [and] 49% at age 74, over a period of 52 years in the future." The forecast used by Mr. Thomas in his projected table was the "low assumption" in the Whelpton Monograph and was for population generally, not for a group of persons with the unique characteristics of the Old Company account. The rates for the year 2000, described as "fantastic" and "incredible" by Messrs. Burian and Maclean, expressed a most favorable trend in mortality which would depend on remarkable improvement in the control of causes of death in older age groups.

Stockholders introduced many other exhibits to show favorable changes in the mortality rates. These exhibits were general in their scope and of limited value in determining whether future mortality improvement should be assumed in the Old Company account, in view of the circumstances heretofore noted.

Between the times the AET Table and the CSO Table were published, i. e., between 1868 and 1941, substantial improvement in mortality in lower age groups had been experienced. People were living longer. A greater number or percentage of people than formerly were not dying until they reached the higher age brackets. The improvement in mortality between 1868 and 1941 was expressed in the CSO Table (based on the 1930–40 experience), which had been published only seven years before Mr. Maclean made his table. The Maclean Table indicated that in the future (after 1948) the mortality rate in the Old Company account for attained ages of 50, 55 and 60 would be 75%, 85% and 95%, respectively, of the rates for those attained ages as expressed in the CSO Table. The Maclean Table, therefore, expressed a further improvement over the 1930–40 period, and projected that further improvement into the future as one which would be maintained at the same improved level, but no provision was made for any additional future improvement.

■■ In establishing a mortality table for use in the gross premium valuation it was the duty of Mr. Maclean and the officials of General American to exercise their best judgment as to what the future rate of mortality would be in the Old Company account, with its unique and peculiar composition. In predicting the rate of mortality for the next 50 to 70 years they were obliged to draw upon their knowledge of actuarial problems and mortality experience, and to make realistic assumptions, tenable at the time. They could not arbitrarily use mortality rates then untenable. But they are not to be held to standards of exactitude, for the whole business of insurance is based upon probabilities and not exactness. It involves a field of speculation; a specialized area of "scientific pre-

diction" based on past experience and future probabilities in which only the most highly trained in the actuarial field can safely operate. The standard to which General American is to be held in predicting future improvement in mortality is that of reasonableness. The burden was on General American, the accounting party, to show that the failure to include future improvement in mortality rates in the Maclean Table was reasonable and realistic. General American and Mr. Maclean concluded, in view of past improvements, the ratio of the improvements between the younger and older age groups, the character and composition of the account, particularly considering that the majority of the policyholders were over age 50 (where any substantial future additional mortality improvement was extremely speculative), and the factor of past anti-selection, that no additional future improvement could be expected. The decision not to assume any further improvement in future mortality rates over the actual experience in the Old Company account was reasonable and realistic in view of the supporting evidence. While there is room for an honest difference of opinion as to whether there will be any future improvement in mortality, we conclude from all of the evidence that the officers and directors of General American in not assuming any such improvement in the Old Company account, exercised in good faith an honest business judgment.

■ Next, Stockholders assert that the reserves were improperly calculated by using a mortality table containing a margin of 5% (9 to 10% on the entire table) over actual experience, which they contend was added for future wars, epidemics and unknown causes of abnormal mortality. It is Stockholders' position that the inclusion of a provision or margin for this purpose was erroneous because the table was to be used in a gross premium valuation to determine the present actual or true liabilities for the calculation of necessary policy reserves, but that future occurrences which are not rea-

sonably foreseeable and which are not reasonably predictable by some accepted actuarial method do not constitute present liabilities for which it is proper to establish policy reserves.

The first question for determination, a factual one, is whether or not the 5% addition, in whole or part, was made to provide for future wars, epidemics and unknown causes. The three reasons given by Mr. Maclean for making the addition to his table make it clear that *some* part of the addition was for that purpose. He testified on several other occasions that these factors were considered by him and that they resulted in higher rates in the Maclean Table. Mr. Burian testified that after taking the actual experience for the three-year period, "we assumed that our future experience was going to be that experience plus something in addition to take care of what we thought was an abnormally low expression of mortality in the three-year period, plus provision for epidemic and war mortality," and also that the 5% addition was for "extra loss that may result above normal experience from wars, epidemics, or any other causes." Mr. Thompson testified that in the Maclean Table "there is a very slight margin there of some six or seven points" for future wars, epidemics and unknown causes. At one time Mr. Maclean minimized the effect on his table of the consideration given by him to future wars and epidemics, but in doing so he admitted that "some" provision therefor was made. We need not set out the other evidence, of which there is considerable, to the same effect. While there is a dispute as to how much of the 5% addition was for future wars, epidemics and unknown causes, it is obvious, in fact admitted, that *some* provision or margin .was made in the Maclean Table for these factors, thereby increasing the rates in the table to some extent.

The next question, a legal one, is whether the inclusion in the Maclean Table of some provision for the above purposes was proper.

Every life insurance company operating on the level premium plan adds to the net premium a "loading" for expenses and for unforeseen contingencies. Maclean, Life Insurance, 6th ed., p. 103. It is not only proper to do so but necessary. See Magers v. Northwestern Mut. Life Ins. Co., 348 Mo. 96, 152 S.W.2d 148; Liebing v. Mutual Life Ins. Co. of New York, 269 Mo. 509, 191 S.W. 250. The money received from this loading, when not expended because of abnormal fluctuations in expected mortality, is retained to form a cushion from which abnormal losses may be paid, but of course there is no actual segregation of funds. We are not concerned with whether it is reasonable to assume that in the future these abnormal fluctuations will occur. That is admitted. Neither are we concerned with whether in a going insurance company provision should be made therefor in the gross premium and the sums so received held as a cushion in the form of surplus to provide for these losses. That too is admitted. Here, the Purchase Agreement provided in effect that as of August 31, 1948 there should be a Final Accounting of the Old Company account in which the total of the *present actual liabilities* be determined; that an equivalent amount of assets be retained by General American; and that the remainder, if any, then be distributed to policyholders and contingently to stockholders. We must therefore determine whether or not in life insurance accounting the possibility of *future* adverse fluctuations in the mortality rate resulting from wars, epidemics and unknown causes, for which contingencies it is proper to load the gross premium, constitute a *present liability* for which it is necessary to establish a reserve. If so, the addition of "some" part of the 5% for this purpose was proper. If not, in doing so General American improperly infused surplus into policy reserves.

We should mention that losses resulting from wars, epidemics, unknown causes and future contingencies do not result in an *additional* number of death claims against an insurance company, but result only in the claims occurring earlier than predicted by the mortality table used. Therefore, these factors produce an adverse fluctuation in the rate of mortality. When used in this discussion, the terms "increased mortality" and "losses" refer to this fluctuation.

The expert witnesses of General American uniformly agreed that in life insurance accounting "present liabilities" do not include losses from future occurrences which have only the possibility, as distinguished from probability, of occurrence. Mr. Burian stated that the assumptions for determining policy reserve liabilities should be the "most probable future experience" and that "the things that you should set up must be probable and really likely to happen." Mr. Maclean stated that the assumptions were to be as "realistic as possible" and should not contain any "margins" which he defined as "something additional * * * a provision for surplus." All of General American's expert witnesses agreed that fluctuations in mortality because of future wars, epidemics and unknown causes are not foreseeable, and that there is no way actuarially to make any reasonable prediction as to when they will occur or their effect. Mr. Maclean testified as follows:

"Q. It isn't possible to have any actuarial formula for computing the deaths that you expect from wars, is it? A. No.

"Q. We don't know when they will occur or how much the loss will be when it does occur, is that true? A. This is true.

* * * * * *

"Q. So that mortality from epidemics, * * * you don't know the time, of course, the extent of the occurrence or the cause of these epidemics, do you? A. No, we don't.

"Q. And you have no actuarial formula of any reliability whatever to predict any of those factors, isn't that true? A. That is true.

"Q. Despite that you have, as you said, made some provision in your mortality assumption for such epidemics in the future, is that right? A. Yes, the five per cent difference was intended to cover that, among other things, whatever it may amount to.

"Q. And by making an addition or taking that into consideration in the mortality table that, of course, is reflected in the reserves, isn't it? A. Yes."

Mr. Maclean, asked if he could tell what amount "in dollars" was reflected in the reserves for future epidemics, replied as follows: "No, I couldn't. I will say again I have no way of measuring this epidemic hazard. There is a hazard there, I believe, and I hope I have included it sufficiently in that five per cent difference. No means of measuring it or what its effect is on the amount of the reserve." When asked what amount of the reserve was for future wars, Mr. Maclean replied, "The same answer." Chapter IX of the Guertin Committee Report, entitled "Wars and Epidemics," contains the following: "Mortality statistics over a long period of years indicate, as elsewhere reported herein, a great improvement in mortality which varies, in incidence and intensity, with age, place and time. Superimposed upon this favorable trend there have always been, and probably will always be, incidental fluctuations, more or less serious and frequent. Some of the most important of such fluctuations in the past have been due to wars and epidemics. * * It appears to be impossible to predict these events with any degree of success, either as to time, incidence, or extent." Therefore, although Mr. Maclean and the other expert witnesses of General American (except Mr. Thompson) said no "margins" were included in the Maclean Table, they also (including Mr. Thompson) said that provision was made therein for fluctuations in mortality for wars, epidemics and unknown causes which were unforeseeable, unpredictable, and not capable of measurement actuarially—exactly what the witnesses in effect said constituted a "margin" in a mortality table.

In addition to the above testimony to the effect that possible future fluctuations in mortality do not constitute a present liability there was substantial evidence that it was the function of surplus in life insurance accounting to provide the cushion for these losses. In this connection it must be pointed out that some life insurance companies carry on their books no sum at all labeled "surplus," but carry what in fact is surplus as "contingency reserves" or by some other name. These "reserves" are not to be confused with policy reserves. They constitute *capital* liabilities and not *actual* liabilities in that they do not represent the present value of a future foreseeable and predictable policy obligation. In his book on Life Insurance at p. 317, Mr. Maclean stated: "Special reserves may be amounts definitely set aside for specific purposes such as the special investment reserves * * * or for strengthening of reserve bases, or they may be merely nominally earmarked portions of the surplus appearing in the statement under such general descriptions as *investment reserve, mortality-fluctuation reserve, contingency reserve*. Special reserves are not actual liabilities." (Italics are Maclean's.) In his book at p. 154, Mr. Maclean also states that "A contingency fund [from surplus] is required chiefly for (1) abnormal mortality losses such as from wars or epidemics and (2) investment losses." He testified consistently with the statement in his book, as follows:

"Q. The function of surplus and the chief reason it is required is to take care of abnormal mortality losses such as from wars and epidemics, and also investment losses, isn't that right? A. That is right.

"Q. And as some of the witnesses have pointed out, some companies * * * actually show their surplus as a contingency reserve for mortality fluctuations and unforeseen possibilities

such as wars and epidemics and investment losses, isn't that right? A. Yes.

\* \* \* \* \* \*

"Q. Do you know of a single company that accumulates a reserve for war mortality? A. I think they all do.

"Q. In what way? A. Usually as a part of surplus.

"Q. And they do the same thing for epidemics? A. Yes.

\* \* \* \* \* \*

"Q. That is the function of surplus, is to take care of asset losses in the future and mortality losses and wars and epidemics, isn't it? A. That is the main function."

Mr. Frank E. Agnew, Jr., Vice-President of General American, testified that surplus is set up for "general contingencies," which are "unforeseeable events." Mr. Linton testified that the purpose of the "contingency reserve" of his company, admitted to constitute surplus and not to constitute an actual liability, was to take care of losses "for which you really have no basis for calculation you know you may experience— have an unfavorable experience and this is to take care of contingencies that may arise of that kind." His company did not maintain a policy reserve (as a liability) for possible future war losses. Mr. Thompson, whose work "very largely" had been that of an actuary, testified that a contingency reserve (surplus) is a "fund for unforeseen contingencies of all kinds," including "excessive mortality," to provide for abnormal mortality in case of wars and epidemics "insofar as such mortality runs beyond the mortality assumed in the table for the valuation of policy liabilities." He stated that the Maclean Table was reasonable because "there should be a small margin for that purpose" [future wars], and the Maclean Table had a "slight margin" for "unforeseeable contingencies," but that in the company of which he was president the "reserve" for these purposes was a contingency reserve in the form of surplus.

In the Guertin Report, after devoting a whole chapter to wars and epidemics, the committee stated its "Conclusions with respect to special contingencies" as follows: "The Committee, influenced by its studies and observations, is satisfied as to the following: (1) It is the use of gross premiums with adequate safety margins rather than the maintenance of reserves based upon a table with redundant rates of mortality that is conducive to protection from adverse fluctuations in mortality; (2) Policy reserves established under legal requirements or by virtue of policy provisions are not intended to provide for the contingency of substantial excess mortality from wars and epidemics; (3) Contingencies of that nature must be met, in whole or in part, out of accumulated surpluses and contingency reserves; (4) Surplus and contingency reserves for this purpose must be provided, directly or indirectly, from the premiums received, and the necessity for the accumulation of such margins must be kept in mind when gross premiums are fixed; \* \* \*." General American quotes the following statement in the opening paragraph of the above chapter: "Such contingencies (wars and epidemics) must, however, be kept in mind in connection with the selection of a mortality table to be used by a life insurance company for the calculation of insurance premiums and reserves." This isolated statement, which does not distinguish between policy reserves constituting a liability and contingency reserves made up from surplus, might be taken to suggest the conclusion that such contingencies could be provided for in policy reserves. The discussion that follows, however, clearly makes the distinction and from a careful study of the entire chapter, considering the quoted language in context, we conclude that the word "reserves" used therein refers to *contingency* reserves constituting surplus. The quotation therefore rebuts rather than supports General American's position.

Although at times certain witnesses made general statements to the effect that future unforeseeable and unpredict-

able fluctuations in mortality could properly be considered to be present liabilities for purposes of determining policy reserves, when the entire testimony of these witnesses is examined, together with all the other testimony on the question, it is unquestionably the rule and practice in the life insurance business that in order for a future policy obligation to constitute a present liability it must be reasonably foreseeable and probable of occurrence, as distinguished from a mere possibility, and must be reasonably predictable by some accepted actuarial method or procedure. It is also equally evident from the testimony of General American's witnesses that possible future fluctuations in mortality by reason of future wars, epidemics and unknown causes do not meet the test and do not constitute a present liability. The evidence clearly establishes that it is the accepted practice and the rule in the life insurance business that these unpredictable and unforeseeable fluctuations must be provided for in the gross premium, and that the sums so received over and above the net premium and the loading for expenses constitute surplus which has as its purpose the creation of a cushion for the payment of unforeseeable, unpredictable, abnormal and adverse fluctuations in mortality. These usages and practices in the life insurance industry were reasonable, generally acquiesced in, and not contrary to law or inconsistent with public policy. The witnesses testifying for the contracting parties established their existence. Knowledge of these well-known and generally established trade usages are to be imputed to General American, which was engaged in the business, and to the Superintendent, who had intimate knowledge of the industry. 55 Am.Jur., Usages and Customs § 35. These valid usages and practices in the industry, not having been expressly or impliedly excluded by the terms of the Purchase Agreement, formed a part of the contract by implication, Jacobs v. Danciger, 328 Mo. 458, 41 S.W.2d 389, 77 A.L.R. 1237; 55 Am.Jur., Usages and Customs § 35, and may be taken into consideration in determining the intention of the parties and in reaching a construction of the Purchase Agreement that is fair and reasonable under all of the facts and circumstances. Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262. Therefore, when Mr. Maclean added to his mortality table *some* provision for future unforeseeable and unpredictable fluctuations in mortality by reason of wars, epidemics and unknown causes, he infused surplus into the policy reserves calculated on the assumptions of that table, and wrongfully so under the terms of the Purchase Agreement. This is true to the same extent as if he had used an unloaded mortality table and after calculating the policy reserves had then added a stated sum as a cushion against these contingencies.

General American vigorously contends that it was proper to include in the mortality table "provisions" for unforeseeable and unpredictable fluctuations in mortality from future wars, epidemics and unknown causes for the reason that in the next 50 or 70 years "some mortality [really a fluctuation in the rate of mortality] must be expected" from either war or epidemics or both. This, in substance, was the ruling in the Circuit Court. Be that as it may, General American's own expert witnesses established that in the life insurance business operating on the level premium plan the only proper method of protecting against these unforeseeable and unpredictable fluctuations is to load the gross premium and with the receipts from this loading and the receipts from other savings and from investments, to build a surplus fund which acts as a cushion for these contingencies and from which these mortality claims in excess of the expected rates are to be paid. These same witnesses also established that such *future* unpredictable, unforeseeable, possible fluctuations in mortality do not constitute a *present* actual liability for the purpose of determining the amount of present policy reserves required to constitute solvency. It may have been unwise to provide that the Old Company account at the end of the 15-year

period should be stripped of all the normal and usual cushions for future unforeseeable and unpredictable fluctuations in mortality, but General American and the Superintendent made a contract so providing. They knew that these possible future fluctuations did not constitute present liabilities for the purpose of calculating presently required policy reserves, and the only reasonable assumption is that in drafting the Purchase Agreement in the terms used, it was intended that the reinsuring company purchasing the account use its own surplus for those contingencies.

What part of the 5% addition is improper? Stockholders contend all of it. They suggest that the Maclean Table is so infused with improper assumptions that the whole gross premium valuation should be disapproved. We do not agree. The basic table after the "smoothing out" process and before the addition of 5% was made was not erroneous, and it properly may be used in the gross premium valuation. Mr. Maclean stated that once the mortality table is determined (and the other assumptions are made) the computation of policy reserves is but a mathematical process. We cannot determine from the record before us to what extent the 5% addition was influenced by improper assumptions as to future wars and epidemics.

In addition to "some" allowance being made in the 5% addition for wars, epidemics and other unknown causes, another element was improperly included, namely, an allowance for future group conversions. In view of the necessity of remand on account of the improper provision for wars, epidemics, etc., it is not necessary to detail the evidence pertaining to future group conversions. It is sufficient to say that the evidence, considered as a whole, in our opinion establishes that in determining the rate in the Maclean Table consideration was improperly given to "some" extent to the fact that subsequent to August 31, 1948 there would be an increasing number of conversions by persons covered by group insurance policies to ordinary insurance, in

a form of "anti-selection." Although General American denies it, we find that such an assumption was made, and we rule that it was improper to make provision for such factor.

There is some merit in General American's contention that the three-year test period was too short and the actual mortality experience was too favorable to be used as a conclusive basis for a mortality table. Although the experience during 1945–47 was not favorable when compared with the experience in the industry generally it *was* favorable when compared to the actual experience in the Old Company account immediately before and immediately after the three-year period. (General American's Exhibit No. 185 shows that in the 1942–44 period the ratio of claims to expected mortality, AET, averaged 75.0% and that in the first eight months of 1948 the ratio was 83.7% while the average for the 1945–47 period was only 72.7%.) The future experience (after 1948 to the termination of all of the policies in the Old Company account) would not necessarily duplicate the very favorable rates of mortality experienced in the 1945–47 period. Some additional compensating amount, therefore, may be allowed providing the amount be established by sufficient competent evidence.

For the above reasons we sustain Stockholders' Point XV, in part, and the judgment of the Circuit Court is reversed in part and to the extent that it approves the inclusion in the Maclean Table of Mortality of a provision for future group conversions and for the future unforeseeable and unpredictable contingencies of wars, epidemics and "other unknown causes," and this issue is remanded to the Circuit Court to give the accounting party an opportunity to develop a new mortality table excluding these factors, and to demonstrate by actuarial methods a reasonable and realistic amount which should be added over actual experience and included in the table to compensate for the too-favorable experience of the 1945–47 period, and to recompute the

policy reserves on the basis of such modified mortality table.

#### Point XVI. Future Optional Settlement Election Rates

 In this point Stockholders attack the assumption made by General American and approved by the Superintendent in establishing this reserve, that the rate of election of settlement options would increase by jumps of 2½% per year from the 19.2% (corrected to 18.82%) experienced in 1947 to 40%, and then remain constant. Stockholders say this represented a mere guess without any foundation and was nothing more than a provision in the nature of surplus for the future unforeseeable contingency of an abnormal rate of election; that no one can really predict with any reasonable degree of accuracy what the election rate will be, subject as it is to so many variables.

Under the direction of Mr. Maclean, General American studied the actual experience of the Old Company account for six years prior to 1948. This study revealed a steadily increasing percentage of ordinary insurance death claims and matured endowments on which settlement options were elected, averaging 2½% to 3% a year, as follows:

| | |
|---|---|
| 1942 | 7.1 % |
| 1943 | 8.0 |
| 1944 | 11.0 |
| 1945 | 13.9 |
| 1946 | 16.5 |
| 1947 | 18.82 |

It was the opinion of Mr. Maclean that such an increase was to be expected, because it was the general experience in the industry that beneficiaries were taking greater advantage of the optional settlements. From this data Messrs. Maclean and Burian concluded that the steady increase in the percentage of election would continue to a much higher figure; that the six-year study revealed a clear trend upward, a trend which could not be ignored in estimating future experience. A further study of the actual experience of the forty largest life insurance companies doing business in this state, writing ordinary insurance only, during the same period, showed a similar steady increase in the rate of election. The composite experience of those companies was as follows:

| | |
|---|---|
| 1942 | 50.2% |
| 1943 | 49.9 |
| 1944 | 52.5 |
| 1945 | 56.0 |
| 1946 | 58.8 |
| 1947 | 58.9 |

There were some companies with rates of over 60% by December 31, 1947. The annual change, expressed in percentages, in the Old Company account was more marked than the composite experience of the forty companies. The fact that the rates of election among the forty companies were much higher than that reached in the Old Company account was explained on the basis that the confidence of the Old Company policyholders had been impaired by the insolvency of Missouri State Life in 1933 and the disturbing events of the following years. The witnesses saw in the steadily increasing rate of election after 1942 the gradual restoration of confidence. Mr. Burian's tentative opinion, before he had studied the experience in the industry generally, was that the rates would increase to a maximum of 30%. Mr. Maclean first assumed that the rate would increase to 50%, and he suggested this figure to Messrs. Burian and Good. After considerable discussion between the actuaries they finally agreed upon the assumption that the rate of election would increase each year after 1947 by 2.5% until an ultimate rate of 40% was reached; that it would not exceed 40% because of special features in the Old Company account. Mr. Maclean was inclined toward a higher figure, but felt that the assumption agreed upon was reasonable. Mr. John S. Thompson, President of Mutual Benefit Life Insurance Company, and a recognized actuary, regarded the assump-

tion as reasonable but low and probably an understatement of the rate of election to be experienced. In his own company the rate had reached 65% in 1946, and he and his associates thought it would reach 75% or more. Mr. M. Albert Linton, President of Provident Mutual Life Insurance Company, an actuary since 1909, considered the assumption reasonable, although less than his own estimate, based upon economic conditions, future prospects and the experience of his own company, in which the rate of election was from 60% to 70%. He regarded the assumption as the most reasonable basis that could be adopted in view of the Old Company experience. The Report of the 1948 Convention Examination of General American (an investigation by examiners representing every state in which General American did business) specifically approved the assumption as to future rates of election as a reasonable one.

Opposed to this evidence was that of Stockholders' actuary, Mr. Thomas, who was of the opinion that the rate of election would not exceed 15%. He counted upon the downward fluctuation in the rate during the first eight months of 1948 (13.9%), and he saw in this a reversal of the upward trend of prior years, due to changing economic conditions (higher interest rates obtainable in early 1948). The actuaries testifying for General American regarded the downward trend in 1948 as an accidental fluctuation and not a reversal of the upward trend. It was pointed out that in the last four months of 1948 the rate increased to 18.3%, compared with 13.9% in the previous eight months, and that the rate of election in the New Company account increased from 32.3% to 40.2% in 1948. All of the foregoing relates to percentage

rates of election by dollar amount. The percentage of *claims* increased in 1948, which fact supported the opinions of the actuaries testifying for General American. The cross-examination of Mr. Thomas on the supposed increase in interest rates in 1948, and contrary evidence introduced by General American, cast serious doubt upon the validity of Mr. Thomas' conclusions.

Our review of the evidence leads to the conclusion that the assumption adopted was not an arbitrary guess, but that the officers and directors of General American in good faith exercised an honest business judgment and that the Superintendent in approving this assumption exercised a reasonable discretion, based upon substantial evidence. Accordingly, Point XVI is overruled.

Point XVII. Interest Rate:
Mortgage Loan Expenses

Point XVIII. Interest Rate:
Asset Losses

■ Stockholders vigorously attack General American's basic assumption of 2.9% as the net interest rate of yield [10] to be expected in the future from investments.

The conduct of a gross premium valuation necessarily involved the making of an assumption as to the net interest rate of yield to be expected in the future on investments. The critical importance of arriving at an accurate percentage assumption of net interest rate is illustrated by the statement that a movement of .01% in the rate will affect the amount of the reserves by approximately $200,000. According as the rate is set lower, the expectable net income decreases. As expectable income goes

10. The net yield rate or net interest rate is the net rate of return of income from interest and dividends from investments. From the gross income or yield from interest-bearing securities (bonds, mortgage notes and other obligations) and from other invested capital (dividends, real estate rentals, and other income) is deducted the expenses attributable to the investment, federal income taxes, asset losses, etc. The remainder—the portion of the yield available for addition to reserve funds—is the net yield, or net income. To determine net yield rate, net income is divided by the mean amount of assets at the beginning and the end of the year.

down, provision for the payment of obligations (reserves) must be increased. Conversely, as the rate is raised, the reserve requirements are lessened. Stockholders claim that the rate established by General American and approved by the Superintendent was too low; that the gross premium valuation, using the assumption of a 2.9% interest rate, produced a reserve requirement excessive by $2,000,000 on account of abnormal mortgage loan expenses assumed and excessive by $5,000,000 on account of the assumptions made as to future asset losses.

In reviewing Points XVII and XVIII there are law questions and fact questions. On both legal and factual grounds Stockholders vigorously object to General American's treatment of mortgage loan expenses and future asset losses. Stockholders argue that the assumption of a 2.9% interest rate, based in part upon these factors, resulted in setting up as liabilities in the Final Accounting improper margins in the nature of surplus in present reserves for future unforeseeable contingencies for possible losses which should be borne by General American after 1948.

*The legal question:* whether as a matter of law under the Purchase Agreement provision can be made in a gross premium valuation for (a) an *abnormal* amount of mortgage loan expenses, or (b) *any* amount for future asset losses. The legal question is limited insofar as mortgage loan expenses are concerned by the concession on page 155 of Stockholders' Reply Brief that *"Some* provision for mortgage loan expenses would, of course, be proper." This leaves the question of fact, hereinafter considered, whether any specific provision for mortgage loan expenses was made, and if so, whether it was abnormally large. The legal question with respect to future asset losses is alive on this appeal (although in their brief in the trial court Stockholders conceded that net yield "should ordinarily be considered as the yield remaining after asset losses [capital and income] and federal income taxes.") This legal question must be resolved against Stockholders' contention, as a practical and logical necessity. The net interest rate of yield is a basic assumption which must be made in order to conduct a gross premium valuation. What net yield may be expected in the future from investments depends upon several indispensable subassumptions, namely: the type of assets in the investment portfolio; the percentage distribution of assets between mortgages, corporate bonds, government bonds, policy loans, cash, real estate, etc.; the gross yields from each type of assets; the expenses attributable to each type of investment; future losses in capital assets; and future federal income taxes. It is basic that all proper deductions from a gross figure must be made before a net figure can be reached. Any factor, such as asset losses, that will serve to reduce the net yield must be taken into consideration. It would be impossible to make an accurate or realistic assumption with respect to net interest rate of yield without considering the deductions. It is customary in the industry to deduct asset losses in estimating net yield rates for the future. Apparently Stockholders would omit this vital element from the deductions on the ground that any such provision infuses surplus into the reserves, contrary to the provisions and intent of the Purchase Agreement. Logically it cannot be omitted, for the reasons given, but in order to consider the merits of the contention of Stockholders, let us momentarily ignore the demands of logical necessity. Ultimately the question whether an allowance for future asset losses shall be made in the net yield rate (thereby effecting larger reserves) depends upon whether such an allowance is a "true liability" for which provision may be made in the regular reserves, or a mere contingent possibility for which provision should be made in surplus or in a *contingency* reserve. According to past experience, an insurance account will sustain some asset losses in the future. The occurrence and extent of those asset losses which will occur in the normal course of events is subject to rea-

sonably accurate prediction. The loss of an asset is as much a liability as a loss from the death of an insured. Therefore, some provision for the normal and reasonably to be expected future asset losses, in the form of a deduction from gross investment yield, must be made in calculating the net yield rate for the purposes of a gross premium valuation, and to this extent such an allowance is a true liability. Abnormally large asset losses, i. e., those exceeding normal losses which reasonably may be anticipated to occur in the future, may not be so deducted. Abnormally large losses must be provided for by resort to surplus funds, or by setting up a special contingency reserve. This is illustrated by the testimony of Mr. Agnew, as follows:

"Q. * * * actually the old company account as of August 31, 1948 was supposed to have no surplus in it, is that true? you understood that? A. That is my understanding of this.

"Q. And did you take that into consideration when you drafted your model portfolio? A. When an investment man—when I, as an investment man, set up any portfolio, I assume it will operate without going to surplus because surplus is not essentially set up to take care of investment losses.

"Q. What is it set up for? A. General contingencies.

"Q. What do you mean? A. Any large corporation handling other people's money can run into unforeseeable events.

"Q. Such as what? A. Well, you could have *heavy* investment losses but you don't plan on *abnormal* investment losses.

"Q. You could have capital losses? A. Every company in business has had but I did not contemplate *large capital losses beyond the provision set up for them.*" (Emphasis added.)

Excerpts from Mr. Burian's testimony with respect to asset losses further illustrates the point: "You can have a provision for anticipated losses and expected losses and you would have a liability; for unforeseen and unanticipated losses, you have a surplus item," and again, "A provision for anticipated asset losses would be a liability. If you want to earmark something over and above that for unforeseen and unanticipated losses, you would have a surplus fund."

This reduces the inquiry to the question of fact whether any specific provision was made for asset losses, and if so, whether it was for the normal, reasonably expectable losses to be encountered in the future, or for abnormal, excessively large losses beyond those reasonably to be expected.

The preliminary general question of fact is whether the discretion of General American in fixing a 2.9% interest rate based in part upon a consideration of mortgage loan expenses and asset losses was exercised in good faith, honestly and reasonably, upon substantial evidence.

General American arrived at the interest rate of 2.9% after conducting a study of the experience of the insurance industry generally, its own experience, and making various other surveys. These studies revealed that the aggregate net yield rate from investments of the forty largest insurance companies in the United States (companies with assets of not less than $100,000,000) had steadily declined from 5.04% in 1930 to 2.8% in 1947. (Both rates were computed without provision for asset losses.) From 1940 to 1947, inclusive, 39 of these 40 companies had adopted lower net yield assumptions for calculation of their reserves, as a result of which their reserves had been increased by a total amount of more than 1⅒ billions of dollars. Of this sum $719,000,000 represented increases in life insurance reserves. These companies all had large amounts of assets over liabilities, and many of them not only increased their reserves but also set up special re-

serves for revaluation. As of December 31, 1947 most of these 40 companies were computing reserves upon currently issued policies at rates not exceeding 2.5%. Twenty companies used 2.5%. Four used 2.25% on participating, 2.5% on nonparticipating policies. Eight used 2.25%. Two used 2%. Only five of the forty used a rate higher than 2.5%. One used 2.75%. Four used 3%. The weighted average of rates used by the companies which wrote ordinary insurance in Missouri (39 of the 40) was 2.45%. A weighted average of 2.45% would indicate an expected net yield of about 2.7%, or not more than 2.95%, in view of the testimony that the expected net yield is usually about $\frac{1}{4}$ of 1%, or not more than $\frac{1}{2}$ of 1%, above the rate assumed in calculating reserves. In 1947–48 the insurance industry as a whole was not anticipating a clear net yield available for reserves of more than 2.8% to 2.85%. From 1940 to 1947, in the 40 largest companies, the proportion of reserves computed at rates of more than 3% had declined from about 63% to about 21%, but in the Old Company account approximately 86% of the reserves were still carried at a rate of more than 3%. The ratio of paid-up insurance to total insurance in the Old Company account was more than $4\frac{1}{2}$ times as great as the corresponding ratio for the 40 largest companies. This ratio is of importance because in paid-up insurance reliance must be placed solely on the investment income, whereas in the case of insurance upon which premiums are still being paid there may be margins in the premiums to offset the deficiency in investment yield. General American surveyed its own experience in 1947, in order to have the latest possible data. The net yield rate realized by General American in 1947 upon all of its assets in both New and Old Company accounts, exclusive of those which would not be available as investments in the future, and without provision for asset losses, was 2.89%, having steadily declined from 3.59% in 1941. When the question of interest rate was presented to Mr. Maclean he at first contemplated a rate of 2.5% to 2.75%, based on three principal considerations: the yields which were being made in general by companies currently on new investments; the long-term, downward trend of interest rates, and the interest assumptions which were being made by companies generally in connection with the issuance of new policies. A rate of 2.5% to 2.75% "would allow some slight safety margin," which was "not only customary but in a way a necessity for safety." For three reasons Mr. Maclean finally recommended the higher rate of 2.9% suggested by the officers of General American: (1) He was swayed by the willingness of the investment officers of General American to assume that they would be able to earn that rate. (2) He desired not to give ground for a claim by Stockholders, who probably would oppose any increase in reserves, that indirect provision was being made for the creation of surplus funds. (3) He considered the amount of assets in the account. Mr. Agnew, Vice-President and head of the investment department, was optimistic enough to believe that 2.9% could be earned, but he considered that to be the maximum rate that could be earned. Mr. McHaney, then Vice-President and General Counsel, felt that 2.9% was the "very maximum" that could be assumed, but that 2.9% was "not as reasonable a figure as we probably should have used." He was "willing to stretch it to 2.9 in order to obtain as much money for policy holders as we possibly could." Mr. Burian, Vice-President and Actuary, regarded 2.9% as the maximum rate of interest that they could hope to attain. He took into consideration the studies previously described, the information he had obtained from discussions in the Actuarial Society and contacts with people in the industry over a period of years, and a hypothetical portfolio which had been made up by the accounting department to illustrate maximum net yield. Executives of other insurance companies confirmed 2.9% as reasonable. Mr. Thompson, an actuary by profession, testified that in his opinion the 2.9% rate was "very reasonable," but an "absolute top." His own

company was using a rate of 2.25% in calculating reserves on currently issued, and 2.75% on previously issued, policies. Mr. Linton, an actuary, testified that 2.9% was a reasonable assumption. His company used 3% during the period the policies were running as insurance and 2.83% for the period during which the policies ran under settlement options. Mr. Paynter, Financial Vice-President of New York Life Insurance Company, testified that in his opinion 2.9% was "the maximum yield any responsible financial officer would have been willing to undertake to produce over future years from that time," i.e., from August 31, 1948. Mr. McDiarmid, Vice-President and Manager of the Investment Department of the Lincoln National Life Insurance Company, testified that in his opinion the highest net yield which, at August 31, 1948, could prudently have been assumed for the future was 2.85%. Mr. Vogelius, Vice-President and a director of Moody's Investors' Service, testifying as an expert on corporate bonds, had prepared a recommended list of corporate bonds to be included in the portfolio of a life insurance company with assets of $150,000,000 and a surplus of $3,500,000. Half of them were Grade Aa, and the other half were equally divided between Grade Aaa and A. They were diversified in kind—public utilities 55%, industrials 30% and rails .5%. The average gross yield was shown, and the weighted average gross yield of the whole bond portfolio was 2.92%. In his opinion a *gross* yield of 2.92% was the highest which could prudently have been assumed at August 31, 1948.

These facts and figures, and the opinions of these experts, whose experience in the field of investment of insurance company funds is satisfying and impressive, stand unimpeached in this record. Stockholders offered no studies and no expert opinion contrary to this testimony. Stockholders' actuary Mr. Thomas did not directly testify that the net yield rate reasonably to be

expected in the future would be greater than the rate testified to by these experts. The opinions of these experts were general, over-all judgments which took into consideration all of the relevant factors entering their conclusions. These studies and opinions are convincing evidence that the assumption in question was made in good faith, honestly and reasonably.

Stockholders' assault upon the 2.9% rate is based upon the flat assertion that the judgment of General American was based, at least in part, upon the assumption as a fact that expenses of mortgage loans and future asset losses would occur in the future at the rates set forth in General American's Exhibit No. 94–B and that General American made specific provision and allowance for a mortgage loan expense rate of 1.06%[11] and a future assets loss rate of .25% in arriving at the 2.9% rate.

Number 94–B, prepared by the officials of General American, is a model asset portfolio designed to illustrate the determination of the maximum aggregate net yield obtainable for the future, based upon assets assumed in the amount of $150,000,000, an assumed percentage distribution as to type of assets; an assumed gross yield rate of 4.34% on mortgage loans, 2.95% on corporate bonds, and 2.42% on government bonds; an assumed investment expense rate of 1.06%, an assumption as to federal income taxes, and an assumption of one-fourth of one per cent of mean amount of assets for asset losses. These assumptions demonstrated a net yield of $4,360,383 and a net yield rate of 2.91%.

Our review of the record convinces us that the real basis of General American's decision to establish the rate at 2.9% was the experience of other companies as disclosed by the studies and surveys previously described, its own experience as revealed by General American's Exhibits Nos. 93 and 93–A, the judgment of Mr. Maclean and the judgment of its executive officers;

11. This figure is 1.06% or 1.07%, depending on method of calculation, and will be referred to consistently herein as 1.06%.

and that No. 94–B was not the basis for the establishment of the 2.9% rate. Number 94–B was a hypothetical suggestion, designed for illustrative purposes only. It was based upon assumptions of fact quite different from the actual situation in the Old Company account. For instance, it envisioned an optimum percentage distribution of assets: the best and most favorable distribution by kind that might be hoped for in the years to come. It proposed to show the highest rate of return that might reasonably be expected upon a possible future realignment of the asset portfolio. Several of the witnesses regarded No. 94–B as too optimistic in its assumptions of asset distribution to form the basis of a valid opinion. Number 94–B *did* make the assumptions of mortgage loan expense and asset loss rates upon which Stockholders seize, and it *was* considered by several of the experts at and before the time the decision was made, but No. 94–B was only one of a large number of factors under consideration. Those who considered the mortgage loan expense rate of 1.06% and the asset loss rate of .25% as those rates appeared in the model portfolio, in arriving at a judgment on the matter, did not base their judgments upon these particular hypothetical factors and subassumptions, but upon many factors, only one of which was the model portfolios. *No specific allowance was made for the 1.06% and .25% rates in adopting the 2.9% rate.* None of the experts testified that his judgment was based upon No. 94–B or any other of the several model asset portfolios introduced in evidence. Mr. Maclean testified that he did not believe the rate of interest should be arrived at by making of portfolios. He agreed that by juggling distribution and yield figures "you can come up with about any figure you want." He did not use model asset portfolios in making his recommendations with regard to interest rate. Although he had seen the portfolios, he regarded them as "optimistic." He stated that the general experience over a long period of time indicates that there will be asset losses and account must be taken of that fact in establishing an in-

terest rate, which must be free and clear of "all deductions," but that in looking forward 50, 60 or more years in the future it would be impossible to "put a figure on" what asset losses would be; that the 2.9% assumption was merely a judgment of the long-term future, based upon general reasoning, and not the result of any exact calculation; that *he* made no assumption as to a gross rate, but "went straight to the assumption of a net rate"; that while no *specific* losses on assets should be assumed, the normal thing to do is to use one's best judgment and set a rate that is reasonable to assume will be earned net after allowing "a wide margin of safety to cover all of these deductions." Mr. Burian testified concerning the model asset portfolio that "It was just one of the many factors I took into consideration in arriving at my conclusion as to the interest rate." He discounted No. 94–B on the ground that "in all respects this model portfolio was purposely assuming the maximums and the most favorable proportions and yields that our investment department thought might be attained in the future * * *." Other factors which Mr. Burian considered: discussions with Mr. Maclean and the other actuaries; a study of the experience of the 40 companies; the fact that the Old Company account was a closed account; discussions at meetings of the two actuarial societies and with other actuaries in the industry, and the General American experience as reflected in studies of the actual 1947 yield rate for the Old Company account, the New Company account and the combined accounts. He testified that "People in the insurance business always take asset losses into consideration in thinking of a net yield rate." From the accounting department of General American he received figures representing the actual experience for 1947: investment expense rates of 1.06% for mortgage loans, .05% for corporate bonds and .05% for government bonds. In General American Exhibits Nos. 94, 94–A and 94–B, one-fourth of one per cent of mean assets was deducted for asset losses. That figure was given to Mr.

Burian by Mr. Agnew, head of the accounting department. This represented Mr. Agnew's judgment, based upon experience in the industry generally. Mr. Burian opined that this was "a reasonable factor," based upon his reading on that subject. Mr. Agnew, testifying concerning mortgage loan expenses, said that the 1947 experience was "just one factor," and that the portfolio was "just one factor," of many factors considered in coming to a final conclusion; that before you draw conclusions "you try to get all the information you can to support that conclusion." Mr. McHaney based his judgment upon the history of the net yield rates of life insurance companies showing a 17-year steadily declining rate from 5% in 1930 to 2.87% in 1947, the best judgment of financial men in various life insurance companies (2.8% to 2.85%), the investment experience in new investments in the New Company account, and the net yield in the combined accounts. He did not mention the model asset portfolios. Mr. Chadeayne had prepared and at the trial he explained General American's Exhibit No. 93, an analysis of the net yield rate on investments in the Old Company, New Company and combined New and Old Company accounts, as reflected in the 1947 annual statement, adjusted on various bases to indicate actual yield. This revealed the following net yield rates in the Old Company account, all of which were calculated *before* making provision for asset losses: (1) a net yield of 3.25%, based upon the book (1933) value of the assets, deducting the arbitrary amount of one-fourth of one per cent of the mean ledger assets for administrative expenses (which is in accordance with the formula prescribed in the Convention Blank); (2) a net yield of 3.04%, based upon book (1933) value of the assets, deducting *actual* expenses for the period; (3) a net yield of 2.95%, based upon estimated actual market value of the assets, deducting *actual* expenses for the period.

Stockholders assert that the rate of 1.-06% for mortgage loan expenses was ex-cessive because it was based upon the actual experience in a year (1947) in which these expenses, for a variety of reasons, were abnormally high. Stockholders argue that the rate should have been based upon a period in which the mortgage loan account was held at a level amount; that 1947 was a year in which General American made a markedly higher investment in new mortgage loans than usual, with correspondingly higher costs, expenses, commissions and premiums; that during 1947 low interest-bearing government bonds were being disposed of and replaced with higher yield mortgage loans; and that in 1947 there was a high turnover rate. Stockholders' actuary Mr. Thomas made his calculations of a mortgage loan expense rate in a manner so as to eliminate what he considered excessive new mortgage loan expenses of a nonrecurring nature. He concluded that new mortgage loan acquisitions in 1947 of about 43½% of those actually acquired would have maintained the mortgage loan portfolio at the level at which it stood at the first of the year. On the mistaken theory that new mortgage loan expenses vary in proportion to the volume of new loans acquired, Mr. Thomas took into account only slightly more than 43½% of the actual new mortgage loan expense for 1947. Stockholders introduced no evidence that such a correlation may be taken for granted. On that issue General American showed, and we find, that these expenses do not vary with that volume; that rent and other items of expense in the field offices, including salaries, are the same regardless of the volume of new loans acquired, and that a heavy volume of loans in a particular year would have an insignificant effect upon the home office expenses attributable to this phase of the operation. Another offsetting factor is that a mortgage loan expense rate assumption for a long period of years in the future must take into consideration unfavorable economic conditions in some years, the extra expenses in depressed eras of difficulties in making collections,

and the extra servicing required as the result of delinquencies, defaults, and foreclosures (factors almost entirely absent in 1947). The mortgage loan expense rate as calculated by Mr. Thomas was .73%. (General American's rate of expense for mortgage loans, calculated upon the same basis used by Mr. Thomas in arriving at his .73% figure would not be 1.06%, but on that basis would be .98%.) The .73% rate was offered by Stockholders as a conservative maximum, and not the most probable rate necessary to maintain a level mortgage loan portfolio. Stockholders argue that expenses will decrease through the years because the fund will be declining, beginning in 1948, and will eventually dwindle to zero; that in 1948 the account contained $57,000,000 in mortgages on which acquisition expenses had already been paid and charged off to policyholders and Stockholders, and that likewise the sizeable bond account came to General American without expense. Stockholders argue that the mortgages on hand August 31, 1948 will control yield in the next 15–20 years, and that the turnover rate of mortgages was beginning to lengthen in 1948, thus reducing mortgage expenses. These considerations, whether weighed separately or in the aggregate, do not serve to impeach the assumption of a mortgage loan expense rate of 1.06%. Upon all of the evidence, we do not find that rate abnormally high, as charged. Mr. Paynter was of the opinion that that rate was an understatement of the expense factor. He thought the expense would amount to 1.-24%. Mr. McDiarmid estimated the proper figure at 1.10%. We do not pretend to have the prescience to know what the mortgage loan expenses will be over the generations to come, and it may be that Stockholders' forecasts will more nearly approximate the actualities than General American's (although their case is based largely upon hypothesis, unproved assertions and unverified studies), but upon the basis of the evidence before us we do know and we rule that 1.06% is not an arbitrary or unreasonably high figure.

Stockholders argue that the rate of .25% for asset losses should not have been assumed; that such an assumption constitutes "a rank guess, pure and simple"—a mere speculation on an unpredictable and unforeseeable matter dependent on the innumerable economic, social and political conditions of the future, and that if any guess or speculation about future asset losses is to be permitted, it should not exceed a maximum allowance of .132%. Although, as we have indicated, no specific provision or allowance was made for an asset loss rate of .25%, such a rate was one of the elements entering into the computation in the hypothetical portfolios considered by some of the experts who arrived at the 2.9% rate, and therefore we will examine Stockholders' argument. It is not a valid indictment of the rate of asset losses that it is based upon assumptions involving uncertainties. The element of uncertainty is the *raison d'etre* of the entire insurance industry. The very purpose of insurance is to make certainty out of uncertainty. Upon the basis of the experience of the past, assumptions or expectations are arrived at in an attempt to accurately predict the probabilities of the future. These assumptions necessarily are based upon predictions, estimates and prognostication. The Court's present function is to determine whether the predictions made were reasonable or arbitrary. Courts are not equipped by training or experience to make accurate predictions in this specialized field. This is not their function. Courts must rely upon experts who, by training and experience, research and studies, are qualified to express opinions on such matters. Whether a particular prediction is reasonable or arbitrary depends upon the availability of sources of information from which the experience of the past may be ascertained, and the experience, judgment, integrity and expertise of the persons who undertake to translate the

experience of the past into a projection of what reasonably and probably may be expected to happen in the future.

The hypothetical suggestion of a .25% rate for asset losses is a composite figure for losses of both principal and interest on both mortgage loans and corporate bonds, representing losses on mortgage loans of .50% and losses on corporate bonds of .15%. On behalf of General American several experienced insurance executives, actuaries and investment men, experts whose pre-eminence in the insurance world stands unchallenged and undisputed, gave opinions with reference to their assumptions. Their judgments on mortgage loans ranged from .38% to .50% and on corporate bonds from .10% to .15%. References were made to studies compiled under the auspices of the Life Insurance Association of America, which indicated a loss rate on bonds of .21%. The actual experience of several large insurance companies was taken into consideration. On behalf of the Stockholders, Mr. Thomas fixed .25% as a "judgment figure" for losses on mortgage loans, but he had no formula, and his reasons for adopting a rate of .25% on mortgage loans instead of .50%, examined in the light of the cross-examination to which that testimony was subjected, are unconvincing. We unhesitatingly adopt the judgments of the experts testifying for General American as more reliable and convincing than the judgment of Stockholders' actuary. This whole subject matter is not one lending itself to judgments of precision and scientific nicety, and we are convinced, by the testimony of all of the several experts who testified for General American, and after reviewing all of the very comprehensive evidence given on behalf of Stockholders, that the .25% composite rate for asset losses was a reasonable and not an arbitrary rate to employ in the model asset portfolio computations, and that the rate of .1320% proposed by Stockholders' actuary Mr. Thomas was not the maximum beyond which the rate becomes arbitrary. Stockholders

argue that with a declining fund mortgage loan expenses will decline, but they offered no evidence showing the extent of the decline or the correlation between the anticipated decline in the fund and the decline in the expenses. Their actuary, Mr. Thomas, prepared numerous charts, studies, portfolios, and other mathematical demonstrations and calculations intended to support their views with respect to net yield, interest requirements, expenses, etc. Because of space limitations it is impractical to attempt any detailed analysis of these exhibits. Suffice it to say that we have studied them and have considered the testimony, both on direct and cross-examination, touching them. They are hypothetical. They make numerous assumptions of fact and employ various factors not supported by the evidence. They are not convincing. They do not persuade us to conclude that the mortgage loan expense and asset loss rates employed in General American's model asset portfolios were abnormally high, or arbitrary and unreasonable, or that the basic assumption of 2.9% as the net interest rate of yield was improper. We find to the contrary.

In order to regain our perspective on the question of the reasonableness or unreasonableness of the interest rate assumption which has been challenged with such force and ability, we observe that the area of contention is small. The struggle relates to a contested change of six-tenths of one per cent with respect to the great majority of the policies, and a change of one-tenth of one per cent with respect to the balance. (From 3.5% to 2.9% with respect to about 86% and from 3% to 2.9% with respect to about 14% of the policies.) In other words, Stockholders are waging war on the basis of a contention that in estimating its net yield from investments over the next 50 to 100 years General American has erred by from one-tenth of one per cent to six-tenths of one per cent. The difference between the amounts of the total reserves calculated on old and new bases is not appreciably more than 5% which,

spread out over the next 50 to 100 years, is a difference of one-tenth to one-twentieth of one per cent per year. While the number of dollars affected by the change is large, the ratio of the amount of the reserves to the amount of the change, calculated over the long term of years involved, is quite small. And this difference is offset to a considerable extent by the fact that the 3.5% and 3% rates were used in connection with the AET, which materially overstates mortality rates, whereas in the gross premium valuation the mortality rate assumed and used with the 2.9% rate was based upon actual experience (adjusted) in the Old Company account.

The discretion of General American in fixing a 2.9% net yield rate was exercised in good faith, honestly, and reasonably, upon substantial evidence, and without placing any reliance upon abnormally high or arbitrary subassumptions. Accordingly, Points XVII and XVIII are overruled.

Point XIX. Stockholders' Valuation.

### Future Group Insurance Profits and Other Margins

██ Stockholders challenge the necessity for any increase in the amount of the policy reserves as they had been computed prior to the Final Accounting, and contend that (a) the gross premium valuation made by Mr. Thomas upon his assumptions demonstrates that the policy reserves calculated on bases used prior to the increase were more than adequate to meet future obligations under the policies even if future group insurance profits be excluded; (b) that if future group insur-

ance profits in the amount of about $300,-000 per annum be taken into account the policy reserves prior to any increase were more than adequate, even if all the assumptions (mortality rate and 2.9% net yield) in General American's gross premium valuation be accepted; and (c) that in addition to future group insurance profits there were other factors (such as future mortality improvement) which widened the margin of adequacy in existing reserves.

Mr. Thomas made what Stockholders call a gross premium valuation to determine, under his assumptions, (1) what net yield in terms of dollars could be expected to be earned "by the existing and future assets in the Old Company account" if that account "started off" after August 31, 1948 with the assets it would have after a disbursement of the amount Stockholders contend constituted "net earnings" and certain other amounts for expenses, and (2) how many dollars the "interest-requiring liabilities [12] of the Old Company account would need from interest-earning assets for their satisfaction or maintenance." To do this Mr. Thomas first determined the total amount of liabilities of the Old Company account as of August 31, 1948 to be $122,567,607.88, without any new reserves or increase in existing reserves. He then made two calculations in the form of a gross premium valuation using the Mo. State 1945–1947 Mortality Table in each and an interest rate of 3% in one and 3¼% in the other. When the reserves were calculated at 3% he determined the total liabilities (including a new reserve for future optional settlements in the amount of $1,903,435) to be $125,966,356.40,

12. The term "interest-requiring liabilities" as Stockholders have here used it refers primarily to policy reserves. In order for an insurance company to acquire sufficient assets to pay future policy obligations when due, the money that has and will be received in the form of premiums over expenses must be invested. A net yield at least equal to the assumed percentage on a sum of money equal to the reserve liability is required in order for future assets to equal future policy obligations when due. Hence the term "interest-requiring liabilities." The term "interest-earning assets" refers to all assets, including surplus, which produce a net yield, and in a solvent company such assets should constitute a larger sum than that necessary to equal the reserve liability or "interest-requiring liabilities."

and when calculated at 3¼% (including a new reserve for future optional settlements in the amount of $1,378,041) to be $121,820,433.15. By interpolation he then determined that an interest rate of 3.-202997% would be needed by the interest-requiring liabilities to produce the exact amount of the policy reserves as computed before the Final Accounting, but including the addition of a reserve for losses from future optional settlement in the amount of $1,472,219.27. Mr. Thomas determined the annual interest requirements of the interest-requiring liabilities to be $3,758,841. He then undertook to ascertain whether the assets in the Old Company account "on and after August 31, 1948" would meet the dollar requirements of interest-requiring liabilities, and to do this he "had to know the volume and kind of assets the account would have to start out with, the assets which the account could expect to have in the future, and gross and net yields therefrom." He assumed, in one of his alternative calculations, that $13,840,207 would be paid out to policyholders and Stockholders (which was comparable to the sum added to net earnings by the Circuit Court and the amount claimed to constitute net earnings under the reserve issues on this appeal), and he adjusted the assets in the Old Company account to indicate what assets he thought should be sold in order to obtain the amount to be paid out. From the contract investment yield rate and expected dollar yield on mortgages, bonds and other assets he determined the net yield to be $3,991,490 per year. He asserted that this left $232,649 as "annual excess interest earnings available for Federal income taxes, asset losses in excess of asset gains, other contingencies and dividends to policyholders." To this Mr. Thomas then added $300,000 which he estimated to be the "average annual profits from group insurance" resulting in a total annual amount of $532,649. The ratio of "annual excess interest" (without group insurance profits) to "admitted assets after adjustments" was .1903%, and with the group insurance prof-

its the ratio was .4357%. Mr. Thomas also made similar computations using the Thomas Projected Table of Mortality to indicate future mortality improvement.

Mr. Thomas' "gross premium valuation" demonstrates mathematically, on the basic assumptions he used, that the reserves calculated on bases used prior to the increase were more than adequate, even if future group profits be excluded. That so-called gross premium valuation, however, has basic defects which render it unreliable. First, he used a mortality table which is not realistic for the reasons heretofore amplified. Second, the theoretical rates of interest employed in his method were not substantiated by evidence that such rates could be earned in the future. Third, Mr. Thomas' assumption of an average 15% rate of election for future optional settlements is too low, as previously demonstrated. Fourth, his use of a .72% mortgage loan expense rate is not acceptable for the reasons heretofore given. Fifth, he failed to make any provision for future possible asset losses. For these reasons Stockholders failed in their effort to establish that the reserves calculated on the 1933 bases were more than adequate.

Stockholders next contend that "if [annual] group insurance profits of about $300,000 * * * be taken into account then the existing reserves without the $10,-171,120 increase were more than adequate even if all assumptions in General American's gross premium valuation be accepted without exception." This contention is unsound and unacceptable. Stockholders' theory is that the over-all income from (1) reserves as they existed in 1948, calculated on the old 1933 bases, (2) future gross premiums, and (3) anticipated income from all departments and all sources, including the persistent $300,000 plus which had been added to the Old Company account for several years as profits from the operation of the group insurance line, and other margins (profits from group accident and health, double indemnity and disability lines), constitute assets of the Old Com-

pany account sufficient to meet all obligations in the future and pay all expenses and losses, on the principle that all assets of an insurance company stand behind all liabilities.

Mr. Thomas' entire approach is based upon an erroneous conception of the nature of the problem confronting the accounting party. In order to make a realistic Final Accounting it was necessary to make a valuation of policy reserves, in other words, a valuation of the present liabilities of the Old Company account as it existed on August 31, 1948. The Final Accounting required a valuation of each of the several lines of insurance which were component parts of that account, i. e. life insurance, annuities and other categories which then were integral parts of the account. The premiums and investment increment thereon of each block of policies was to be considered separately in calculating the present reserve liability as to such block of policies. Future income from sources other than the premiums and increment of that block were not to be considered in calculating the present reserve liability. Future profits from group policies cannot be considered in calculating present reserve liability on ordinary policies. After determining the total policy reserve liabilities the insurance accountant looks around for assets to offset liabilities, and in so doing he may take into consideration presently existing assets from any and all sources, whether from previously collected premiums, interest received from investments, capital gains, earnings from group insurance, etc. The excess of assets over actual or true liabilities is what the Purchase Agreement referred to as one kind of "net earnings" available for distribution to policyholders and contingently to stockholders. This accomplished, the Old Company account as such, and all interest of Stockholders in the account or in future proceeds, terminated and ceased to exist. The Ordinary insurance, annuities, and group insurance of the Old Company account then merged with General American's New Company account, and thereafter were held and owned by General American as one New Company account, and all rights of policyholders and Stockholders under the Purchase Agreement perished. Anticipated future income from gross premiums on Ordinary insurance lines (life, total and permanent disability, accidental death benefits under life policies, and annuities, excluding disability annuities) is taken into consideration at the time of the valuation of reserve liabilities only for the purpose of determining the reserve liabilities as of that time. Group insurance is different from Ordinary insurance in that it requires no reserve constituting a liability. It is short-term insurance, usually written on a one-year basis. Policies written this year expire next year. If rewritten next year, a new policy is issued. There is only one year's premium, not a series of premiums to be received periodically over a number of years, as in the case of Ordinary insurance. There were no premiums to be received in the future on the group insurance policies in existence on August 31, 1948, all of which expired within one year from that date. After August 31, 1948 no group policy written by General American would be identifiable as part and parcel of the policies transferred to General American from the Old Company account. All group policies written by General American after that date would be new business written by General American, indistinguishable as such from former Old Company business. The profits to be realized from group insurance policies written after that date would belong to General American and not to the Old Company account, which would then be nonexistent. Future profits after August 31, 1948 from group insurance and future increment thereon was not a proper "asset" of the Old Company account to be considered in computing the present assets as of that date, nor would such potential and prospective profits be derived from, the Old Company account. Such future anticipated profits from future anticipated new group policies to be written after that date had no place either in

the calculation of the policy reserve liability of the Old Company account as of August 31, 1948, or in Mr. Thomas' hypothetical calculation of the adequacy of interest-earning assets.

Stockholders' contention must necessarily be based upon some theory that the Old Company account is to be considered as continuing after August 31, 1948; that profits thereafter from group insurance would serve to reduce policy reserves as of that date. This theory of continuation flies in the face of the definite provisions of the Purchase Agreement which abolish the Old Company account as of that date. For the foregoing reasons Stockholders' Point XIX is overruled.

### Point XX. Interest Rate on Surcharges

Stockholders and policyholders Ladd and Mitchell charge error in allowing 4% simple interest on the net surcharges against General American, claiming that 6% compound interest should have been allowed. In their exceptions Stockholders prayed for interest "for themselves and on behalf of all other stockholders of Missouri State * * * (not on behalf of the policyholders) upon all sums ascertained to be due and owing to them" (not upon sums due and owing the policyholders). We will consider Stockholders' contentions in this respect, since they complement and support the contentions of policyholders Ladd and Mitchell who have a justiciable interest (albeit minimal) in the rate of interest to be paid, but it is to be remembered that Stockholders' only financial or justiciable interest in this subject will arise in the unlikely event that in the final computation a balance of net earnings for distribution shall be found due and owing Stockholders and remaining for distribution to them, after the prior payment in full of all of the claims of policyholders. Although the sums due policyholders have been materially increased as a result of the efforts of Stockholders, the latter have no financial interest in those sums, and no

justiciable interest in the rate or amount of interest to be paid on those sums.

Policyholders Matthew F. Morse, et al. (twenty-four in number) were permitted to intervene for themselves, but not in a representative capacity on behalf of any other policyholders. They prayed that the Final Accounting be approved, took no exception to the rate of interest paid, and in effect have disclaimed with respect to any increase in the interest to be allowed. Policyholders Ladd and Mitchell were permitted to intervene for themselves, but not in a representative capacity on behalf of all other policyholders. The other thousands of policyholders are not parties, and are not before the Court, except insofar as the Superintendent purports to represent them and their interests. The Superintendent has not asked that the allowance of 4% to them be increased. On the contrary, the Superintendent regards the 4% allowance as proper and has joined with General American in manfully resisting any increase in the rate of interest allowed. Consequently, the other thousands of policyholders, through their representative, have in effect disclaimed with respect to any such increase.

Under these circumstances our ruling with respect to interest will not affect the amount of interest to be paid policyholders Matthew F. Morse, et al. or the other thousands of policyholders who have not raised any objection to the 4% allowance, and will govern only the payment of interest on the sums due policyholders Ladd and Mitchell, and the sums due Stockholders in the unlikely event they participate in the final distribution.

The facts are undisputed, and the law is clear. The Purchase Agreement provided that the net earnings available for distribution be applied to the reduction of the policyholders' liens. If and when all such liens were discharged such net earnings were to be paid pro rata to the Stockholders. The Purchase Agreement did not specify the rate of interest to be allowed policyholders

(and, contingently, Stockholders) on net earnings available for distribution, due but not paid when due. According to the Final Settlement proposed by the accounting party and approved by the Superintendent, General American owed policyholders the sum of $2,038,681.09 under the terms of the Purchase Agreement. (The sum of $24,-265.00 was later added because of errors in calculation.) General American did not distribute this sum (totalling $2,062,946.09) to the policyholders until August 16, 1950. At that time General American computed interest at the rate of 3% from August 31, 1948 to August 16, 1950 on amounts due policyholders. On this appeal the amount of net earnings to be distributed to policyholders has been substantially increased above the $2,062,946.09.

The Circuit Court's decree of August 19, 1957 allowed interest on amounts payable in cash to policyholders in repayment of lien interest, at the rate of 4% from August 31, 1948 "through the date on which such payment is made," and provided that those policyholders who had received interest at 3% on August 16, 1950 should receive an additional payment to compensate for the difference between the 3% received and the 4% to which they were entitled. Policyholders Ladd and Mitchell contend that the matter is governed by statute; that the rate should have been fixed at 6% under § 408.040, or 6% under § 408.020, but that if it is to be fixed on equitable principles the rate allowed should be 5% (the amount policyholders were required by the Purchase Agreement to pay as interest on their liens). Stockholders contend that the matter is governed by § 408.020, and that in this proceeding the Court is bound by the statute. General American contends that since the proceeding is in equity, ungoverned by statute, the allowance of interest was a matter within the sound discretion of the trial court, and that in fixing the rate at 4% simple interest the Court acted "within the boundaries of its discretion."

The legal question is whether the Circuit Court, sitting in equity in this account-ing proceeding involving rights under a written contract, has the right to exercise its discretion in fixing the rate of interest on the amount of the net earnings available for distribution to the parties entitled, or whether the Court is bound to award interest at the statutory rate of six per cent per annum provided for by § 408.020. The answer is: no discretion; 6% per annum.

Section 408.020 provides: "Creditors shall be allowed to receive interest at the rate of six per cent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; * * *."

Policyholders Ladd and Mitchell were creditors entitled to moneys due and payable on August 31, 1948 under a written contract in which no rate of interest was agreed upon. They come strictly and precisely within the terms of § 408.020. By the plain terms of § 408.020 policyholders Ladd and Mitchell have a right to 6% interest per annum (simple interest) from August 31, 1948 to and including the date of entry of final judgment herein.

■■ In the absence of a governing statute designating the rate of interest a court of equity may exercise its discretion in the allowance of interest, depending upon the facts surrounding each case, 30 Am. Jur., Interest, § 35; 37 A.L.R. 448; 55 A.L.R. 950; 112 A.L.R. 833; 156 A.L.R. 937; 18 A.L.R.2d 1432, but the Chancellor has no power to exercise any discretion in fixing a rate of interest when the matter is regulated by statute. Equity follows the rules of law governing the allowance of interest. Story's Equity Jurisprudence, 14th Ed., Vol. I, § 64, fn. 4; § 66, fn. 6; Pryor v. City of Buffalo, 61 Misc. 162, 113 N.Y.S. 249. On the general propositions that equity follows the law and that an equity court may not disregard plain provisions of a statute and act upon its own conception of what is right in a particular case where the rights of parties litigant are clearly

932

defined by statute, see Straube v. Bowling Green Gas Co., 360 Mo. 132, 227 S.W.2d 666; Milgram v. Jiffy Equipment Co., 362 Mo. 1194, 247 S.W.2d 668, 30 A.L.R.2d 925; Aetna Ins. Co. v. O'Malley, 342 Mo. 800, 118 S.W.2d 3. Hence, although the Circuit Court was sitting as a court of equity, exercising equity powers and jurisdiction, it had no power to exercise its discretion in determining the rate of interest, and could not ignore and disregard, but was bound to enforce, the plain provisions of § 408.020, and award simple interest at 6% from August 31, 1948 to the date of the entry of final judgment and decree to those entitled to interest.

In support of its thesis General American cites Boyle v. Crimm, 363 Mo. 731, 253 S.W.2d 149, and quotes therefrom, loc. cit. 157, as follows: "An allowance of interest must be based upon either a statute or a contract, express or implied; and in equity such an allowance is generally a matter for the chancellor's discretion." That case is not apposite, and the quotation is inapropos. The point for determination there was not whether an equity court could exercise its discretion in fixing a rate of interest different from the rate prescribed by an applicable statute. The question was whether Crimm was entitled to interest at all, and the Court held that he was not. The quotation does not militate against our holding. In the instant case there is an applicable statute governing the *right to* and the *rate of* interest to be allowed. .

General American cites Albert v. Sanford, 201 Mo. 117, 99 S.W. 1068 for the proposition that interest is not always allowed, "even in cases involving a trust relationship." That case merely applied the well-settled rule that in the settlement of a trustee's account in a court of equity (in which there is no statute or arbitrary rule) the trustee is charged or is not charged with interest according to the circumstances. That case has no bearing on this one. We are not dealing here with the settlement of a trustee's account. General American was not a trustee and again, there is an ap-

plicable statute governing the right to and the rate of interest.

General American also cites American Ins. Co. v. Lucas, D.C., 38 F.Supp. 896, 925, and Ward Coppage Mercantile Co. v. American Ins. Co., D.C., 85 F.Supp. 166, the first fire-rate case, in which the fire insurance companies were ordered to pay interest upon returned funds on the basis of the earnings actually received by the companies upon the impounded funds. Citing Board of Commissioners of Jackson County, Kan. v. U. S., 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313, Judge Stone indicated that interest will be allowed or denied on considerations of fairness, "where not controlled by statute or decision applicable to the situation before the court." These cases are not in point for obvious reasons. They dealt with the right to interest, which is conceded here, and there were no controlling statutes in those cases.

Accordingly, that portion of the final judgment of August 19, 1957 awarding 4% interest is reversed insofar as applicable to policyholders Ladd and Mitchell, and contingently to Stockholders, and on remand the Circuit Court is directed to award interest to policyholders Ladd and Mitchell at the rate of 6% per annum to and including the date of entry of final judgment, on their distributive shares of the amount of net surcharges against General American, and if in the final accounting any sum is found due Stockholders, after payment in full of all of the amounts due all policyholders, the Circuit Court is directed to award interest to Stockholders at the same rate on any such sum.

Fees of Attorneys for Stockholders

■ By its post-trial separate judgment the trial court awarded Stockholders and their attorneys $110,000 attorney fees to be paid from the $300,000 reserve referred to in the decree of August 19, 1957. General American and the Superintendent have both appealed. They do not question the amount, but they challenge the right of

Stockholders and their attorneys to the allowance of any fees.

In its Final Accounting General American stated, in effect, that it had in its possession a fund of $2,038,681.09 (later increased by $24,265 as the result of a mathematical error) denominated "net earnings" which it proposed to distribute pursuant to the terms of the Purchase Agreement. The Superintendent approved that accounting, thereby agreeing that only $2,038,681.09 should be in the fund. Therefore, all parties in the then-pending litigation were urging disposition of the fund in the possession of General American, pursuant to its own accounting, and with no individual, group or interest contesting or challenging the propriety of the accounting, or the amount of the fund General American proposed to distribute, or its sufficiency to satisfy the legal obligations of General American under the Purchase Agreement. A group of stockholders formed a committee, hired counsel, and upon request were permitted by the trial court to intervene in the proceeding (pursuant to a stipulation signed by General American and the Superintendent) on their own behalf and on behalf of all other stockholders of the Old Company similarly situated. They asserted, by way of 27 exceptions to the Final Accounting, that the fund which General American proposed to distribute was approximately 22 million dollars less than it should have been. In the Circuit Court Stockholders resolutely presented and actively sought to establish most of the exceptions. Their efforts, in the face of vigorous opposition on the part of General American and the Superintendent, resulted in increasing the amount of the fund available for distribution by $1,456,038.58, plus interest. (The trial court reserved $300,000 of this sum out of which costs and expenses were to be paid, and later authorized payment of $175,000 therefrom as fees for the attorney for the Superintendent, whose principal activity in the trial and on these appeals was to oppose any increase whatever in the fund. The trial court did not purport to make this allowance on equitable principles, but on the theory that these fees were "closing" expenses properly chargeable against the Old Company account). At the conclusion of the proceedings in the Circuit Court the fund in the hands of General American available for distribution had been increased by reason of the efforts of the Stockholders to approximately $3,218,904.67, and there remained approximately $6,448,430 of unrefunded interest on the policy liens. Under the terms of the Purchase Agreement the latter amount would have to be distributed to the policyholders before Stockholders would be entitled to participate in any distribution. The efforts of Stockholders on these appeals have resulted in a further substantial increase in the fund, but the fund as finally computed will yet not likely be of sufficient size to leave any money for distribution to Stockholders.

On this appeal these two principal contentions are made by General American: (1) the allowance is precluded by the Insurance Code, and if not, (2) the allowance is precluded because Stockholders' claims and their objectives were antagonistic to the interests of those who would share in the fund. Incidentally, General American has no justiciable interest in whether an allowance of attorney fees should be made to Stockholders and their counsel from the fund remaining for distribution. Once the amount of the distributable "net earnings" has been ascertained, General American's only concern is that of a distributing agent with no legal interest in the question of whether the fund, in which it will not participate, should be diminished by an allowance of this kind. We shall, however, consider the arguments advanced by General American in connection with the contentions of the Superintendent, who by operation of law does have a justiciable interest, and who makes essentially the same points. The real parties in interest, those who will share in the fund (the policyholders), have defaulted as to this issue unless it may be

said that they have relied on representation by the Superintendent.

First, was the allowance precluded by the Insurance Code? The only sections of the Insurance Code relating to the employment and compensation of Counsel are the following: Section 374.120 empowers the Superintendent to employ clerical help for a proper discharge of the business of the department, and it provides that he "may, with the approval of the governor, employ other counsel for the purpose of enforcing the insurance laws." Section 374.160 provides that "All the expenses of the insurance division now or hereafter incurred and unpaid, or that may be hereafter incurred including the salaries of the superintendent and deputy superintendent, except the expenses of examinations, valuations or proceedings against any company, and for winding up, dissolving or settling the affairs of companies, which expenses are to be paid by the company, or as provided by the law, shall be paid monthly out of the amount appropriated by law from the insurance division fund, on warrants issued upon such fund by the state auditor on vouchers approved by the superintendent and comptroller." Section 375.740 provides that in proceedings to enjoin, rehabilitate, dissolve, wind up or otherwise settle the affairs and dispose of the assets of insurance companies the Superintendent "shall have power and authority * * * through the course of the whole case, to employ the necessary legal counsel and assistance, * * * subject to the approval of the court as to the amount of compensation to be paid them, and the expenses of such employment, together with all necessary expenses in the settlement of the business of the company, or the collection, disposition or distribution of its assets shall be taxed as costs, and paid by the superintendent out of the assets of such company; or, in case it is reinsured, by the reinsuring company, or, if the company proceeded against has no assets, then as by law in such cases provided, to the persons doing the work and rendering the service."

General American and the Superintendent cite several decisions of this Court construing §§ 374.120 and 374.160, by which the following principles have been established: By the enactment of the Insurance Code and the several amendments thereto the General Assembly has indicated an intention to regulate the insurance business from beginning to end, State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S.W.2d 174, and has provided a comprehensive method of defraying the expenses of enforcing the insurance laws. State v. Hall, supra; State ex rel. Carwood Realty Co. v. Dinwiddie, 343 Mo. 592, 122 S.W.2d 912, 914. The Superintendent has no inherent power to employ attorneys to assist in the enforcement of the insurance laws, because §§ 374.120 and 374.160 confer the power on the Superintendent in this respect and define the manner of executing that power. State ex rel. Lucas v. Blair, 346 Mo. 1017, 144 S.W.2d 106. Fees of counsel employed by the Superintendent to assist in the enforcement of the insurance laws are required to be paid in the same manner as other departmental expenses, State v. Dinwiddie, supra, namely, out of appropriations or by assessment against the companies. State v. Blair, supra; Barker v. Leggett, Mo.Sup., 295 S.W.2d 836, loc. cit. 839. The statute regulating the method of payment of the expenses of the insurance division, § 374.160, does not except attorney fees. State v. Blair, supra. The statutory provisions relating to the payment of departmental expenses are exclusive, Jacobs v. Leggett, Mo.Sup., 295 S.W.2d 825, and the Superintendent has no power to contract for the payment of attorney fees out of a fund recovered by the efforts of counsel employed by the Superintendent. Jacobs v. Leggett, supra, 295 S.W.2d loc. cit. 829; Aetna Ins. Co. v. O'Malley, 343 Mo. 1232, 124 S.W.2d 1164, 1167. Section 374.160 has completely supplanted, Jacobs v. Leggett, supra, 295 S.W.2d loc. cit. 829, and superseded, Aetna Ins. Co. v. O'Malley, supra, the equitable lien method of payment of such expenses. The exclusive statutory method relating to payment of expenses of the in-

surance division becomes a part of any contract of employment between the Superintendent and special counsel employed by him under his statutory powers, State v. Blair, supra, as fully as if written into the contract.

The attorneys whose fees are in question, however, *were not employed by the Superintendent* for the purpose of assisting him in enforcing the insurance laws or of assisting him in the conduct of the instant proceedings, as were the attorneys in the cases just reviewed. In the instant case the attorneys were employed by private interests, for the assertion of private rights as third-party beneficiaries under a rehabilitation contract entered into between the Superintendent and a reinsuring company. Not only were they not employed by the Superintendent but they were actively opposed by the Superintendent and his counsel. On every issue as to which the Superintendent took a stand, his position was adverse to that of Stockholders and adverse to any increase whatever in the fund.

The provisions of the Insurance Code which have supplanted the equitable lien method for the payment of counsel employed by the Superintendent contain nothing which may reasonably be construed to supplant the equitable lien method for the payment of other counsel. The Insurance Code contains no provision which precludes the allowance of attorney fees out of a fund, on the equitable lien theory, to attorneys not employed by the Superintendent.

The rationale of O'Malley v. Continental Life Ins. Co., 343 Mo. 382, 121 S.W. 2d 834, supports our conclusion. There the question was whether an allowance should be made out of the assets of Continental Life, held by the Superintendent for liquidation, to pay for attorneys' services rendered to the company in defending against the Superintendent's suit to force its dissolution and liquidation. It was contended there, as it is contended here, that the absence of statutory authority precluded any such allowance. Although attorney fees

were not allowed under the facts of that case (because the suit was defended without reasonable grounds and probable cause that the company was solvent and that the continuance of the business was in the best interests of the policyholders, stockholders and creditors), the plain implication of the decision is that an allowance could have been made to the directors as trustees for necessary and proper legal expenses incurred in preserving the company funds and property if such expenses had been incurred in good faith for the benefit of the policyholders, stockholders and creditors with the sincere conviction that the company was solvent and in the honest belief that the defense of the suit was for the best interests of these groups, based upon reasonable grounds and probable cause.

General American and the Superintendent rely upon Robertson v. Missouri State Life Ins. Co., Mo.App., 136 S.W.2d 362, in which fees awarded by the Circuit Court to attorneys for the policyholders in the instant case were disapproved by the St. Louis Court of Appeals. The attorneys, who were not employed by the Superintendent but by a policyholder, opposed the approval of the Purchase Agreement at the hearing on September 7, 1933 on the Superintendent's petition for instructions with reference thereto. The basis of the attorneys' claim for an allowance was that as a result of their objections and opposition the proposed Purchase Agreement was amended 39 times and that the changes enured to the benefit of the policyholders. While the result reached by the court of appeals was correct (no fund having been created, protected, preserved or increased by the efforts of the attorneys), the reasons given (that the Insurance Code does not authorize an allowance in such a situation, and that the inherent power of equity courts to allow attorney fees out of funds under supervision of courts has been superseded by the Code) were inapplicable. The case is no authority in the instant situation, because of vital differences in the facts of the two cases, and because the reasoning in the

Robertson case as applied to the facts is unsound.

 We turn now to the second contention, that the allowance of the fees was unauthorized because the interests of Stockholders and the policyholders were antagonistic. It is the general rule, "well rooted in equitable principles," City of Wewoka, Okl. v. Banker, 10 Cir., 117 F.2d 839, 840, that where one goes into a court of equity and takes the risk of litigation on himself, and successfully "creates, protects, or preserves" a fund, 49 A.L.R. at p. 1153, or brings about the "creation, increase or protection" of a fund, 35 Col.L.R. 740, 746; Buell v. Kanawha Lumber Corp., D.C., 201 F. 762, 769, in which others are entitled to share, those others will not be allowed to lie back and share the results of the successful labors without contributing their proportionate part of counsel fees. Trustees of Internal Improv. Fund of State of Fla. v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104; Handlan v. Handlan, 360 Mo. 1150, 232 S.W.2d 944; Koplar v. Rosset, 355 Mo. 496, 196 S.W.2d 800; Lovrien v. Fitzgerald, 245 Iowa 1325, 66 N.W.2d 458; Annotations 49 A.L.R. 1149; 107 A.L.R. 753; 9 A.L.R. 2d 1132; 39 A.L.R.2d 580; Note, 35 Col.L. Rev. 740. The equitable way to apportion the expenses of counsel fees is to allow them against the fund. Brand v. Denson, Tex. Civ.App., 81 S.W.2d 111. The Superintendent and General American do not challenge the above rule, but they contend no fee to counsel for Stockholders can be allowed from the fund because the claims made by the exceptions of Stockholders are "adverse to the interest of the policyholders out of whose funds the allowance is payable." See 14 Am.Jur., Costs § 75, and Annotations 49 A.L.R. at p. 1159. This rule is more properly stated that there can be no allowance of counsel fees from a fund if the interests of the party claiming the allowance are antagonistic to those entitled to the fund. Annotations 49 A.L.R. at p. 1160. The usual situation in which this rule applies is where a party by litigation seeks to destroy or diminish the fund. Lewis v. Gaillard, 70 Fla. 172, 69 So. 797; Gillespie v. J. C. Piles & Co., 8 Cir., 178 F. 886, 44 L.R.A.,N.S., 1. However, counsel fees may properly be allowed, other circumstances permitting, when the interests of the party seeking the allowance are antagonistic to the one brought to account and compelled to pay a fund into court for distribution even though he is one of the beneficiaries of the fund. Hempstead v. Meadville Theological School, 286 Pa. 493, 134 A. 103, 49 A.L.R. 1145; In re Weed's Estate, 163 Pa. 595, 30 A. 272.

Frequently those entitled to benefit from the increase or preservation of a fund have a dual interest. For example, in creditors' suits against a corporation one of the creditors may also be a stockholder of the corporation being proceeded against. It is uniformly held that the creditor-stockholder may be required to contribute his proper share of the expenses of the creditors' suit because he has been benefited in his capacity as a creditor, although he may be adversely affected in another capacity. Helm v. Smith-Fee Co., 79 Minn. 297, 82 N.W. 639; Mason v. Alexander, 44 Ohio St. 318, 7 N.E. 435; In re Weed's Estate, 163 Pa. 595, 30 A. 272; Annotations 49 A.L.R. at pp. 1168–1170. The dual interest also arises in minority stockholders suits, but the fact that some of the stockholders or directors have an interest in not having the fund increased from which they would also benefit does not prevent the allowance of counsel fees from the fund so increased or protected by the minority stockholders. 49 A.L.R. at pp. 1190–1196. In inquiring into the existence of adverseness of interests courts usually, and properly, confine their examinations to the effect of the litigation on the interest common to those who may share in the fund, and refuse to consider hostility of interests peculiar to the situations of particular individuals. 35 Col. L.Rev. at p. 743.

The effect of the argument of General American is that we should pierce the corporate veil, whereby we see and understand that when General American, a mu-

tual company owned by the policyholders, is required to pay money into a fund it is the same as if its policyholders were paying the money. The right to the sums which Stockholders sought to add to the fund was based on a contract, the Purchase Agreement. Pursuant thereto General American either was entitled to keep for itself all the money it withheld in the Final Accounting or it was bound to place an additional sum in the fund for distribution. If the latter, General American was wrongfully withholding money from the fund, money to which it was not entitled. The result in the trial court and the result on these appeals disclose that it was wrongfully withholding several million dollars. Therefore, assuming that we should look behind the corporate veil, as suggested, to determine the interest of the policyholders (in their relationship to General American) should we not look at all there is to see? A *comprehensive* look discloses that the policyholders of General American, some of whom are the beneficiaries of the fund, were wrongfully seeking to keep money from the fund. Therefore, "it is clear that for [them] to show a detriment, in order to avoid the application of the principles of equity, [they] must rely upon the accruements of an act, not sanctioned by law." City of Wewoka, Oklahoma v. Banker, 10 Cir., 117 F.2d 839, 844. An interest to effect a wrongful disposition of the assets which properly belong in the fund will not be recognized as altering an otherwise common interest in the preservation or increase of the fund. In re Weed's Estate, supra; 35 Col.L.Rev. at pp. 743–744.

Stockholders did not seek to destroy or diminish a fund claimed by policyholders (in their interest under the Purchase Agreement), or profit at the expense of those interested in the fund. Stockholders' efforts were not directed toward the destruction or reduction of policyholders' interest in the fund, or the subordination of policyholders' priority. Instead, Stockholders at all times recognized that policyholders would and should be paid in full out of any moneys recovered, before Stockholders would begin to share in the recovery. It was only through the promotion and advancement of policyholders' interests, and the satisfaction in full of all amounts due them, that Stockholders could begin to participate for themselves. General American contends that the interests of the policyholders and the Stockholders were antagonistic for a further reason, namely, that *if* the Stockholders had been successful as to *all* exceptions General American would have been rendered insolvent. General American and the Superintendent seek to differentiate between policyholders' financial interest in the distributable net earnings to which they were entitled under the Purchase Agreement and policyholders' interest in General American as holders of policies in a mutual insurance company, contending that policyholders' interests in the solvency of the company was adverse and antagonistic to Stockholders' interest in augmenting the fund. They argue that to the extent that the distributable net earnings were increased the reserves (surplus) of General American would be reduced, thereby impairing their insurance protection, and conceivably destroying the company. The issue of the solvency of *General American* has neither been pleaded and proved nor presented as an issue, and the figures presented in the brief assume reserves as set up by General American in its Final Accounting without adjusting the liabilities in the event Stockholders had prevailed on the issue of the right of General American to increase old and create new reserves. What we said concerning dual interests and the right to and results of disregarding the corporate entity applies here. Furthermore, and of more importance, ability to pay is not material on the issue of a legal duty to pay in an action on a contract, or in an accounting, and is not a factor in determining adverseness of interests between the one seeking the payment and the policyholders in a company required to pay.

General American and the Superintendent also argue that the advantages to the fund by reason of the efforts of Stockholders were merely *incidental* to the attempts of Stockholders to benefit themselves. They rely on a statement in 49 A.L.R. at p. 1159 that "A mere incidental advantage resulting to a fund by reason of adverse litigation furnishes no basis for charging the attorneys' fees of plaintiff to the fund." The cases cited in the annotation support this rule, but a brief reference to the facts in the first two cases cited is sufficient to demonstrate the inapplicability of the rule to the facts of this case. In Huff v. Bidwell, 5 Cir., 195 F. 430, the attorney for a creditor in a creditors' suit, who caused the sale of all the debtor's property, sought a fee from the surplus left over after the payment of all debts. This "benefit" was properly held to be incidental. In Myers v. Mutual Life Ins. Co. (Bartholomew, Intervener), 36 Ind.App. 328, 75 N.E. 31, the plaintiff intervened in a receivership case and had a bond given by him payable to the bankrupt declared paid and canceled. He thereby decreased the fund, but he sought the allowance of counsel fees therefrom on the theory that the rule of law he had established by his litigation would be of benefit to the receiver in the subsequent handling of other claims. This "benefit" was properly held to be incidental. The benefit to the fund in this case (a total increase of several million dollars) brought about by the efforts of Stockholders, however, was not incidental, unexpected or accidental. It was intentional, sought, effective and the result of a calculated effort. It was the indispensable prerequisite to a recovery by Stockholders from the fund.

The last argument of the Superintendent, that "Stockholders brought nothing into this court and can take nothing out," deserves but brief comment. This argument is based on the contention that the Circuit Court had retained jurisdiction over the proceeding during the 15-year period, and therefore the fund was already in court. It is clear, however, that money was wrongfully withheld from the fund by General American with the approval of the Superintendent. It was not in the fund where it was supposed to be. It would never have been placed there or restored to its proper owners but for the efforts of Stockholders, over the vigorous objections and resolute opposition of both General American and the Superintendent. The rule permits the allowance of fees when a fund in court has been created, *increased* or preserved. There is no question that the Stockholders did increase a fund in court.

The Superintendent cites and relies primarily on an 1883 case, Atty. Gen. v. North American Life Ins. Co., 91 N.Y. 57, which does not express the current and accepted rule. In that case a policyholder intervened and filed exceptions to a receiver's accounting, challenging principally the receiver's fees. The policyholder prevailed and the fund thereby was increased, but the court held that he was not entitled to counsel fees from the benefited fund. Several reasons were given, one of which was that nothing was added to the fund; only improper payments were prevented. In this respect see Holthusen v. Edward G. Budd Mfg. Co., D.C., 55 F.Supp. 945, which sets forth the correct rule. Another reason was that "those (the other policyholders) upon whom they seek to levy tribute were already represented by the receiver and the Attorney General." In this case since General American (corresponding to the receiver) and the Superintendent (corresponding to the Attorney General) vigorously opposed every attempt to increase the fund for distribution in any amount whatever, can it be said that those entitled to share in the greatly increased fund were adequately represented by the Superintendent, or in fact represented by him at all in their capacity as beneficiaries of the fund as distinguished from their capacity as policyholders in General American?

The rule of equity is fully applicable here. The interests of the policyholders were promoted by the litigation, and they should contribute to the expenses. Several million

dollars, earmarked by the accounting party for uses and purposes other than the payment or crediting of interest on policy liens, were saved, recovered and recaptured for distribution to the policyholders as net earnings. Since Stockholders were permitted to intervene in a proper proceeding for the assertion of their rights, which enured to the direct benefit of the policyholders, and since Stockholders effectively corrected administrative and managerial mistakes by which several million dollars, improperly accounted for, were restored to their proper channels, they and their attorneys are entitled to invoke the equity powers of the Court to impress a lien for counsel fees upon the funds distributable to the policyholders. The order and judgment of the Circuit Court allowing fees to Stockholders and their counsel is affirmed.

Counsel for Stockholders have asked that in the judgment and mandate provision be made for the filing by them of supplemental petitions for further allowances, if they should prevail in these appeals upon any of their points relied on. We have not explored, and do not now rule on, the question whether they may be entitled to any further fees, but they are entitled to have the question adjudicated. To keep this question open we direct the Circuit Court to permit the filing of such supplemental petitions.

### Recapitulation

The judgment, order and decree dated August 19, 1957, is

Affirmed as to the following Exceptions:

C (State Premium Taxes)

Y (Part) (State Premium Taxes for 1948)

P (Net Earnings and Contingency Reserve)

Q (Ordinary Life Reserves)

R (Annuities and Supplementary Contracts Involving Life Contingencies)

S (Supplementary Contracts Not Involving Life Contingencies)

T (Dividends on Deposit)

U (Future Optional Settlement Contracts)

V (Disability Benefits Reserve)

*Except* that that part of this judgment relating to Exceptions P to V is reversed and remanded insofar as it gave approval to the inclusion in the Maclean Table of Mortality of any amount of margin for future unforeseeable and unpredictable contingencies of wars, epidemics, future group conversions and "other unknown causes;"

and

Reversed as to the following Exceptions:

A (Home Office Rent Credits)

F (Investigation and Settlement of Claims)

E (Convention Examinations and Audits)

G (Valuation Fees);

and

Reversed as to the following Set-Offs of General American:

First (Excess Rent Credits)

Second (Social Security Taxes)

Third (Convention Examinations and Audits);

and

Reversed as to the award of interest to Intervenors Ladd and Mitchell, and contingently to Stockholders.

The Judgment, order and decree dated August 13, 1958 is

Affirmed insofar as it relates to attorney fees for Stockholders,

and

Reversed insofar as it relates to additional 1948 convention examination expenses.

The judgments, orders and decrees dated June 24, 1958 are

Reversed insofar as they authorize as charges against the Old Company account the sum of $47,169.58 as fees and expenses of the appraisers, the sum of $4,600 as attorney fees for counsel employed by the Superintendent, and the sum of $3,030.33 for services and expenses of the actuary employed by the Superintendent, and in all other respects they are affirmed.

On remand the Circuit Court is directed to hear and determine any supplemental petitions now on file or which hereafter may be filed by Stockholders or their counsel for further allowances of attorney fees.

As to those Exceptions, Set-Offs, judgments and awards in which a remand has been ordered, the Circuit Court is directed to conduct the further proceedings indicated in each such separate division of this opinion, in a manner consistent with and according to the views expressed in this opinion, to the end that the Final Accounting of General American, as amended and modified, may be finally approved, and the net amount due policyholders under (a) the Purchase Agreement, (b) the judgment of the Circuit Court not affected by this consolidated appeal, and (c) the opinion of this Court, may be ascertained and determined. And when that net amount shall have been so ascertained and determined, the final accounts of General American shall be surcharged therewith, and the proper proportionate parts thereof shall then be distributed to the parties in interest, or to their successors, heirs, administrators, executors or assigns, under the supervision and orders of the Circuit Court.

PER CURIAM.

The foregoing opinion by STOCKARD, C., and HOUSER, C., is adopted as the opinion of the court.

All concur except STORCKMAN, J., not sitting.